UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BISTRO OF KANSAS CITY, MO., LLC | : | |
| Plaintiff, | : | |
| vs. | : | Civil Action No. 1:10-CV-02726-JFM |
| KANSAS CITY LIVE BLOCK 125 RETAIL, LLC, | : | |
| Defendant. | : | |
| KANSAS CITY LIVE BLOCK 125 RETAIL, LLC, | : | |
| Counter-Plaintiff, | : | |
| vs. | : | |
| BISTRO OF KANSAS CITY, MO., LLC, ROBERTO RUGGERI, JR., | : | |
| Counter-Defendants. | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION OF ROBERTO RUGGERI
TO DISMISS COUNTERCLAIM FOR LACK OF PERSONAL JURISDICTION**

For his memorandum of points and authorities in support of his Motion of Roberto Ruggeri to Dismiss Counterclaim for Lack of Personal Jurisdiction (the "Motion"), Roberto Ruggeri ("Ruggeri") states the following:

Procedural Background

1.  The plaintiff in the above-captioned civil action, Bistro of Kansas City, Mo., LLC

1

("Bistro KC") formerly operated a white-tablecloth Mediterranean bistro restaurant in Kansas City, MO.  Its landlord was the defendant Kansas City Live Block 125 Retail, LLC ("KC Live"), pursuant to two real property leases for contiguous restaurant space (collectively, the "Leases") located in a mixed-use retail, entertainment, commercial and residential development known as "Kansas City LIVE!"  The development is located in urban Kansas City, MO in an area popularly-known as the Power & Light District.

2.  Bistro KC alleges that, even though it was not in breach of the terms of the Leases, representatives of its landlord KC Live entered its premises, demanded the keys to its premises from its on-site manager, asked its employees to leave the premises and thereafter locked its employees out of the premises.  These actions were taken without benefit of any Court order and are more fully described in the complaint (the "Complaint") filed by Bistro KC against KC Live in the Circuit Court for Jackson County, Missouri (the "State Court").  *See*, Docket No. 1.  Thereafter, KC Live (a Maryland limited liability company) removed the lawsuit to the United States District Court for the Western District of Missouri (the "Missouri District Court") based on diversity jurisdiction (Bistro KC is a Delaware limited liability company).  Subsequently, the Missouri District Court transferred the venue of this civil action to this Court based on a forum selection clause contained in the Leases.

3.  KC Live has now filed an answer to the Complaint in this Court, together with a counterclaim (the "Counterclaim") consisting of two counts – one of which is against the plaintiff Bistro KC for its alleged breach of the Leases and, the other of which is against Ruggeri, who was previously not a party to this civil action.  Ruggeri was a principal of Bistro KC.  The claim against Ruggeri is pursuant to his two limited personal guarantees (collectively,

the "Guarantees") of some of Bistro KC's obligations under the Leases.  Ruggeri is a resident of the State of Florida.  Ruggeri has now filed his Motion, in which he asks this Court to dismiss the Counterclaim against him, for the reasons set forth below.

Factual Background

4.     As mentioned above, Ruggeri is a principal of Bistro KC, a Delaware limited liability company.   He is now, and has been for all relevant times to this lawsuit, a resident of the state of Florida.  He is not, and has never been, a resident of Maryland.  He does not own any real or personal property in Maryland or conduct business in Maryland.  *See*, Verified Statement of Roberto Ruggeri, attached hereto as Exhibit 1.

5.     In the mid-2000's Ruggeri was contacted by an individual affiliated with the Cordish Companies ("Cordish"), a real estate developer based in Baltimore, MD.   This contact was by telephone.   At that time, the individual informed Ruggeri that Cordish was in the process of developing a mixed use entertainment, retail, office and residential district located in the Power & Light District of Kansas City, MO, known as Kansas City LIVE!.  At that time, Ruggeri had never heard of either Cordish or of Kansas City LIVE!  He does not now recall this individual's name.  *See*, Exhibit 1, at ¶ 3.

6.     At the time of the telephone call mentioned in the previous paragraph, Ruggeri had no interest in operating a restaurant in Kansas City, Missouri.  Based on this telephone call and subsequent phone calls, however, Ruggeri agreed, at Cordish's invitation, to meet with officials of Cordish at their office in Baltimore, MD for a short meeting.  This meeting was a "sales pitch" at which Cordish described in general terms its history as a real estate developer and its Kansas City LIVE! development in particular.  *See*, Exhibit 1, at ¶ 4.

7. Based on this meeting, it became the intention to form Bistro KC to pursue further discussions regarding the possibility of operating a restaurant at Kansas City LIVE! by this entity. All of these further discussions occurred between representatives of the to-be-formed Bistro KC and KC Live, a Cordish-related entity, which managed Kansas City LIVE! and which maintained its offices in Kansas City, MO. All such meetings took place in Kansas City, MO. Eventually, Bistro KC agreed to open a restaurant at Kansas City LIVE!. All face-to-face negotiations regarding the formation of the Leases between Bistro KC and KC Live occurred at KC Live's premises in Kansas City. Any negotiations by phone or email regarding the formation of the Leases were between Bistro KC's lawyer in San Diego, CA and representatives of Cordish. Exhibit 1, at ¶ 5.

8. After the terms of the Leases were negotiated, Bistro KC subsequently opened and operated its restaurant at the Kansas City LIVE! premises. Bistro KC's operations and property were and have always been located exclusively in Kansas City, MO. In particular, Bistro KC never conducted any business in the State of Maryland, nor did it have any property there. Exhibit 1, at ¶ 6.

9. During the negotiations in Kansas City, MO between Bistro KC and KC Live regarding the terms of the Leases, KC Live demanded that Bistro KC's principal, Ruggeri, execute two limited personal guarantees (the "Guarantees") of Bistro KC's obligations to KC Live. Copies of the Guarantees are attached as Exhibit 2. The notion of a personal guaranty was never discussed at all at the initial sales pitch to Ruggeri in Baltimore. Their terms were entirely negotiated either during Bistro KC's in-person negotiations in Kansas City, or over the phone by Bistro KC's lawyers in San Diego. Exhibit 1, at ¶ 7. The Guarantees state that they are to be

4

governed by the laws of the State of Missouri.  Moreover, the Guarantees contain a consent-to-jurisdiction clause in which Ruggeri consented to jurisdiction in the State of Missouri.  Exhibit 2.

10.     Cordish's development at Kansas City LIVE! was troubled from its inception. Various portions of the development (including a large multiplex movie theater) were delayed, resulting in significantly less retail traffic at the restaurant than what had been promised by KC Live and its representatives.  When Bistro KC complained to representatives of KC Live regarding the problems at the development, it was invited in the Summer of 2008 to come to Cordish's offices in Baltimore to discuss a possible renegotiation of the Leases' terms.  These negotiations did not concern the Guarantees.  Exhibit 1, at ¶ 8.

11.     Other than the two in-person meetings described in paragraphs 6 and 10 (both of which were initiated by KC Live and/or Cordish), neither Ruggeri nor Bistro KC has had any contacts with the State of Maryland regarding the subject matter of this lawsuit.  Exhibit 1, at ¶ 9.

12.     Notwithstanding this, after the transfer of the venue of the civil action to this Court, KC Live filed its counterclaim against Ruggeri on or about October 4, 2010 alleging claims against him under the Guarantees  Under these facts, Ruggeri is entitled to a dismissal of the Counterclaim.

Legal Discussion

a.      Ruggeri's Contacts with the State of Maryland are Insufficient for this Court to Exercise Personal Jurisdiction over Him.

A federal court sitting in diversity acquires personal jurisdiction over a nonresident defendant only if the jurisdiction is authorized by the long-arm statute of the state in which it is located, and if the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment to the United States Constitution.  *Carefirst of Md., Inc. v. Carefirst*

*Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). The Counterclaim purports to base this Court's personal jurisdiction over Ruggeri on the "provisions of the Maryland Long-Arm Statute, Md. Ann.Code, Cts. & Jud. Proc. Art. §6-103." Counterclaim, at p. 6, ¶ 5. Maryland courts "have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution." *Carefirst of Md., Inc.*, 334 F.3d at 396. Thus, the "statutory inquiry necessarily, merges with the constitutional inquiry, and the two inquiries essentially become one." *Waldron v. Atradius Collections, Inc.*, 2010 WL 2367392 (D.Md. 2010) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

The "constitutional inquiry", in turn, is in essence an inquiry into whether the nonresident defendant "purposefully availed" himself of the privilege of conducting business within the forum state, and whether the claims asserted against him relate to these purposeful activities. *Waldron v. Atradius Collections, Inc.*, 2010 WL 2367392, at p. 2 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d at 712. But even if a court concludes that a nonresident defendant has "purposefully availed" himself of the privilege of conducting business in the forum state, a court still cannot constitutionally exercise personal jurisdiction over him unless doing so also comports with the requirements of "fair play and substantial justice." *Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993).

In determining whether a nonresident defendant in a breach of contract case has "purposefully availed" himself of the legal system of the forum state, a federal court considers primarily where the contract was to be performed and which state's law governs the interpretation of the contract. *See, Waldron v. Atradius Collections, Inc.*, 2010 WL 2367392, at

p. 3 ("The dispute as to whether Atradius breached the employment agreement is substantively connected to the alleged incidents in Illinois, and bears only an incidental relationship to Atradius' contacts with Maryland.") *See also, Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d at 478 (noting that contract was to be performed outside of forum state and was not governed by the law of the forum state). While a court's inquiry will take into account the fact that a nonresident defendant has conducted negotiations concerning a contract in the forum state, such contacts count for little in the analysis if they were undertaken *at the behest of the other party to the contract. Waldron v. Atradius Collections, Inc.*, 2010 WL 2367392, at p. 3 (citing *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2001).

Given these legal principles, it is frankly to be doubted that this Court could even constitutionally exercise jurisdiction over *Bistro KC* but for the forum selection clause in the Leases: the restaurant's business was performed in Kansas City, Missouri, the Leases are governed by the laws of the State of Missouri and all the actions giving rise to the parties respective claims in this civil action occurred in Missouri. Apart from the fact that KC Live's state of incorporation happens to be Maryland and the forum selection clause in the Leases, the only connections at all between Bistro KC and Maryland are the two isolated meetings between Bistro KC's representatives and Cordish in Baltimore, which took place at Cordish's invitation, and the fact that rent payments under the Leases were sent to an address in Baltimore. Neither of these attenuated connections, however, count for much in a court's analysis of whether a defendant in a contract action has availed himself of a forum state's legal system when the work under the contract occurred elsewhere. *See*, *Waldron v. Atradius Collections, Inc.*, 2010 WL

7

2367392, at p. 2 ("The Fourth Circuit has given great weight to the question of who initiated the contact between the parties."); *see also*, *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d at 452 (fact that monthly contract payments were sent by nonresident to forum state "... were incidental to [nonresident's] role under the contract.").

But even these meager contacts arguably connecting Bistro KC and the Leases to the State of Maryland do not apply at all to *Ruggeri and the Guarantees*: Ruggeri is not a Maryland resident; the terms of the Guarantees were never discussed or negotiated in Maryland; the underlying conduct allegedly giving rise to KC Live's claims under the Guarantees occurred in Missouri; the Guarantees themselves are governed by the substantive law of Missouri and the Guarantees contain a clause in which Ruggeri consents to jurisdiction over him *by the courts of Missouri*.

## CONCLUSION

Quite simply, this Court cannot constitutionally exercise personal jurisdiction over Ruggeri to adjudicate a claim based on the Guarantees. Such jurisdiction would require that Ruggeri – in his personal capacity – have availed himself of the benefits of the Maryland courts. But apart from the bare fact that the plaintiff pursuing Ruggeri happens to be organized under the laws of Maryland (even though its business is conducted in Missouri) there is no connection at all between this forum and KC Live's claims under the Guarantees. In the complete absence of any connection at all to Maryland, the Fourteenth Amendment mandates that the Counterclaim against Ruggeri be dismissed.

Date:   December 1, 2010.

        Respectfully submitted,
        COOTER, MANGOLD, DECKELBAUM
        & KARAS, LLP


By:    /s/ Stephen Nichols
        Dale A. Cooter
        Md. Fed. Bar No. 01743
        Stephen Nichols
        Md. Fed. Bar No. 08194
        5301 Wisconsin Avenue, NW
        Suite 500
        Washington, DC 20015

PHONE:    (202) 537-0700
FAX:    (202) 364-3664
EMAIL:    efiling@cootermangold.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of December, 2010 a copy of the MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, together with a copy of the accompanying MEMORANDUM OF POINTS AND AUTHORITIES (with exhibits) and PROPOSED ORDER was transmitted electronically due to the efiling of the document to the following:

    Charles M. Kerr, Esq.
    KERR McDONALD, LLP
    31 Light Street
    Suite 400
    Baltimore, MD 21202


    /s/ Stephen Nichols
    Stephen Nichols