UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BISTRO OF KANSAS CITY, MO., LLC : <br><br> Plaintiff, : <br><br> vs. : <br><br> KANSAS CITY LIVE BLOCK 125 : <br> RETAIL, LLC, : <br><br> Defendant. : | Civil Action No. 1:10-CV-02726-JFM |
| KANSAS CITY LIVE BLOCK 125 : <br> RETAIL, LLC, : <br><br> Counter-Plaintiff, : <br><br> vs. : <br><br> BISTRO OF KANSAS CITY, MO., LLC, : <br> ROBERTO RUGGERI, JR., : <br><br> Counter-Defendants. : | |

## VERIFIED STATEMENT OF ROBERTO RUGGERI
## IN SUPPORT OF MOTION TO DISMISS

Roberto Ruggeri, Jr., for his Verified Statement, states the following:

1. My name is Roberto Ruggeri. I am over eighteen years of age and am competent to make this verified statement.

2. I am the majority member of an entity called Bistro of Kansas City, Mo., LLC ("Bistro KC"), the plaintiff in the above-captioned case. Bistro KC is a Delaware limited liability company. I am now, and have been for all relevant times to this lawsuit, a resident of the state of Florida. I am not, and have never been, a resident of Maryland. I do not own any

real or personal property in Maryland or conduct business in Maryland.

3. In the mid-2000's I was contacted by an individual affiliated with the Cordish Companies ("Cordish"), a real estate developer. I later learned that Cordish was based in Baltimore, MD. This contact was by telephone. At the time he informed me that Cordish was in the process of developing a mixed use entertainment, retail, office and residential district located in urban Kansas City, MO known as Kansas City LIVE!. At that time, I had never heard of either Cordish or of Kansas City LIVE! I do not recall this individual's name.

4. At the time of the telephone call mentioned in the previous paragraph, I had no interest in operating a restaurant in Kansas City, Missouri. Based on this telephone call and subsequent phone calls, however, I agreed to meet with officials at Cordish at their office in Baltimore, MD for a short meeting. This meeting was a "sales pitch" at which Cordish described in general terms its history as a real estate developer and its Kansas City LIVE! development in particular.

5. Based on this meeting, it became the intention to form Bistro KC to pursue further discussions regarding the possibility of operating a restaurant at Kansas City LIVE! by this entity. All of these further discussions occurred between representatives of the to-be-formed Bistro KC and Kansas City Live Block 125 Retail, LLC ("KC Live"), a Cordish-related entity, which managed Kansas City LIVE! and which maintained its offices in Kansas City, MO. All such meetings took place in Kansas City, MO. Eventually, Bistro KC agreed to open a restaurant at Kansas City LIVE!. All face-to-face negotiations regarding the formation of the Lease took place between Bistro KC and KC Live and occurred at KC Live's premises in Kansas City. Any negotiations by phone or email regarding the formation of the Lease were between Bistro KC's lawyer in San Diego, CA and representatives of KC Live.

6. After the terms of the lease were negotiated, Bistro KC subsequently opened and operated its restaurant at the Kansas City LIVE! premises. Bistro KC's operations and property were and have always been located exclusively in Kansas City, MO. In particular, Bistro KC never conducted any business in the State of Maryland, nor did it have any property there.

7. During the negotiations in Kansas City, MO between Bistro KC and KC Live regarding the terms of the Lease, KC Live demanded that I execute a limited personal guaranty of Bistro KC's obligations to KC Live. The notion of a personal guaranty was never discussed at all at the initial sales pitch to me in Baltimore. Its terms were negotiated either during Bistro KC's in-person negotiations in Kansas City, or over the phone by Bistro KC's lawyers in San Diego.

8. Cordish's development at Kansas City LIVE! was troubled from its inception. Various portions of the development (including a large multiplex movie theater) were delayed, resulting in significantly less retail traffic at the restaurant than what had been promised by KC Live and its representatives. When Bistro KC complained to representatives of KC Live regarding the problems at the development, it was invited in Summer of 2008 to come to Cordish's offices in Baltimore to discuss a possible renegotiation of the Lease's terms. These negotiations did not concern the personal guaranty.

9. Other than the two in-person meetings described in paragraphs 8 and 5 (both of which were initiated by KC Live and/or Cordish), neither myself nor Bistro KC has had any contacts with the State of Maryland regarding Cordish, the restaurant in Kansas City, or the

related lease and personal guaranty.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
Roberto Ruggeri