IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BISTRO OF KANSAS CITY, MO., LLC,　*

    Plaintiff,　*

v.　*

                         Civil Action No. 1:10-CV-02726-JFM

KANSAS CITY LIVE BLOCK 125　*
RETAIL, LLC,
　　　　　　　　　　　　　　　　　*
    Defendant.
　　　　　　　　　　　　　　　　　*

\*　　　\*　　　\*　　　\*
　　　　　　　　　　　　　　　　　*

KANSAS CITY LIVE BLOCK 125
RETAIL, LLC,　*

    Counter-Plaintiff,　*

v.　*

BISTRO OF KANSAS CITY, MO., LLC,　*
et al.,
　　　　　　　　　　　　　　　　　*
    Counter-Defendants.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

COUNTER-PLAINTIFF KANSAS CITY LIVE BLOCK 125 RETAIL, LLC'S
MEMORANDUM IN OPPOSITION TO COUNTER-DEFENDANT
ROBERT RUGGERI, JR.'S MOTION TO DISMISS COUNTERCLAIM

Counter-Plaintiff Kansas City Live Block 125 Retail, LLC ("KC Live"), opposes Counter-Defendant Roberto Ruggeri, Jr.'s ("Ruggeri") motion to dismiss KC Live's counterclaim against Ruggeri, Doc. Nos. 24 and 25. Ruggeri's motion, filed pursuant to Federal Rule of Civil Procedure 12(b)(2), asserts that the counterclaim against him should be dismissed because, according to Ruggeri, "this court cannot

constitutionally exercise personal jurisdiction over" him.[1] At this stage in the proceedings, KC Live need only make a prima facie showing of personal jurisdiction to defeat Ruggeri's motion to dismiss. See, e.g., CareFirst of Maryland, Inc. v. CareFirst Pregnancy Ctrs., Inc., 334 F.3d. 390, 396 (4th Cir. 2003); Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). To determine if KC Live has met that burden, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676.[2] Set forth below are the facts that, viewed in the light most favorable to KC Live and when construed as the legal principles applicable to such motions require, compel the conclusion that KC Live has made the requisite prima facie showing. In consequence, Ruggeri's motion to dismiss for lack of personal jurisdiction should be denied.

## I. Facts relevant to the Ruggeri motion to dismiss.

The KC Live counterclaim, as it relates to Counter-Defendant Ruggeri, arises out of Ruggeri's guaranty of the March 27, 2007, lease between KC Live and Bistro of Kansas City Live, MO., LLC, ("Bistro"), a copy of which is found at Bates Nos. 000068-70 in Exhibit A to KC Live's counterclaim (the "Restaurant Lease"), and his guaranty of the October 1, 2007, lease between KC Live and Bistro, a copy of

---

[1] See Ruggeri memorandum of points and authorities in support of motion to dismiss counterclaim for lack of personal jurisdiction, Doc. No. 25 at p. 8.

[2] Per CareFirst, where, as here, a defendant challenges this Court's personal jurisdiction over him by way of a motion to dismiss, the question of personal jurisdiction is for the trial judge to decide. The District Court need not, however, conduct an evidentiary hearing, and, in this District, such evidentiary hearings are rarely held. This Court can decide the motion based upon the papers and evidentiary support for them filed by the parties. As explained above, the plaintiff opposing the motion is only required to make a prima facie showing of personal jurisdiction to defeat the motion. See CareFirst, supra, 334 F. 3d at 396.

which is found at Bates Nos. 000489-91 in Exhibit B to the counterclaim (the "Gelateria Lease"). KC Live, the landlord in both of these leases, is a Maryland limited liability company, and its principal place of business is in Baltimore City.[3] That locational fact was stated in each of the leases at §201(r). Each lease required Bistro to pay rent and make reports to KC Live at its Baltimore office. While each lease, at §2702, stated that it was governed by, and to be construed in accordance with, the laws of the State of Missouri, each lease also provided, in §2702, that, in instances where diversity of citizenship existed, the United States District Court for the District of Maryland was the exclusive judicial forum in which a lawsuit arising out of these leases could be brought.[4] In each of the guarantees that Counter-Defendant Ruggeri signed, he "expressly acknowledge[d] that he . . .ha[d] reviewed the lease and understands the same." He likewise acknowledged, in each of the guarantees that he signed, that his liability to KC Live "is coextensive with that of [Bistro] and also joint and several . . . ." He further agreed, in each of the guarantees, that "[a]ll notices and other communications" to KC Live relating to the guarantees were to be sent to KC Live at its Baltimore City, Maryland, address.[5]

---

[3] See Declaration of Robert C. Fowler attached hereto as Exhibit 1 at ¶1.

[4] See Order of the United States District Court for the Western District of Missouri, Western Division, filed in this case on September 21, 2010, Doc. No. 11, in which that Court so ruled.

[5] Although each of the guarantees provided that they were governed by, and to be construed in accordance with, the law of the State of Missouri and contained a consent by Ruggeri to the personal jurisdiction of Missouri courts, neither guaranty made Missouri courts the exclusive forum for litigation arising out of the guarantees.

KC Live is an entity created by the Baltimore City enterprise known as The Cordish Company. The Cordish Company, among other things, develops real estate projects throughout the United States, and one of those projects is the The Kansas City Power & Light District in Kansas City, Missouri, for which KC Live is a landlord entity.[6] Michael Morris was Director of Leasing and Development for The Cordish Company in the period from 2004 through January of 2008. He became acquainted with Counter-Defendant Ruggeri in the 2004-05 time period because Ruggeri expressed an interest in opening one or more of his Italian-themed restaurants in existing or to-be-developed Cordish Company projects. Morris, throughout his time with The Cordish Companies, lived in the Baltimore metropolitan area. His primary office was at The Cordish Company Power Plant offices in Baltimore City, and e-mail communications and the like were addressed to him at the Baltimore City offices of The Cordish Company and its real-estate entities like KC Live. Counter-Defendant Ruggeri had e-mail and telephone contact and negotiations with Morris in Baltimore City relating to a number of potential restaurant locations in Maryland, Florida, Virginia, as well as Kansas City. He also came to Baltimore to meet with Morris and other members of The Cordish Company development team to learn about the various projects The Cordish Company was developing with an eye to opening, as tenant, a restaurant in one or more of those projects.[7]

By late 2005, Ruggeri was in contact with Morris in Baltimore keeping him apprised of his "Bice Group" restaurant openings at various locations in the United States, and, in early 2006, Ruggeri had proceeded far enough with his negotiations with Morris for a restaurant location in the KC Live development

---

[6] See Fowler Declaration, Ex. 1 hereto, at ¶1.

[7] See Declaration of Michael Morris, attached hereto as Exhibit 2, at ¶¶1-2.

in Kansas City that Robert Fowler, an in-house attorney for The Cordish Company, began drafting a lease for a restaurant premises at KC Live to be operated by Ruggeri's Bice Group.[8] Negotiations, lease drafting, and preparation of drawings by KC Live's personnel in Baltimore with Ruggeri continued through April of 2006. That proposed restaurant deal was not consummated.[9]

By August of 2006, Ruggeri and Morris refocused on a Bice restaurant in the KC Live project, and initial negotiations began over the terms of a guaranty that KC Live would accept for such a lease. Ruggeri's negotiations with Morris in Baltimore regarding a potential lease and the terms of a proposed guaranty continued through 2006, and, by October 26, 2006, Morris and Ruggeri were sufficiently committed to a "Bice Bistro" restaurant in the Kansas City Live Development that Morris sent a letter of intent, on Kansas City Live letterhead with that entity's Baltimore City address, to Ruggeri at Ruggeri's New York City address. Ruggeri replied by advising Morris that the letter of intent was consistent with his understanding of potential terms, including potential terms of a lease guaranty. By November of 2006, negotiations had proceeded to the point where Fowler sent Ruggeri, on Baltimore City letterhead, a draft lease for a Bice Bistro restaurant at The Power & Light District project in Kansas City. Negotiations, at that point, were handled by Ruggeri, Trevor Sacco, an agent for Ruggeri, and Tim Pickwell, a California lawyer for Ruggeri and the Bice Group. On The Cordish Company side, negotiations were conducted by Morris and Fowler, based in Baltimore.[10]

---

[8] See Fowler Declaration, Ex. 1 hereto, at ¶2; Morris Declaration, Ex. 2 hereto, at ¶3.

[9] See Fowler Declaration, Ex. 1 hereto, at ¶2; Morris Declaration, Ex. 2 hereto, at ¶3.

[10] See Morris Declaration, Ex. 2 hereto, at ¶4.

At Morris' request to Ruggeri, Ruggeri had his accountant, in December of 2006, send financial information on the Bice restaurant group to Morris in Baltimore.[11] Drafting of the proposed restaurant lease and guaranty was a protracted process that, on The Cordish Company side, was handled by Cordish attorney Fowler and by Morris in Baltimore. By January of 2007, negotiations between Ruggeri and Morris were also underway for a second potential lease of space in the Kansas City project for what Ruggeri described as a "gelateria."[12]

Fowler sent four "execution copies" of the KC Live restaurant lease to Ruggeri on February 2, 2007. Fowler's cover letter to Ruggeri showed the Kansas City Live landlord entity having its offices with The Cordish Company in Baltimore City. The enclosed lease had Ruggeri himself as one of the guarantors, and the execution process envisioned that Ruggeri would execute the lease on behalf of the Bice tenant entity, a guaranty of the lease by what Ruggeri had told Morris and Fowler was the Bice holding company entity, and a second guaranty by Ruggeri himself. As Fowler's letter to Ruggeri stated, the lease and guarantees did not bind the parties until Ruggeri signed the documents, returned them to Baltimore, and the documents were then signed by KC Live's "authorized person," Blake Cordish, in Baltimore. Negotiations over the terms of the guarantees, including Ruggeri's personal guaranty, continued between Ruggeri's California attorney, Tim Pickwell, and KC Live's Baltimore lawyer, Robert Fowler. On March 27, 2007, Ruggeri signed the Bistro restaurant lease, the Bice Holding, Inc., guaranty, and his own personal guaranty, and he returned the documents he had executed to Fowler and Morris in Baltimore, where the lease was then signed in Baltimore

---

[11] See id. at ¶4 n.1 and accompanying text.

[12] See Fowler Declaration, Ex. 1 hereto, at ¶4.

by KC Live's "authorized person" Blake Cordish, thereby consummating the transaction. The fully-executed lease with its guarantees was subsequently sent by Fowler from Baltimore on April 4, 2007, to Ruggeri's lawyer, Tim Pickwell.[13]

At that point, negotiations over the proposed "gelateria" lease continued with Ruggeri, his agent Trevor Sacco, and his lawyer, Tim Pickwell, and Messrs. Morris and Fowler for KC Live based in Baltimore. Fowler sent, from Baltimore, a proposed lease for the gelateria to Pickwell on April 13, 2007. Negotiations over the gelateria lease continued through August, 2007, between Fowler and Morris in Baltimore and Ruggeri, Sacco, and Pickwell. Then, on August 27, 2007, Fowler sent, from Baltimore, the execution copies of the agreed-upon gelateria lease and guarantees to Ruggeri at his New York City office address. The same execution sequence was spelled out. Ruggeri was to execute the leases and the guarantees and return them to Fowler and Morris in Baltimore where they would then be executed, in Baltimore, by KC Live through its "authorized person," Blake Cordish. Only then would the transaction be consummated and binding upon the parties. On September 18, 2007, Pickwell returned the gelateria lease and guarantees, executed by Ruggeri, to Fowler in Baltimore, instructing Fowler to send the fully-executed lease to Ruggeri at his Florida office. On October 1, 2007, Blake Cordish, as KC Live's "authorized person," executed the gelateria lease in Baltimore, consummating the transaction and binding the parties. That same day, Fowler sent the fully-executed lease to Ruggeri under cover of an October 1, 2007, letter on KC Live letterhead showing KC Live's address at The Cordish Company in Baltimore.[14] Thereafter, Ruggeri remained in

---

[13] See id.

[14] See id. at ¶5.

7

contact with Morris in Baltimore, expressing interest in potential Bice restaurant locations in other Cordish Company projects.[15]

Morris left The Cordish Company in January, 2008, and his responsibilities for KC Live were assumed by Nick Benjamin who, at that time, was, like Morris, based in Baltimore at the Baltimore City office of The Cordish Company.[16] Ruggeri executed an amendment dated July 24, 2008, to the restaurant lease, which he had negotiated with KC Live's Baltimore-based personnel. Ruggeri did so on behalf of the tenant entity, guarantor Bice Holding, Inc., and himself. Ruggeri, after he signed the amendment, sent it to Baltimore, where it was executed by Blake Cordish, as KC Live's "authorized person." Only then was the amendment consummated and binding on the parties. Although the amendment is dated July 24, 2008, it was not executed by Blake Cordish and returned to Ruggeri until February 24, 2009.[17]

By November of 2008, Bistro was in default on its leases for having failed to pay the rent it was required to pay. Benjamin, in Baltimore, spoke with Bistro representatives, and, in December, 2008, Ruggeri asked for a meeting at KC Live's Baltimore office with Benjamin and Blake Cordish to discuss the default and to attempt to negotiate a resolution of the default dispute. The meeting in Baltimore took place on January 27, 2009, between Ruggeri and Trevor Sacco and Blake Cordish and Nick Benjamin.[18] After that Baltimore meeting, discussion continued regarding terms that would be satisfactory to KC Live to resolve the rent-default issue, and those negotiations and discussions involved Benjamin, Fowler, and Blake

---

[15] See Morris Declaration, Ex. 2 hereto, at ¶¶ 6 and 7.

[16] See Declaration of Nick Benjamin attached hereto as Exhibit 3 at ¶¶1-2.

[17] See Fowler Declaration, Ex. 1 hereto, at ¶6.

[18] See Benjamin Declaration, Ex. 3 hereto, at ¶5.

Cordish, among others, in Baltimore for KC Live, and Ruggeri and others for the Bistro entity and for himself as guarantor. In March, 2009, Ruggeri advised Benjamin, Fowler, and Blake Cordish, by an e-mail to them in Baltimore, that his effort to obtain a loan in Italy to fund his restaurant operations had been unsuccessful. Benjamin told Ruggeri that KC Live would initiate legal proceedings against Bistro for its breach of the leases. Settlement discussions continued through June 5, 2009, when Bistro tendered settlement checks to KC Live in Baltimore and an amendment to the two leases that was signed by Ruggeri on behalf of Bistro, Bice Holding, Inc., as guarantor, and himself, as guarantor.[19] Bistro failed to abide by the settlement agreement, and, on February 4, 2010, it vacated and abandoned the leased premises at KC Live in Kansas City. Thereafter, settlement discussions between KC Live, primarily through its Baltimore counsel Robert Fowler, and Bistro and Ruggeri, acting through their legal counsel, continued until Bistro filed the action in Missouri state court that initiated the case that is presently before this Court.[20]

## II. Argument

A. <u>Applicable legal principles</u>.

Pursuant to Federal Rule of Procedure 4(k)(1)(A), this Court may exercise personal jurisdiction over a defendant in the manner provided by the state law of Maryland. <u>See</u> <u>CareFirst of Maryland, Inc.</u>, <u>supra</u>, 334 F. 3d at 396. Two conditions must be satisfied for this Court to exercise personal jurisdiction over a non-resident defendant: (1) The exercise of jurisdiction must be authorized under Maryland's long-arm statute; and (2) The exercise of jurisdiction must comport with the due process requirements of the 14th

---

[19] <u>See id</u>.

[20] <u>See</u> Fowler Declaration, Ex. 1 hereto, at ¶¶7-8.

Amendment. Id. Because Maryland's courts consistently have held that Maryland's long-arm statute permits the assertion of personal jurisdiction to the full extent allowed by the Due Process Clause,[21] the two inquiries merge into one. CareFirst of Maryland, Inc., supra, 334 F. 3d at 396-97. In its capacity as counter-plaintiff, however, KC Live is obliged to identify a specific statutory provision authorizing personal jurisdiction. See Message Systems, Inc. v. Integrated Broadband Services, LLC, 2010 WL 2891706 *3 (D. Md. 2010). In its counterclaim at ¶5, KC Live asserted that this Court has personal jurisdiction over Counter-Defendant Ruggeri pursuant to §6-103 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code. Specifically, KC Live maintains that this Court has personal jurisdiction over Counter-Defendant Ruggeri under §6-103(b)(1) which states that a Maryland court may exercise personal jurisdiction over a person who, directly or by an agent, transacts any business in Maryland.

Due process requires that a defendant have "minimum contacts" with the forum state such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). There are two different approaches to determining the extent of a state's jurisdictional power: specific and general jurisdiction. See ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F. 3d 707, 711 (4th Cir. 2002). KC Live does not assert that Counter-Defendant Ruggeri is subject to general personal jurisdiction in Maryland, so the Court need only examine KC Live's argument that Counter-Defendant Ruggeri is subject to specific personal jurisdiction. See Message Systems, Inc., supra.

---

[21] See, e.g., Androutsos v. Fairfax Hosp. 323 Md. 634, 636-37, 594 A.2d 574, 575-76 (1991).

10

The transacting business provision of §6-103(b)(1) does not require that a defendant be present in Maryland. The defendant's activities need only culminate in purposeful business activity within Maryland. Id. at *4. To determine whether the exercise of specific jurisdiction comports with due process, the Court considers: (1) the extent to which the defendant purposefully availed himself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. See ALS Scan, supra, 293 F. 3d at 712. Although an out-of-state party's making of a business contract in the forum state will not automatically establish the Court's personal jurisdiction over that defendant party, the surrounding facts, negotiations, contract terms, location of payment, and the parties' course of dealing, may do so. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478-79 (1985). The ultimate question is whether the contract at issue had a "substantial connection" to the forum state. Id. at 479. Even a single contact may be sufficient to create jurisdiction so long as the "principle of fair play and substantial justice is not thereby offended." CareFirst of Maryland, Inc., supra, 334 F. 3d at 397. This Court, in making a transacting-business personal jurisdiction determination, evaluates the "quality and nature" of the defendant's contacts with Maryland rather than simply adding up their quantity. Message Systems, Inc., supra, at *4.

When determining whether a defendant has purposefully availed himself of the privilege of doing business in Maryland, this Court considers a variety of non-exclusive factors including: (1) whether the defendant reached into Maryland to solicit or initiate business; (2) whether the defendant engaged in significant business activities in the forum state; (3) whether the defendant made in-person contact with a resident of Maryland regarding the business relationship; (4) the nature, quality and extent of the parties' communication about the business transacted; and (5) whether the performance of some portion of the

11

contract was to occur within the forum. Id., citing Consulting Engineers Corp. v. Geometric Ltd., 561 F. 3d 273, 278 (4th Cir. 2009). This Court, in Giannaris v. Cheng, 219 F. Supp. 2d 687, 692 (D. Md. 2002), stated that the "strongest factor" in determining whether business negotiations give rise to specific jurisdiction is "whether the defendant initiated the business relationship in some way."

Where, as here, the defendant's activities in Maryland form the basis for the lawsuit, this Court must determine whether the exercise of personal jurisdiction would be constitutionally reasonable. The Fourth Circuit holds that the "ultimate question" for the trial court is whether litigation in the forum state is "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F. 3d 285, 296 (4th Cir. 2009). In making its determination, this Court, according to the Fourth Circuit, should consider such additional factors as: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interest of the states in furthering substantive social policies." Consulting Engineers, supra, 561 F. 3d at 279. In cases involving an out-of-state guarantor, such as this one, the focus is not just on the execution of the guaranty. This Court has held, instead, that prima facie personal jurisdiction may be found over the individual, out-of-state, guarantor if that guarantor's execution of the guaranty, viewed with the provisions of, and the facts surrounding execution of, the underlying contract for which the guaranty was given, supplies the requisite

contacts with the forum state. See Choice Hotels International, Inc. v. Madison Three, Inc., 23 F. Supp. 2d 617, 621-22 (D. Md. 1998).[22]

  B. When the applicable legal principles are applied to the facts that have been properly proffered to the Court, KC Live has made the requisite prima facie showing of the Court's personal jurisdiction over Counter-Defendant Ruggeri, and, therefore, the Ruggeri motion to dismiss should be denied.

In his memorandum of points and authorities in support of his motion to dismiss, Counter-Defendant Ruggeri references 12 factual assertions that he predicates on the "verified statement" that he attached as an exhibit to that memorandum. The "verified statement," according to Ruggeri on the last, unnumbered page of the statement above what appears to be Ruggeri's signature, is "true and correct to the best of my knowledge, information and belief." Such a statement is, in fact, simply a proffer of hearsay and opinion which has no evidentiary value, and, simultaneously with the filing of this opposition memorandum, Counter-Plaintiff KC Live has moved to strike the verified statement and the asserted facts based upon the statement that are marshaled by Ruggeri in support of his motion. Assuming that this Court grants KC Live's

---

[22] This Court's decision in Choice Hotels, finding that it had personal jurisdiction over an out-of-state guarantor, is not unique. Both federal and state courts have found personal jurisdiction over out-of-state guarantors utilizing a constitutional, minimum-contacts analysis that takes into account all of the factual circumstances of the underlying contract as well as of the guaranty itself. See, e.g., Beaver Builders v. Schnip Building, 622 F. Supp. 1051 (D. Mass. 1985); Halliburton Company v. Texana Oil Company, Inc., 471 F. Supp. 1017 (D. Colo. 1979); Meachum v. Worthen Bank & Trust Company, N.A., 13 Ark App. 229, 231-34, 682 S.W. 2d 763, 764-66, review denied, 285 Ark 198, 685 S.W. 2d 173, cert. denied, 474 U.S. 844 (1985); Drennen v. First Home Savings Bank, 204 Ga. App. 714, 715-17, 420 S.E. 2d 376, 377-78 (1992); American Bank and Trust Co. v. Sunbelt Environmental System, Inc., 451 So. 2d 1111, 1116-15 (Ct. App. La. 1st Cir. 1984); Ware v. Heiber, 267 Ore. 124, 132-36, 515 P. 2d 721, 725-26 (1973).

13

motion to strike, there is no factual proffer before the Court made by Ruggeri upon which a challenge by Ruggeri to the assertion of personal jurisdiction made by KC Live in its counterclaim could be grounded.

KC Live, on the other hand, has attached to this opposition three declarations under oath based upon personal knowledge of the Baltimore agents of KC Live, Messrs. Morris, Benjamin, and Fowler, who were responsible for negotiating the two leases and accompanying guarantees upon which the counterclaim is based, who then dealt with Ruggeri and his attorneys and agents when amendments to the leases were negotiated and consummated and the guarantees affirmed and restated by Ruggeri, and who also handled, for KC Live, the breaches of the leases by the Bistro tenant entity that resulted in the present litigation that is before this Court. The facts set forth, with an appropriate evidentiary foundation, in those declarations establish that the facts proffered by Ruggeri, even if considered by this Court, are disputed. Consequently, because this Court is required to consider these disputed facts in the light most favorable to KC Live and because KC Live's properly proffered facts give rise to the requisite inferences for the proper exercise of personal jurisdiction by this Court over Counter-Defendant Ruggeri, Ruggeri's motion to dismiss should be denied, as explained more fully below.

Using five of the non-exclusive factors for determining whether a defendant has purposefully availed himself of the privilege of doing business in Maryland laid out by this Court in <u>Message Systems</u>, the facts presented by KC Live include the following:

(1) <u>Defendant Ruggeri reached into Maryland to solicit or initiate business</u>: Mr. Morris, in his Declaration at ¶2, Ex. 2 hereto, says that he, while based in Baltimore, became acquainted with Mr. Ruggeri in the 2004-05 time period. Ruggeri told him that he was interested in the possibility of placing one or more of his Bice restaurants in existing or to-be-developed projects of The Cordish Company. According to

14

Morris, Ruggeri asked to meet with Morris and other Cordish Company development personnel at The Cordish Company's Baltimore office, and he also asked to see the Baltimore Power Plant and Power Plant Live! facilities that The Cordish Company had developed in Baltimore. Ruggeri then did come to Baltimore to visit The Cordish Company and to tour the Power Plant and Power Plant Live! facilities in Baltimore. Thereafter, Ruggeri and Morris remained in contact with each other regarding on-going Cordish Company projects into 2006 and 2007, and those discussions between Morris, in Baltimore, and Ruggeri resulted in the March 27, 2007, consummation of the restaurant lease transaction when Blake Cordish signed that lease in Baltimore and the October 1, 2007, consummation of the gelateria lease transaction when Blake Cordish signed that lease in Baltimore.

(2) <u>Defendant Ruggeri engaged in significant business activities in Maryland</u>: As stated in the Morris and Fowler declarations, Ruggeri signed the restaurant and gelateria leases for the Bistro tenant entity and the guarantees for himself and for Bice Holding, Inc., and he caused those executed documents to be delivered to KC Live in Baltimore knowing that the leases and guarantees had no force or effect until, and unless, KC Live, through its authorized person, Blake Cordish, signed the leases for KC Live in Baltimore. Per the Fowler and Benjamin declarations, Ruggeri also delivered to Fowler, in Baltimore, the July 24, 2008, amendment to the restaurant lease on behalf of the Bistro tenant entity which also contained his consent and ratification of that lease amendment on behalf of the Bice Holding, Inc., guarantor and himself, as guarantor, knowing that this amendment had no force or effect until, and unless, it was executed in Baltimore by KC Live through Blake Cordish. Similarly, as stated in the Fowler and Benjamin declarations, Counter-Defendant Ruggeri signed, on behalf of the Bistro entity, the amendment to both leases per the June, 2009, settlement agreement, he signed a consent and ratification to that amendment for himself and for Bice

15

Holding, Inc., as guarantors, and he caused this document to be delivered to KC Live in Baltimore in June of 2009 knowing that the amendment was not consummated until it was accepted by KC Live in Baltimore. In sum, the leases and the amendments to these leases that are the subject of the Ruggeri guarantees upon which KC Live's counterclaim as against Ruggeri is based were made in Baltimore, Maryland, and they constitute significant business activities in Maryland particularly because the drafting and negotiation process for these agreements was done by Ruggeri and his agents with KC Live's agents, Messrs. Morrris, Benjamin, Fowler and Blake Cordish, in Baltimore.

(3) <u>Counter-Defendant Ruggeri made in-person contact with Maryland residents regarding the business relationship</u>: Per the Morris declaration, Ruggeri asked to visit The Cordish Company and its Power Plant and Power Plant Live! projects in Baltimore, and he did, in fact, come to Baltimore to meet the personnel with whom he would be dealing if he elected to pursue placement of one or more Bice restaurants or like facilities in Cordish Company projects around the United States, like the KC Live project he ultimately chose for two lease tenancies for the Bistro entity. As the Benjamin declaration states, when the Bistro entity defaulted on its rental obligations in late 2008 and early 2009, Ruggeri requested a meeting in Baltimore at KC Live's office in The Cordish Company with Messrs. Benjamin and Blake Cordish to attempt to negotiate a resolution of Bistro's breaches of these two leases. These were in-person contacts with Maryland residents regarding the business relationship between the parties, including Mr. Ruggeri in his role as guarantor.

(4) <u>The nature, quality, and extent of the parties' communications about the business transacted demonstrate that Counter-Defendant Ruggeri knew he was negotiating the leases, and issues and disputes arising out of the leases, in Maryland</u>: The Morris, Fowler, and Benjamin declarations show that Counter-

Defendant Ruggeri and his agents were in regular communication with these Baltimore-based agents of KC Live from 2004 through the time this year that Bistro filed the Missouri lawsuit that is the matter presently before this Court. Furthermore, the leases themselves make mandatory such communication to KC Live, as landlord, in Baltimore. Ruggeri expressly acknowledged, in his guarantees of each of these leases, that he reviewed and understood them. The leases clearly state, at §201(r), that KC Live is a Maryland limited liability company, and both leases require the Bistro tenant to send notices, pay rent, and supply reports to KC Live at its Baltimore office.

(5) <u>The performance of some portions of these two leases, which Ruggeri guaranteed, occurred in Maryland</u>: As noted in the preceding section, payment of rent, and written communication of notices and reports and the like by Bistro, as the tenant in these two leases, was required to occur by delivery to KC Live at its Baltimore, Maryland, office. Both of the leases also expressly provided, in §2702, that, in instances where diversity of citizenship exists, the United States District Court for the District of Maryland is the exclusive judicial forum in which an action arising out of these leases can be brought by either KC Live or Bistro.[23] Ruggeri acknowledged, in the guarantees, that his personal liability to KC Live was "coextensive with that of [Bistro] and also joint and several" with Bistro, meaning he necessarily knew that, if Bistro initiated litigation under the leases or if KC did, and if diversity of citizenship with the requisite amount in damages existed, such litigation between KC Live and Bistro, with which Ruggeri was jointly and severally liable and in privity of contract, would occur in the U.S. District Court for the District of Maryland and nowhere else.

---

[23] <u>See</u> Order of the United States District Court for the Western District of Missouri, Doc. 11, <u>supra</u>.

Turning to the constitutional reasonableness standard that the Fourth Circuit has defined as the "ultimate question" for a District Court that is charged with making a personal-jurisdiction decision on a motion to dismiss by a defendant, Ruggeri has advanced no argument and no properly cognizable facts to show that the District of Maryland is a "gravely difficult and inconvenient place" for Ruggeri to litigate this matter or that litigating the counterclaim against him in this District puts Ruggeri "at a severe disadvantage in comparison to" KC Live. Counter-Defendant Ruggeri is represented by the same lawyers in this case as is Plaintiff and Counter-Defendant Bistro. Counter-Defendant Bistro did not, by either a Federal Rule of Civil Procedure 12(b)(2) motion filed before it filed its answer or in its answer, raise personal jurisdiction as a defense, and, in Ruggeri's motion to dismiss, he appears to concede, albeit begrudgingly, that this Court has personal jurisdiction over Bistro.[24] Consequently, this case will proceed before this Court in any event as to Bistro as to all issues and all defenses that would be available to Ruggeri, given his co-extensive and joint and several liability with Bistro under these leases, as set forth in the two guarantees that Ruggeri signed. The trial preparation, witness presentation, and the like of Bistro will be done by Bistro's attorneys in this case who are also Ruggeri's attorneys, without any further burden being visited on Ruggeri by virtue of this case being tried in the District of Maryland. Counter-Defendant Ruggeri, notwithstanding his Florida residency, is an international restauranteur for whom travel, be it to Baltimore or Kansas City, is an every day part of his business. KC Live is a Maryland limited liability company with its principal place of business in Baltimore, and its records and several of its key witnesses in this case are here in Baltimore. KC Live endeavors to conduct a national business from its Baltimore base, so it is in Maryland's interest to afford

---

[24] See Ruggeri memorandum of points and authorities in support of motion to dismiss, Doc. No. 25, at pp. 7-8.

it a forum for adjudicating disputes that arise out of its Baltimore-based business. KC Live clearly has an interest in obtaining convenient and effective relief as to both Bistro and Ruggeri in one trial, and it is in the shared interest of all other potential judicial forums that this litigation be resolved in a single trial in a single court, that court being the United States District Court for the District of Maryland.

### III. Conclusion.

For the reasons stated, Counter-Plaintiff Ruggeri's motion to dismiss this case for lack of personal jurisdiction should be denied because Counter-Plaintiff KC Live has made a prima facie showing that this Court may properly exercise personal jurisdiction over Ruggeri.

Respectfully submitted,

_____
Charles M. Kerr
Federal Bar No. 00395
Kerr McDonald, LLP
31 Light Street, Suite 400
Baltimore, Maryland 21202
(410) 539-2900
(410) 539-2956 (FAX)
CKerr@KerrMcDonald.com

Attorney for Defendant and Counter-Plaintiff Kansas City Live Block 125 Retail, LLC

### REQUEST FOR HEARING

Counter-Plaintiff Kansas City Live Block 125 Retail, LLC, requests, pursuant to Local Rule 105.6., a hearing on Counter-Defendant Ruggeri's motion to dismiss Counter-Plaintiff's counterclaim against him and Counter-Plaintiff's opposition thereto.

_____
Charles M. Kerr
Federal Bar No. 00395
Kerr McDonald, LLP
31 Light Street, Suite 400
Baltimore, Maryland 21202
(410) 539-2900
(410) 539-2956 (FAX)
CKerr@KerrMcDonald.com

Attorney for Defendant and Counter-Plaintiff
Kansas City Live Block 125 Retail, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of December, 2010, a copy of Counter-Plaintiff Kansas City Live Block 125 Retail, LLC's memorandum in opposition to Counter-Defendant Robert Ruggeri, Jr.'s motion to dismiss counterclaim, request for hearing, accompanying exhibits, and proposed order, which were electronically filed in this case on December 23, 2010, was mailed, first class, postage prepaid, to Dale A. Cooter, Esq., and Stephen W. Nichols, Esq., Cooter, Mangold, Deckelbaum and Karas, LLP, 5301 Wisconsin Avenue, N.W., Suite 500, Washington, D.C. 20015, attorneys for Plaintiff and Counter-Defendants Bistro of Kansas City, MO., LLC, and Robert Ruggeri, Jr.

_____
Charles M. Kerr

K19226