Bistro of Kansas City, Mo., LLC,

    *Plaintiff*,

    v.

Kansas City Live Block 125 Retail, LLC,

    *Defendant.*

Kansas City Live Block 125 Retail, LLC,

    *Counter-Plaintiff*,

    v.

Bistro of Kansas City, Mo., LLC
    &
Roberto Ruggeri, Jr.,

    *Counter-Defendants.*

Civil Action No.: ELH-10-2726

## MEMORANDUM OPINION

This case involves competing allegations of breach of leases for two adjacent premises, one housing a restaurant and the other a gelateria, located in Kansas City, Missouri. The properties were leased by Bistro of Kansas City, Mo., LLC ("Bistro" or "Bistro KC"), a Delaware limited liability company, from Kansas City Live Block 125 Retail, LLC ("KC Live"), a Maryland limited liability company. Roberto Ruggeri, Jr., a principal of Bistro, executed personal guaranties of both leases (the "Restaurant Lease" and the "Gelateria Lease"). Subject matter jurisdiction is founded on diversity of citizenship. *See* 28 U.S.C. § 1332(a).[1]

---

[1] Bistro originally filed its complaint against KC Live in state court in Missouri, but KC Live removed the case to the United States District Court for the Western District of Missouri, based on diversity of citizenship. *See* Notice of Removal (ECF 1). KC Live then successfully

KC Live filed an Answer and Counterclaim (ECF 16) against Bistro, adding Ruggeri as a counter-defendant. KC Live asserts that, pursuant to personal guaranties of the leases between Bistro and KC Live, Ruggeri is personally liable to KC Live for Bistro's alleged breaches of the leases. *See* Counterclaim ¶¶ 7, 12 & 16.

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, Mr. Ruggeri has moved to dismiss KC Live's counterclaim for lack of personal jurisdiction ("Motion") (ECF 24). The Motion has been fully briefed, and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the Court shall deny the Motion.

### Rule 12(b)(2) Standard

"When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff [or counter-plaintiff] ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Discovery and an evidentiary hearing are not required to resolve the motion, however. *See generally* 5B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1351, at 274-313 (3d ed. 2004, 2010 Supp.). Rather, the district court may address the question of personal jurisdiction as a preliminary matter, ruling solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009). In that circumstance, the plaintiff need only make "a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Id.*

moved to transfer the case to this Court, on the basis of a forum selection clause in the leases. *See* Order (ECF 11).

"In deciding whether the plaintiff [or counter-plaintiff] has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). However, "'[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *New Wellington Fin. Corp. v. Flagship Resort Development Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (citation omitted).[2]

## Factual Background

Ruggeri is a resident of Miami Beach, Florida. *See* Answer & Counterclaim at 6. He is the owner of the "Bice Group," which operates several Italian-themed restaurants in various locations in the United States and other countries. *See* Decl. of Michael Morris ("Morris Decl.") ¶ 2 (ECF 29-2), Ex. 2 to Mem. in Opp. to Motion to Dismiss ("Opposition") (ECF 29). KC Live, the landlord here, is an entity created by the Cordish Company, a real estate development company based in Baltimore, Maryland, which is involved in real estate projects throughout the United States. *See* Opposition at 4; *see also* Verified Statement of Roberto Ruggeri ("1st Ruggeri Statement") ¶ 3 (Ex. 1 to Motion, ECF 25-1).[3]

---

[2] Alternatively, the court may, in its discretion, permit limited discovery as to the jurisdictional issue. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993). Then, "the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs*, 886 F.2d at 676. In this case, no party has requested discovery as to jurisdiction, or an evidentiary hearing. Nor does there appear to be a need for either one.

[3] As noted, KC Live is a Maryland limited liability company. Answer & Counterclaim ¶ 1. According to KC Live's Missouri "Application for Registration of a Foreign Limited Liability Company" (ECF 1-3), which was submitted as an exhibit to KC Live's Notice of

In the mid-2000's, Ruggeri received an unsolicited telephone call from a representative of the Cordish Company, whose identity Ruggeri does not recall. *See* 1st Ruggeri Statement ¶ 3. Ruggeri's motion papers describe the telephone contact as a "cold call." Response to Mem. in Opp. to Motion ("Reply") ¶ 1 (ECF 32). The caller sought to interest Ruggeri in opening a restaurant in a mixed-use entertainment, retail, office, and residential development called "Kansas City LIVE!," which the Cordish Company planned to develop in an urban area of Kansas City, Missouri, known as the "Kansas City Power & Light District." *See id.* ¶ 3; *see also* Mem. in Support of Motion ("Mem.") ¶ 1. Ruggeri claims that, at the time of the telephone call, he "had never heard of either [the] Cordish [Company] or of Kansas City LIVE!," and "had no interest in operating a restaurant in Kansas City, Missouri." 1st Ruggeri Statement ¶¶ 3-4.

It appears that the caller was Michael Morris, who was, at the time, the Cordish Company's Director of Leasing and Development. *See* Morris Decl. ¶ 2; *see also* Reply ¶ 12. As a result of the initial call and subsequent telephone calls between Ruggeri and Morris, Ruggeri met with Morris and other Cordish Company officials at the Cordish Company's offices in Baltimore.[4] Neither Ruggeri nor Morris remembers the date of this meeting, but Ruggeri describes it as a "short meeting" that consisted of a "'sales pitch' at which [the] Cordish

Removal, KC Live was formed under Maryland law on February 22, 2005, and its principal office is at the Cordish Company's offices at the Power Plant in Baltimore. Kansas City Live, LLC appears to be an affiliate or subsidiary of the Cordish Company. According to KC Live's disclosure of corporate interests (ECF 6), filed before transfer of venue to this Court, KC Live's sole member is Kansas City Live, LLC, a Maryland limited liability company. Although none of the members of Kansas City Live, LLC have been identified in this proceeding, an affidavit of Robert Fowler, Esq., the Cordish Company's in-house counsel, filed with KC Live's Notice of Removal (ECF 1-4), states that all of the "individual members and trust benefactors of Kansas City Live, LLC are citizens and residents of the state of Maryland."

[4] Ruggeri states that the Cordish Company initiated the meeting and that he "agreed" to it. Morris states that Ruggeri "asked if he could meet" with Cordish Company representatives. *Compare* 1st Ruggeri Statement ¶ 4 *with* Morris Decl. ¶ 2.

[Company] described in general terms its history as a real estate developer and its Kansas City LIVE! development in particular." 1st Ruggeri Statement ¶ 4. The meeting included a tour of the Cordish Company's Power Plant and Power Plant Live! projects in Baltimore. Morris Decl. ¶ 2.

After the meeting, Ruggeri and Morris "remained in intermittent e-mail and telephone contact" regarding the prospect of developing a Bice Group restaurant at one of the Cordish Company's projects throughout the United States. *Id.* In early 2006, Ruggeri and Morris's discussions reached the point that Robert Fowler, Esq., the Cordish Company's in-house counsel, drafted a proposed lease for a Bice Group restaurant to be located at Kansas City LIVE! Although that deal "foundered," Morris and Ruggeri remained in contact "regarding existing or potential projects in places like Maryland, Florida, and Virginia, as well as Kansas City." Morris Decl. ¶ 3; *see also* Decl. of Robert Fowler ("1st Fowler Decl.") ¶ 2 (Ex. 1 to Opposition, ECF 29-1). Morris asserts that, during this time, he was "operating out of Baltimore" at the Cordish Company's offices. Morris Decl. ¶ 4.

In August 2006, Ruggeri and Morris "refocused" on a plan to establish a Bice restaurant at Kansas City LIVE! Morris Decl. ¶ 4. In late October 2006, Morris sent Ruggeri a letter of intent proposing "basic terms" for the lease arrangement. *Id.* According to Morris, the letter of intent was sent to Ruggeri "on KC Live stationary [sic] showing KC Live['s] Baltimore City address at the Cordish Company." *Id.* Morris asserts that "the letter was intended to elicit a response by way of a conceptual agreement from Mr. Ruggeri, and Mr. Ruggeri did, in fact, tell [Morris] that he wanted to proceed to the next stage of lease drafting, drawings, and construction details." *Id.* On November 9, 2006, Fowler sent a letter from the Cordish Company's Baltimore

offices, on KC Live letterhead, via Federal Express, to Ruggeri at the Bice Group's New York address, which enclosed a proposed lease. *See* Letter from Fowler to Ruggeri (Ex. 1A to Opposition, ECF 29-1); 1st Fowler Decl. ¶¶ 1 & 3; Morris Decl. ¶ 4.

The lease negotiations were "a protracted process" that spanned the period from November 2006 until March 2007. Morris Decl. ¶ 5. The restaurant lease was negotiated in part via telephone and email, by Morris and Fowler on behalf of the Cordish Company and KC Live, and by Ruggeri as well as the Bice Group's attorney, Tim Pickwell, Esq., who was located in San Diego, California, and Trevor Sacco, the Bice Group's Chief Operating Officer, who also resided in California. *See* Morris Decl. ¶ 4; 1st Fowler Decl. ¶ 3; 1st Ruggeri Statement ¶ 5; Verified Statement of Trevor J. Sacco ("Sacco Statement") ¶¶ 2-3 (Ex. 2 to Reply, ECF 32-2).[5]

According to Ruggeri, "[a]ll face-to-face negotiations regarding the formation of the lease took place between Bistro KC and KC Live and occurred at KC Live's premises in Kansas City." 1st Ruggeri Statement ¶ 4.[6] KC Live asks the Court to focus, instead, on the assertions of Fowler and Morris that they were "based" "in Baltimore" during the negotiation process, and

---

[5] Ruggeri asserts: "Any negotiations by phone or email regarding the formation of the Lease were between Bistro KC's lawyer in San Diego, CA and representatives of KC Live." 1st Ruggeri Statement ¶ 5. However, KC Live has submitted Fowler's Declaration, attached to which are copies of emails between Fowler and Pickwell, as well as emails between Ruggeri, Sacco, and Morris negotiating the terms of the lease (Ex. 1B to 1st Fowler Decl., ECF 29-1). At this juncture the Court considers the facts in the light most favorable to KC Live.

[6] KC Live urges the Court to disregard this assertion in its jurisdictional analysis, because Ruggeri has not proffered the dates or attendees of the alleged meetings, and has not specifically alleged that he was personally in attendance (so as to have personal knowledge of facts regarding the meetings). *See* Surreply at 7. KC Live also notes that "Bistro KC" had not yet been formed as a business entity at the time that the leases were negotiated. *See* Surreply at 4. In my view, the uncontested fact as to Bistro KC's formation does not controvert Ruggeri's statement. Rather, I take Ruggeri's mention of "Bistro KC" in this context as a shorthand reference to what he describes earlier in the same paragraph as "representatives of the to-be-formed Bistro KC." 1st Ruggeri Statement ¶ 5.

argues that, given the Court's obligation to resolve any dispute of fact in KC Live's favor at this juncture, the Court must conclude that the negotiations occurred in Baltimore. *See* Surreply at 6; *see also* Morris Decl. ¶¶ 1, 3-6; 1st Fowler Decl. ¶¶ 2, 5. However, none of KC Live's affidavits actually contradicts Ruggeri's assertions that face-to-face meetings regarding the terms of the proposed leases occurred in Kansas City, and that no such meetings occurred in Baltimore. Moreover, substantial, uncontroverted evidence (including submissions by KC Live) indicates that several face-to-face meetings among the parties occurred in Kansas City.

For example, in his Supplemental Verified Statement ("2d Ruggeri Statement") (Ex.1 to Reply, ECF 32-1), Ruggeri alleges that Morris was "KC Live's on-site leasing director. He maintained an office in Kansas City." *Id.* ¶ 4. According to Ruggeri, Morris claimed "that his job required him" to "stay" in Kansas City. *Id.* He adds: "[A]ny face-to-face negotiations between Bistro KC and KC Live mentioned in paragraphs 4, 5 and 6 of the Morris Declaration *in which I participated* took place at KC Live's premises in Kansas City in Mr. Morris's office there. None of these negotiations took place in Baltimore." *Id.* (emphasis added).

Further, in ¶ 3 of his Verified Statement, Sacco asserts:

> Beginning in February, 2007, I had several meetings with the project manager of Kansas City LIVE!, Michael Morris. At this time, I resided in California, but communicated often by telephone with Mr. Morris and had approximately 10 in-person meetings with him. At these meetings, I reviewed the commercial space available at the project at which the project owner, . . . KC Live[,] hoped to house a Bice restaurant. In these same meetings, I also participated extensively in the negotiation of the terms of Bistro KC's lease with KC Live. All of my in-person meetings with Mr. Morris were at his office in Kansas City. All of my telephone calls to Mr. Morris's office were to the phone number of his office in Kansas City, Missouri or to his cell phone. I never spoke to any employee of Cordish or KC Live, other than employees who worked in the Kansas City office of KC Live.

Moreover, in the emails submitted by KC Live as exhibits to Fowler's Declaration, there is one dated December 11, 2008, from Ruggeri to Morris. It states: "[W]e will come on the 27/28 to visit the space [i.e., in Kansas City] and start planning design." Fowler Decl., Ex. 1B (ECF 29-1 at 13).

In his Reply, Ruggeri took issue with Morris's general assertions that he was "operating out of Baltimore" or "based" in Baltimore, claiming that Morris "does not really deny, and is attempting to artfully conceal, the fact that th[e] lease negotiations *actually occurred in Kansas City*." Reply ¶ 15 (emphasis in original). To support his position, Ruggeri attached to his Reply his Supplemental Verified Statement, as well as Sacco's Verified Statement (ECF 32-1, 32-2).[7]

In my view, there is no material factual dispute as to the location of the lease negotiations. Ruggeri has not controverted KC Live's assertions that substantial lease negotiations occurred by telephone and email contact with Fowler and Morris, or Fowler's assertion that he conducted his end of the telephone and email negotiations from his office in Baltimore, and was never in Kansas City.[8] Nor has KC Live controverted Ruggeri's assertion

_____

[7] I previously denied as moot KC Live's motion to strike Ruggeri's first Verified Statement, which was based on "knowledge, information, and belief," because Ruggeri subsequently submitted his Supplemental Verified Statement, in which he adopted the content of the first Verified Statement upon personal knowledge (ECF 34). In light of Ruggeri's submission of the additional verified statements, however, I also granted KC Live leave to file a surreply and additional affidavits, in order to make clear "which of Mr. Ruggeri's factual assertions KC Live disputes, and which it does not," and to provide an opportunity to controvert allegations raised by the statements submitted with Ruggeri's Reply. ECF 34. When KC Live filed its Surreply, it urged the Court to scrutinize carefully Ruggeri's attempt at a "do over," but it did not submit any evidence contradicting Ruggeri and Sacco's assertions regarding the in-person meetings in Kansas City.

[8] Morris states that one of the emails, containing the Bice Group's financial information, was "e-mailed to me at my Cordish Company Baltimore City address." Morris Decl. ¶ 4 n.1. Morris's assertion based on the location of an email address, rather than his actual physical location, tends to obfuscate rather than clarify the issue of his location. In any event, Morris's

that several in-person meetings regarding the lease terms occurred in Kansas City, and none occurred in Baltimore.

On February 2, 2007, from Baltimore, Fowler sent a letter to Ruggeri in New York, along with four "execution copies" of the Restaurant Lease, indicating that the restaurant was to be called "Bice Bistro." Letter from Fowler to Ruggeri, Ex.C to Fowler Decl. (ECF 29-1). A copy was also sent to Pickwell in San Diego. In the letter, Fowler asked Ruggeri to "insert the proper name of the Tenant on 'page 1' of the Lease, and on the signature page of the Lease." *Id.*

The Restaurant Lease provides that KC Live's address for purposes of receipt of rent and notices is at the Cordish Company's offices in Baltimore. *See* Restaurant Lease § 201(r). Section 2702 of the Restaurant Lease contains the following choice-of-law and choice-of-venue provision:

> This Lease is made pursuant to, and shall be governed by, and construed in accordance with the Laws of the State of Missouri and any applicable local, municipal or county rules, regulations, and ordinances. Any action or proceeding arising hereunder shall be brought in the courts of such state; provided, that if such action or proceeding arises under the Constitution, law or treaties of the United States of America, or *if there is diversity of citizenship between the parties thereto, so that it is to be brought in a United States District Court, it shall be brought in the United States District Court for the District of Maryland.* (Emphasis added.)

On February 27, 2007, Bistro KC was formed as a limited liability company under the laws of Delaware, with its principal business address in Delaware. *See* Certificate of Formation, Ex.A to Supplemental Declaration of Robert Fowler ("2d Fowler Decl."), Ex.2 to Sureply (ECF 37-2); *see also* Answer & Counterclaim ¶ 2. Ruggeri signed the Restaurant Lease on behalf of

---

location when he received this particular email is not dispositive of the jurisdictional question, and thus any factual dispute as to Morris's location is of no moment.

Bistro KC,[9] and sent it back to Fowler in Baltimore, where Blake Cordish signed it on March 27, 2007, as KC Live's "authorized person." *See* Restaurant Lease, Ex.A to Answer & Counterclaim (ECF 16-1); *see also* Fowler Decl. ¶ 4. In addition, Ruggeri executed a personal guaranty ("Restaurant Guaranty") of Bistro's obligations under the Restaurant Lease, *see* Restaurant Guaranty, Ex.2 to Motion at 1 (ECF 25-2), which was transmitted to KC Live with the Restaurant Lease. *See* Fowler Decl. ¶ 4.[10]

The parties agree that KC Live's requirement of a personal guaranty of the Restaurant Lease, and the terms of the Restaurant Guaranty, were developed in the course of the negotiations over the Restaurant Lease terms. According to Ruggeri, during the lease negotiations, "KC Live demanded that [Ruggeri] execute a limited personal guaranty of Bistro KC's obligations to KC Live. The notion of a personal guaranty was never discussed at all at the initial sales pitch to [Ruggeri] in Baltimore." 1st Ruggeri Statement ¶ 7.

The Restaurant Guaranty provides that Ruggeri's liability, as guarantor, is "coextensive with that of [Bistro] and also joint and several, and legal action may be brought against Guarantor and carried to final judgment either with or without making [Bistro] . . . a party thereto." *Id.* at 1. The Restaurant Guaranty also requires notice to KC Live at the Cordish Company's Baltimore address. *Id.* at 2. In addition, it contains its own choice-of-law and choice-of-venue provisions, which differ significantly from § 2702 of the Restaurant Lease. The Restaurant Guaranty provides, *id.* at 3:

_____

[9] The record does not reflect the date on which Ruggeri signed the Restaurant Lease.

[10] In addition to the personal guaranty, Ruggeri also allegedly executed a guaranty on behalf of Bice Holdings, Inc. *See* Fowler Decl. ¶ 4. Bice Holdings is not a party to this case, and its guaranty is not at issue here.

> This Guaranty shall be governed by and construed in accordance with the laws of the State of Missouri applicable to agreements made and to be wholly performed within the State of Missouri. *Guarantor hereby consents to the jurisdiction of any competent court within Missouri in Landlord's discretion, including, without limitation, Federal courts of the United States.* (Emphasis added.)

During the negotiations as to the Restaurant Lease, the parties also developed a plan for Bistro to rent another property adjacent to the restaurant, which Bistro would operate as a gelateria or café. *See* 1st Fowler Decl. ¶ 4. After the Restaurant Lease was executed, the parties began negotiating the terms of the Gelateria Lease. The negotiations proceeded in a similar fashion to those for the Restaurant Lease, including phone and email discussions involving the attorneys, Pickwell and Fowler, as well as in-person meetings in Kansas City. *See* 1st Fowler Statement ¶ 5.

On August 27, 2007, Fowler sent execution copies of the Gelateria Lease and an accompanying personal guaranty ("Gelateria Guaranty") to Ruggeri in New York. *Id.*; *see also* Letter from Fowler to Ruggeri, Ex.1D to Fowler Decl. (ECF 29-1). Ruggeri signed the Gelateria Lease and Gelateria Guaranty, and Pickwell returned them to KC Live in Baltimore.[11] On October 1, 2007, in Baltimore, Blake Cordish signed the Gelateria Lease on behalf of KC Live. 1st Fowler Decl. ¶ 5; *see also* Gelateria Lease, Ex.2 to Answer & Counterclaim (ECF 16-2); Gelateria Guaranty, Ex.2 to Motion at 4 (ECF 25-2). Pursuant to Pickwell's instructions, Fowler then sent copies of the fully executed Gelateria Lease and Gelateria Guaranty to Ruggeri in Florida. 1st Fowler Decl. ¶ 5. The Gelateria Lease and Gelateria Guaranty contain choice-of-law and choice-of-forum provisions that are identical to the respective counterpart provisions of the Restaurant Lease and Restaurant Guaranty.

---

[11] Again, the record does not disclose the date that Ruggeri signed this lease.

In January 2008, Morris left his position with the Cordish Company and KC Live.  *See id.*; *see also* Morris Decl. ¶ 7.  He was replaced by Nick Benjamin.  *See* Sacco Statement ¶ 4; Declaration of Nick Benjamin ("Benjamin Decl.") ¶ 2, Ex. 3 to Opposition (ECF 29-3).  Around the same time, Bistro opened the restaurant and gelateria at Kansas City LIVE!, and Sacco moved temporarily to Kansas City for "approximately two months" to supervise the openings.  Sacco Statement ¶ 4.  During this period, Sacco "dealt with Mr. Benjamin on a daily basis regarding issues associated with the opening of the restaurant."  *Id.*  According to Sacco, Benjamin "was working full-time in Kansas City at KC Live's office and was the project manager for the entire Kansas City LIVE! project."  *Id.* ¶ 5.  Sacco recounts: "All of my meetings with Mr. Benjamin during this time were in Kansas City.  All of my telephone conversations with him and emails to him during this time were to his Kansas City office."  *Id.*  During this time, claims Sacco, he "never met Mr. Benjamin in Baltimore."  *Id.*

Benjamin recounts that he lived in Maryland from February 18, 2008, until August 23, 2009, and worked "primarily" in Baltimore at the Cordish Company's offices during that time as the Development Director for the Kansas City LIVE! project.  Benjamin Decl. ¶ 1.[12]  Benjamin states that, during this time period,  his primary contact with Ruggeri related to two amendments to the Restaurant Lease, one executed on July 24, 2008, and the other on June 5, 2009 (respectively, the "2008 Amendment" and the "2009 Amendment").  *Id.* ¶ 3.  The 2009 Amendment resulted from what Benjamin characterizes as Bistro's "default on its leases."[13]  *Id.* ¶ 5.  According to Benjamin, in December 2008, Ruggeri "asked for a meeting at the Baltimore

_____

[12] I discern no dispute of fact between Sacco and Benjamin on this point.  Both affidavits are consistent with Benjamin and Sacco temporarily residing in Kansas City during January and much of February 2008.

[13] Ruggeri disputes the allegation of default.  2d Ruggeri Statement ¶ 5.

City address of KC Live and The Cordish Company with Blake Cordish and [Benjamin] to attempt to resolve the lease default issues." *Id.* Ruggeri claims, however, that he contacted Benjamin "at his Kansas City office, not in Baltimore, and assumed that any meeting regarding this matter would be in Kansas City, where all of Bistro KC's other meetings with KC Live had occurred." 2d Ruggeri Statement ¶ 5. He asserts: "Because [Benjamin] did not have authority to discuss a modification of the leases, he stated that the meeting had to be in Baltimore." *Id.*

In any event, the parties agree that the meeting occurred in Baltimore in January 2009, and that Ruggeri, Sacco, Benjamin, and Blake Cordish were in attendance. Benjamin Decl. ¶ 5; Sacco Statement ¶ 5. Ruggeri maintains: "No discussions at [the January 2009] meeting concerned any of my personal obligations under the Guarantees [sic], and no modifications to the Guarantees [sic] resulted from that meeting." 2d Ruggeri Statement ¶ 5. The meeting resulted (after further negotiations) in the 2009 Amendment to the Restaurant Lease. Benjamin Decl. ¶ 5.

Neither the 2008 Amendment nor the 2009 Amendment modifies either of the guaranties. However, both amendments contain a "Consent and Ratification" provision, signed by Ruggeri both in his personal capacity and on behalf of Bice Holding, Inc., stating that the guarantors consent to the amendment and reaffirm the Restaurant Lease, and that each guarantor "remains liable under his/her Guaranty to said Lease." *See* 2008 Amendment & 2009 Amendment, Exs.3A & 3B to Benjamin Decl. (ECF 29-3).[14]

Bistro and KC Live each contend that the other subsequently breached the leases, giving rise to the present lawsuit. KC Live further claims that Ruggeri failed to satisfy his personal

---

[14] The quoted language is from the 2008 Amendment. The 2009 Amendment uses substantively identical language, but also includes reference to the Gelateria Lease, in addition to the Restaurant Lease.

guaranties.  The specific allegations of breach, however, are not relevant to resolution of the Motion.  Additional facts are included in the discussion.

## Discussion

Federal Rule of Civil Procedure 4(k)(1) authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state where the district court is located.  *Carefirst*, *supra*, 334 F.3d at 396.  Therefore, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment."  *Id.*

Maryland's long-arm statute is codified at Md. Code (2006 Repl. Vol., 2009 Supp.), § 6-103(b) of the Courts & Judicial Proceedings Article.  It authorizes "personal jurisdiction over a person, who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State," or who "[c]ontracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing."  *Id.*

Maryland's courts have "consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution."  *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15, 878 A.2d 567, 576 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)).  "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become

one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *accord ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). Thus, the question here is whether the exercise of personal jurisdiction over Ruggeri offends the due process guarantee of the Fourteenth Amendment.

In *CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009), the Fourth Circuit iterated that due process jurisprudence recognizes "two types of personal jurisdiction: general and specific." The Court explained:

> General personal jurisdiction, on the one hand, requires 'continuous and systematic' contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred. Specific personal jurisdiction, on the other hand, requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state.

*Id.* (citing, *inter alia*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984)) (internal citations omitted). KC Live concedes that Maryland cannot exercise general personal jurisdiction over Ruggeri. *See* Opposition at 10. Therefore, the Court must consider whether Ruggeri is subject to specific personal jurisdiction.

The United States Supreme Court has long held that personal jurisdiction over a non-resident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Courts have separated this test into individual "prongs," first ascertaining whether the threshold of "minimum contacts" is met, and then considering whether the exercise of jurisdiction on the basis of those contacts is "constitutionally reasonable." *ALS Scan*, 293 F.3d at 712. *See Consulting Engineers, supra*, 561 F.3d at 278-79.

The "minimum contacts" test is met where the defendant has "purposefully avail[ed] himself of the privilege of conducting business under the laws of the forum state." *Id.* at 278. A determination that the defendant has established minimum contacts with the forum state amounts to a conclusion that "'it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Generally, the court must consider the prong of constitutional reasonableness "[i]f, and only if" the minimum contacts test is met. *Consulting Engineers*, 561 F.3d at 278. The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477. However, in some cases, the constitutional reasonableness analysis can "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*

## A. Minimum Contacts

The Supreme Court expounded on the minimum contacts requirement in *Burger King*, *supra*, 471 U.S. 462. There, the Court explained that minimum contacts are not "'random,' 'fortuitous,' or 'attenuated' contacts," but rather are contacts that involve "significant activities within a State" or "'continuing obligations' between [the defendant] and residents of the forum." *Id.* at 475-76 (citations omitted). The benchmark is "'foreseeability . . . that the defendant's conduct and connections with the forum state are such that he should reasonably anticipate being

hauled into court there.'" *Id.* at 474 (quoting *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 295 (1980)).

In the context of a contractual relationship, the *Burger King* Court stated unequivocally that entering into a contract with a citizen of the forum state "*alone*" cannot "automatically establish minimum contacts" over a nonresident defendant. *Burger King*, 471 U.S. at 478 (emphasis in original). But, the Court was equally clear that "even a single act can support jurisdiction," so long as that act "creates a 'substantial connection' with the forum." *Id.* at 475 n.18 (citation omitted). The Court also stated: "Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there," jurisdiction cannot be "avoided merely because the defendant did not *physically* enter the forum State." *Id.* at 476 (emphasis in original). Of import here, the *Burger King* Court observed that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.*[15]

Notably, the Supreme Court explained, *id.* at 479 (internal citations omitted):

> [A] "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

---

[15] As the parties' email correspondence shows, that observation is all the more true in the internet age.

In *Consulting Engineers*, 561 F.3d at 278, the Fourth Circuit enumerated several "nonexclusive factors," applicable in the "business context," that may help to "resolve whether a defendant has engaged in such purposeful availment":

- whether the defendant maintains offices or agents in the forum state;
- whether the defendant owns property in the forum state;
- whether the defendant reached into the forum state to solicit or initiate business;
- whether the defendant deliberately engaged in significant or long-term business activities in the forum state;
- whether the parties contractually agreed that the law of the forum state would govern disputes;
- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;
- the nature, quality and extent of the parties' communications about the business being transacted; and
- whether the performance of contractual duties was to occur within the forum.

*Id.* (internal citations omitted). The Court cautioned, however, that these factors are "not susceptible of mechanical application." *Id.*

Noting that the restaurant and gelateria are in Kansas City, and that the leases are governed by Missouri law, Ruggeri contends that personal jurisdiction over Bistro (let alone Ruggeri), would be doubtful, "but for the forum selection clause in the Leases." Mem. at 7. He argues that, "[a]part from the fact that KC Live's state of incorporation happens to be Maryland and the forum selection clause in the Leases," Bistro's only connection with Maryland is the two "isolated" meetings in Baltimore and rent payments sent to a Baltimore address. *Id.* Further, he contends that, "even these meager contacts arguably connecting Bistro KC and the Leases to the State of Maryland do not apply at all to *Ruggeri and the Guarantees*." *Id.* at 8 (emphasis in original). Ruggeri points out that he "is not a Maryland resident"; the guaranties' terms "were

never discussed or negotiated in Maryland"; "the underlying conduct allegedly giving rise to KC Live's claims" under the guaranties occurred in Missouri; the guaranties are governed by Missouri law; and the guaranties contain "a clause in which Ruggeri consents to jurisdiction over him *by the courts of Missouri*." *Id.* (emphasis in original).

Pointing to Ruggeri's initial meeting with Morris in Baltimore and the subsequent contacts between Ruggeri and Morris that led to the negotiation of the Restaurant Lease, KC Live counters that "Ruggeri reached into Maryland to solicit or initiate business." Opposition at 14-15. KC Live also maintains that the "drafting and negotiation process" for the leases and guaranties occurred "in Baltimore." *Id.* at 16. According to KC Live, Ruggeri's "in-person contact with Maryland residents" during the course of the business relationship and the parties' conduct demonstrate that Ruggeri "knew he was negotiating the leases, and issues and disputes arising out of the leases, in Maryland." *Id.* KC Live also contends that Ruggeri "engaged in significant business activities in Maryland," given that he "caused" the "executed documents [i.e., the leases and guaranties] to be delivered to KC Live in Baltimore knowing that the leases and guarantees had no force or effect" until they were signed by Blake Cordish in Baltimore. *Id.* at 15. In addition, KC Live maintains that the performance "of some portions of these two leases, which Ruggeri guaranteed, occurred in Maryland," including the payment of rent and sending of notices to Baltimore, as well as the leases' forum selection clause choosing this Court as the exclusive forum if the requirements of diversity jurisdiction were met. *Id.* at 17.

With respect to the guaranties specifically, KC Live observes that they make Ruggeri jointly and severally liable for breach of the leases. *Id.* In light of the leases' forum selection clause, KC Live argues that Ruggeri "necessarily knew that, if Bistro initiated litigation under

the leases or if KC Live did, and if diversity of citizenship with the requisite amount in damages existed, such litigation . . . would occur in the U.S. District Court for the District of Maryland and nowhere else." *Id.*

Before addressing the contentions, it is helpful to highlight portions of the facts set forth earlier in more detail. As indicated, Ruggeri is not a Maryland resident, has no property in Maryland, and has no connection to Maryland, outside of the transactions at issue. Moreover, the business relationship that is the subject of this case began when a representative of KC Live contacted Ruggeri to solicit his involvement in the Kansas City LIVE! venture. In the course of the parties' subsequent communications, however, they developed a reciprocal relationship.

It is also noteworthy that Ruggeri is an experienced businessman, and the Cordish Company and its subsidiary, KC Live, are sophisticated enterprises. Ruggeri personally came to Maryland on two occasions, specifically to meet with representatives of KC Live regarding a business matter. Although almost all in-person meetings occurred in Kansas City, substantial portions of the negotiations were conducted via telephone and email, and at least some of KC Live's representatives were located in Maryland during these negotiations.

The negotiations culminated in the execution of leases and guaranties that concern a restaurant and gelateria located in Kansas City, Missouri, and are governed by Missouri law. Although Bistro was formed under the laws of Delaware, and KC Live was formed under the laws of Maryland, the exclusive focus of the business is the Kansas City LIVE! development in Kansas City.[16] However, the leases and guaranties call for all payments and notices to be sent to

---

[16] KC Live asserts that "KC Live endeavors to conduct a national business from its Baltimore base, so it is in Maryland's interest to afford it a forum for adjudicating disputes that arise out of its Baltimore-based business." Opposition at 18-19. However, the record suggests that it is KC Live's parent company, the Cordish Company (which is not a party to this case),

- 20 -

KC Live at its Maryland address. In addition, the leases require the parties to file, in the Maryland federal court, any lawsuit regarding their obligations under the leases, so long as the diversity requirements are met. In contrast, the guaranties contain a provision by which Ruggeri "consents to the jurisdiction" of Missouri courts.

Several of the foregoing factors might suggest that this Court lacks personal jurisdiction. The most powerful of these factors, in my view, are that the leases and guaranties are governed by Missouri law, and the business enterprises that they concern are located in Kansas City. Regardless of where bicoastal negotiations conducted by phone and email can be said to be "located," the focus of performance under the leases was Kansas City, Missouri.

Moreover, KC Live's reliance on the fact that the leases call for payments to be mailed to KC Live at its Baltimore address is not, standing alone, particularly compelling in favor of jurisdiction. Although several cases, including *Burger King*, 471 U.S. at 480, have cited contractual requirements to send monthly payments to the forum state among the factors favoring jurisdiction, those cases have included other factors that also supported jurisdiction. In *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 452 (4th Cir. 2001), the Fourth Circuit held that personal jurisdiction could not be exercised over a nonresident corporation that had entered into a contract with a forum state corporation. The contract was for the operation of a medical facility outside the forum, but called for monthly payments to be sent to the forum state. In that context (in which several other factors weighed against jurisdiction), the Court was of the view that the payment provisions "amounted only to 'attenuated contact' with" the forum. *Id.* (citation omitted). *See also Southfork Apartments*,

---

that "endeavors to conduct a national business from its Baltimore base."

*supra*, 93 F. Supp. 2d at 628 & n.5 (rejecting personal jurisdiction despite requirement to send monthly payments to forum state).[17]

To be sure, courts routinely exercise personal jurisdiction over out-of-state guarantors when their guaranties are governed by the laws of the forum state, or guarantee the obligations of business enterprises located in the forum state. *See, e.g.*, *Days Inn Worldwide, Inc v. Patel*, 445 F.3d 899, 904 n.5 (6th Cir. 2006); *Gen'l Elec. Co. v. Deutz AG*, 270 F.3d 144, 151-52 (3d Cir. 2001); *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 703 (7th Cir. 1992); *Nat'l Can Corp. v. K Beverage Co.*, 674 F.2d 1134, 1137 (6th Cir. 1982); *Marathon Metallic Bldg. Co. v. Mountain Empire Constr. Co.*, 653 F.2d 921, 923 (5th Cir. 1981) (Unit A); *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1175 (7th Cir. 1971); *Drennen v. First Home Sav. Bank*, 420 S.E.2d 376, 377-78 (Ga. App. 1992); *Meachum v. Worthen Bank & Trust Co.*, 682 S.W.2d 763, 766 (Ark. App. 1985). However, the fact that personal jurisdiction over Ruggeri could easily be obtained in Missouri does not mean that jurisdiction necessarily cannot be obtained in Maryland.

Notwithstanding the factors that weigh against the exercise of personal jurisdiction, I am satisfied that the factors favoring the exercise of jurisdiction predominate. Therefore, I conclude that Ruggeri has sufficient minimum contacts with Maryland such that it is "presumptively not unreasonable" to subject him to jurisdiction in this State. *Burger King*, 471 U.S. at 476. My reasoning is as follows.

---

[17] In *Diamond Healthcare*, unlike this case, the parties never met in person in the forum state, 229 F.3d at 451, and there apparently was no forum selection clause in the parties' contract. Similarly, the parties' contract in *Southfork Apartments* "was negotiated by local Minnesota counsel for both parties," 93 F. Supp. 2d at 625, rather than in Maryland, and also contained no forum selection clause.

Case law from this Court, cited by Ruggeri, supports the proposition that the "strongest factor" in the minimum contacts analysis is "whether the defendant initiated the business relationship in some way." *Nueva Engineering v. Accurate Electronics, Inc.*, 628 F. Supp. 953, 955 (D. Md. 1986); *accord Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002) (quoting *Nueva Engineering*); *Municipal Mortg. & Equity v. Southfork Apartments Ltd. P'ship*, 93 F. Supp. 2d 622, 627 (D. Md. 2000) (same); *Potomac Design, Inc. v. Eurocal Trading, Inc.*, 839 F. Supp. 364, 370 (D. Md. 1993) (same). To be sure, where the nonresident defendant has reached into the forum state to initiate business, minimum contacts may be satisfied; the defendant's initiation of contact may be the "strongest factor" in such a case.[18] But, it is not necessarily fatal to the exercise of personal jurisdiction that the nonresident defendant did not initiate first contact.

The Fourth Circuit has made clear that a "prospective defendant need not initiate the relevant 'minimum contacts' to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state." *Christian Science Board of Directors v. Nolan*, 259 F.3d 209, 216-17 (4th Cir. 2001) (upholding exercise of personal jurisdiction where out-of-state defendant was invited to do business "within the context of his friendship and ongoing correspondence" with forum state resident, and "deliberately entered into a collaborative

_____

[18] Indeed, this principle is well illustrated by several cases that the Court has reviewed, in which personal jurisdiction was obtained over nonresident guarantors where the guarantors (or the business enterprises whose obligations they were guaranteeing) had applied to obtain a loan from a bank in the forum state. In that context, as one court observed, "Mellon [Bank] did not approach the borrowers seeking to lend money nor did Mellon initially request the guaranties. It was the defendants who approached Mellon and through this contact established a business relationship with a [forum state] entity." *Mellon Bank (East) PSFS, N.A. v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). *See also Continental Bank*, *supra*, 964 F.2d at 703; *First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.*, 820 F.2d 1127, 1131 (10th Cir. 1987); *Amer. Bank & Trust Co. v. Sunbelt Envir. Sys., Inc.*, 451 So.2d 1111, 1113-17 (La. App. 1984).

enterprise" with resident of the forum state).  *See also Gen'l Elec. Co. v. Deutz AG*, 270 F.3d 144, 151 (3d Cir. 2001) ("It is not significant that one or the other party initiated the relationship. In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration.") (internal citation omitted).

Because this case involves a relationship extending over several years between sophisticated parties who are accustomed to doing business across the United States, I do not place great weight on which party initiated the contact.  It is the nature of communication that someone must initiate it, and Ruggeri was not lured unwittingly into Maryland.  The initial contact culminated in detailed lease arrangements with KC Live, with the assistance of counsel. It is fair to assume that Ruggeri would not have entered into business with KC Live unless he found it to his advantage.

Ruggeri's personal visits to Maryland in connection with the business dealings, and the negotiation of the leases and guaranties by means of communication with persons in Maryland, are significant.   It is clear that Ruggeri's contacts with Maryland were not "'random,' 'fortuitous,' or 'attenuated.'"  *Burger King*, 471 U.S. at 475 (citation omitted).  To the contrary, he knowingly and purposefully entered into a long-term, reciprocal business relationship with a Maryland company that he knew, or should have known, would result in litigation in this Court in the event of a significant dispute.

In addition, the forum selection clause in both leases, which Ruggeri guaranteed, is relevant.[19]  In *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-12 (1972), the Supreme

---

[19]  As noted, the forum selection clause in the leases states that, if a dispute arises, "if there is diversity of citizenship between the parties thereto, so that [the dispute] is to be brought

Court held that forum selection clauses are "prima facie valid" when made in "arm's-length negotiation by experienced and sophisticated businessmen," and "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." Reiterating that principle in *Burger King*, the Court observed that parties to an agreement may, in essence, contract around principles of personal jurisdiction by consenting to resolve their disputes in specified tribunals. *See Burger King*, 471 U.S. at 471 n.14. *See also Truserv Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005) (upholding exercise of personal jurisdiction over guarantor, where guaranty contained consent to jurisdiction in forum state, noting that "'personal jurisdiction is waivable and . . . parties can, through forum selection clauses and the like, easily contract around any rule we promulgate,'" and that "'[o]bviously, a valid forum-selection clause, even standing alone, can confer personal jurisdiction'") (citations omitted).

Here, as the federal court in Missouri has already held, the parties to the leases expressly selected this Court as the exclusive forum to resolve disputes concerning the leases, so long as there is diversity jurisdiction. Ruggeri was represented by counsel during the negotiations of the leases (and guaranties). It is fair to assume that he knew that, in the event of diversity, any litigation concerning the leases would occur in federal court in Maryland.

I recognize that the clause selecting this Court as a forum is found in the leases, not the guaranties. Ruggeri emphasizes that the guaranties' forum selection clause only provides for personal jurisdiction in Missouri. Although Ruggeri seeks to distinguish the minimum contacts analysis applicable to Bistro and the leases, on the one hand, and Ruggeri and the guaranties, on

_____

in a United States District Court, it shall be brought in the United States District Court for the District of Maryland." Restaurant Lease § 2702.

the other, I do not view the analysis as entirely separable.[20]  The terms of the guaranties were negotiated contemporaneously with the terms of the leases, by the same sophisticated parties, who were represented by capable counsel with respect to all the documents.  Each guaranty was executed at the same time as its corresponding lease, and by its explicit terms, was an inducement to KC Live to enter into the corresponding lease relationship.

Moreover, Ruggeri does not argue that the guaranties' forum selection clause is exclusive.  And, by its terms, it is not.  The guaranties state that Ruggeri "*consents* to the jurisdiction of any competent court within Missouri in [KC Live's] discretion, including, without limitation, Federal courts of the United States."  Restaurant Guaranty at 3 (emphasis added).  This provision does not contain mandatory or exclusive language, however.  Put another way, it does not bar suit in Maryland.

Under Fourth Circuit law, the "general maxim" is that "'an agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion.'"  *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 (4th Cir. 2007) (citation omitted; emphasis in original).  In *IntraComm*, the Court held that a clause providing that either party "shall be free to pursue its rights" in a certain court was not exclusive. *Id.*  Interpreting a forum selection clause that provided that disputes "'shall be subject to . . . the jurisdiction of the English High Court,'" the Fourth Circuit recently observed that the clause

---

[20] KC Live argues that, because the guaranties make Ruggeri's liability to KC Live "coextensive with that of [Bistro] and also joint and several," Restaurant Guaranty at 3, the guaranties fully incorporate the leases, and Ruggeri is bound by the leases' forum selection clause.  *See* Surreply at 10-11.  However, Ruggeri is not a party to the leases, and the guaranties do not explicitly "incorporate" the leases.  Although I need not decide whether the leases' forum selection clause is personally binding on Ruggeri, the leases' terms are relevant to the minimum contacts analysis.

"appears to make the designation of the English court permissive" under federal law, at least "taken by itself and out of context."[21] *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 646 & 651 (4th Cir. 2010) (quoting contract). *Compare Sterling Forest Assocs., Ltd. v. Barnett-Range Corp.*, 840 F.2d 249 (4th Cir. 1988) (holding that forum selection clause stating that "jurisdiction and venue shall be in California" was exclusive), *overruled on other grounds by Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495 (1989).

In light of the clearly mandatory forum selection language in the leases, which selects this Court as the forum if diversity jurisdiction attaches, it is difficult to view the guaranties' language as anything but permissive. As the contemporaneous lease language plainly demonstrates, the parties and their counsel were well aware of how to draft an exclusive forum selection clause if they wished to make Missouri the exclusive forum for litigation regarding the guaranties.

Ruggeri's personal visits to Maryland with respect to a potential business venture; his direct and frequent interaction with Maryland citizens in connection with the business arrangements at issue; the leases' forum selection of Maryland; the guaranties' provision that "legal action may be brought against [Ruggeri] and carried to final judgment either with or without making [Bistro] . . . a party thereto"; and Ruggeri's mere "consent" to suit in Missouri are, in my view, sufficient to provide Ruggeri with "fair warning" of the possibility of suit against him in Maryland. These factors combine to meet the threshold of minimum contacts.

---

[21] Although the forum selection clause in *Albemarle* appeared permissive under federal law, it was exclusive under English law, which controlled under the parties' choice of law. *See Albemarle*, 628 F.3d at 651.

This case is significantly unlike the handful of cases in which courts have refused to exercise personal jurisdiction over a guarantor, despite maintaining jurisdiction over the entity whose obligations were guaranteed. In both *Arkansas Rice Growers Cooperative Ass'n v. Alchemy Industries, Inc.*, 797 F.2d 565, 574 (8th Cir. 1986), and *Bond Leather Co. v. Q.T. Shoe Manufacturing. Co.*, 764 F.2d 928, 934 (1st Cir. 1985), the appellate courts held that personal jurisdiction could not be maintained over nonresident "passive" guarantors, whose only connection to the underlying transaction was the guaranty. In those cases, however, the guarantors had "no financial interest," *Bond Leather*, 764 F.2d at 934, or were mere "passive investor[s]," *Rice Growers*, 797 F.2d at 574, in the entity whose obligations they were guaranteeing, and had not participated in the negotiation or performance of the underlying contractual obligations. "*Solely*" by executing guaranties, which provided them with no "rights . . . which could have been enforced" in the forum state, *Bond Leather*, 764 F.2d at 934 (emphasis in original), the guarantors had not created a sufficient connection with the forum state to support personal jurisdiction. *See id.*; *Rice Growers*, 797 F.2d at 573 ("The mere fact that the individual defendants guaranteed an obligation to an Arkansas corporation does not subject the guarantors to jurisdiction in Arkansas.").

In contrast, Ruggeri is a principal member of Bistro, and stood to benefit directly from the business arrangements he guaranteed. He was personally involved in negotiating both the terms of the arrangements and the guaranties, and the guaranties were an integral part of the transaction. Under these circumstances, personal jurisdiction over Ruggeri is not based "solely" on his execution of the guaranties, but rather on his entire course of conduct, both in his personal capacity and as principal of Bistro.

For the foregoing reasons, the Court concludes that Ruggeri purposefully conducted business with a "'substantial connection'" to Maryland, *Burger King*, 471 U.S. at 479 (citation omitted).  As a result, the minimum contacts standard has been met.

### B.  Constitutional Reasonableness

Having determined that Ruggeri has minimum contacts with Maryland that "form the basis" of KC Live's suit, I turn to consider "'whether the exercise of personal jurisdiction would be constitutionally reasonable.'"  *Consulting Engineers*, *supra*, 561 F.3d at 278-79 (citation omitted).  Courts conduct the constitutional reasonableness inquiry in order to ensure that "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent."  *Burger King*, 471 U.S. at 478 (citation omitted).  Drawing on Supreme Court case law, the Fourth Circuit has identified several factors that are relevant to the constitutional reasonableness inquiry, including the following, *id.* at 279:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

In his briefing, Ruggeri does not argue that this Court's exercise of jurisdiction over him would be constitutionally unreasonable.  Indeed, each of the factors identified by the *Consulting Engineers* Court either cuts decidedly in favor of exercise of jurisdiction over Ruggeri or is neutral.[22]

---

[22] The "interest of the forum state in adjudicating the dispute" and "the interests of the states in furthering substantive social policies" do not lean in either jurisdictional direction.

Given that Bistro's claims against KC Live, and KC Live's claims against Bistro, will proceed in this Court regardless of whether Ruggeri is a party, the additional "burden on [Ruggeri] of litigating in the forum" is practically non-existent. Indeed, it is hard to conceive of how Bistro would proceed in this case without calling Ruggeri as a witness. And, as KC Live points out, Ruggeri is represented by the same attorneys who represent Bistro. Because KC Live's claims against Ruggeri are based solely on his joint liability for Bistro's alleged breaches of the leases, and because he is a principal of Bistro and a key player in the events that form the basis of the underlying claims, defending the suit on the guaranties in Maryland will visit no litigation burdens on him that he would not already have to endure in pursuing or defending the claims on behalf of Bistro.

Furthermore, the factors of "efficient resolution of disputes" and KC Live's "interest in obtaining convenient and effective relief" profoundly favor the exercise of jurisdiction. If this Court declined to exercise jurisdiction over Ruggeri, and if KC Live later were to prevail on its claims of breach, it would need to initiate a separate suit against Ruggeri in another forum, solely to obtain a judgment against him on the guaranty. Splitting the claims in such a manner would be woefully inefficient, both for the judiciary and for all parties.

As the Supreme Court has explained, a strong showing of constitutional reasonableness can "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 477. Although I have concluded, *supra*, that the threshold of minimum contacts is met here, I have also noted that there are several factors that favor Ruggeri on that point. Even assuming, *arguendo*, that Ruggeri's contacts with Maryland would fall shy of the "minimum contacts" bar in a case in

which only a minimal showing of constitutional reasonableness was made, the Court is satisfied that the strength of the constitutional reasonableness factors here dictates the exercise of personal jurisdiction over Ruggeri.

In sum, the constitutional reasonableness standard is abundantly satisfied in this case.

### C. Conclusion

The Due Process Clause "'gives a degree of predictability to the legal system,'" by ensuring that litigants have "fair warning" of where they may be subject to suit. *Burger King*, 471 U.S. at 472 (quoting *World-Wide Volkswagen*, *supra*, 444 U.S. at 297). It is not "a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Id.* at 474. In this case, KC Live has made a *prima facie* case that Ruggeri had "fair warning" that he could be subject to suit in this Court, and that the Court's exercise of jurisdiction over him is not offensive to constitutional considerations of "fair play and substantial justice." *International Shoe*, 326 U.S. at 320. Accordingly, Ruggeri's motion to dismiss is denied. A separate Order implementing this ruling follows.


_____/s/_____
Ellen Lipton Hollander
United States District Judge


Dated: March 18, 2011