IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BISTRO OF KANSAS CITY, MO., LLC, | |
|     *Plaintiff,* | |
|       v. | |
| KANSAS CITY LIVE BLOCK 125 RETAIL, LLC, | Civil Action No.: ELH-10-2726 |
|     *Defendant & Counter-Plaintiff,* | |
|       v. | |
| BISTRO OF KANSAS CITY, MO., LLC & ROBERTO RUGGERI, JR., | |
|     *Counter-Defendants.* | |

**MEMORANDUM OF DECISION**

This case involves competing allegations of breach of lease for two premises located in the Kansas City Power & Light District ("District" or "Power & Light District") in Kansas City, Missouri.[1] On March 27, 2007, Bistro of Kansas City, MO., LLC ("Bistro"), as Tenant, and Kansas City Live Block 125 Retail, LLC ("KC Live"), as Landlord, executed a commercial lease for a 7,000 square foot space, to be used as a restaurant (the "Restaurant Lease").[2] On October 1, 2007, Bistro, as Tenant, and KC Live, as Landlord, executed a commercial lease for a smaller, adjoining space, to be used as a gelateria (the "Gelateria Lease"). Roberto Ruggeri ("Ruggeri"), an experienced restaurateur and one of Bistro's owners, executed a personal guaranty for each lease.

---

[1] The witnesses generally referred to the Cordish Company or the Cordish Companies ("Cordish") as the corporate entity that owns and operates the Power & Light District.

[2] Bistro is a Delaware limited liability company. Pretrial Order, Stipulations of Fact ¶ 1 ("SOF," ECF 74). KC Live is a Maryland limited liability company. *Id.* ¶ 2.

On June 2, 2010, Bistro sued KC Live in the Circuit Court of Jackson County, Missouri, claiming that KC Live had wrongfully evicted Bistro from the premises of its restaurant, in violation of the Restaurant Lease. The case was removed to the United States District Court for the Western District of Missouri, *see* ECF 1, and was subsequently transferred to this Court, pursuant to the Restaurant Lease's forum selection clause. *See* ECF 11.[3] In its answer, KC Live denied liability and filed a counterclaim against Bistro, as Tenant, asserting claims for breach of contract as to each lease. *See* Answer & Counterclaim (ECF 16). In addition, KC Live sued Ruggeri as a counterclaim defendant, in his capacity as guarantor of both leases. *See id.* According to KC Live, Bistro, as Tenant, had closed and abandoned both premises and discontinued operations, in violation of the leases, and thus was liable for unpaid rent and liquidated damages. KC Live also sought as damages various costs associated with construction of both the restaurant and the gelateria, claiming Bistro, as Tenant, was obligated to pay.

In its answer to the counterclaim, Bistro denied liability. *See* ECF 23. Ruggeri moved to dismiss, asserting that the federal court in Maryland lacked personal jurisdiction over him. *See* Motion to Dismiss (ECF 24) & Supporting Memorandum of Law (ECF 25).[4] I denied Ruggeri's motion to dismiss, finding that KC Live had made a prima facie showing of personal jurisdiction. *See Bistro of Kansas City, MO., LLC v. Kansas City Live Block 125 Retail, LLC*, Civ. No. ELH-10-2726, 2011 WL 1063800, at *16 (D. Md. Mar. 18, 2011) (ECF 40). However, the burden remained on KC Live to establish personal jurisdiction over Ruggeri at trial. *See id.* at *1. Thereafter, Ruggeri filed an answer to the counterclaim, denying liability. *See* ECF 42.

The parties' claims were tried to the Court, without a jury, over seven days in December

---

[3] Diversity jurisdiction is proper here under 28 U.S.C. § 1332(a).

[4] The case was reassigned to me on January 13, 2011.

2012 and January 2013.[5]  On the fifth day of trial Bistro filed a motion to modify the pretrial order ("Motion," ECF 88), which KC Live opposed ("Opposition" or "Opp.," ECF 101).  On March 1, 2013, the parties filed post-trial memoranda, with proposed findings of fact and conclusions of law.  *See* ECF 102 ("Bistro Memo"); ECF 103 ("KC Live Memo").  Each side filed a response on March 22, 2013.  *See* ECF 104 ("Bistro Response"); ECF 105 ("KC Live Response").  The Court heard closing arguments on April 26, 2013, and, as directed by the Court, the parties subsequently filed supplemental memoranda as to liquidated damages, *see* ECF 108 ("KC Live Supp. Memo"); ECF 109 ("Bistro Supp. Memo"), followed by responses.  *See* ECF 110 ("Bistro Supp. Response"); ECF 111 ("KC Live Supp. Response").

On July 16, 2013, when my Memorandum of Decision was almost completed, Ruggeri filed in the United States Bankruptcy Court for the Central District of California a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code.  *See* ECF 112 ("Notice of Suggestion of Bankruptcy"); Voluntary Petition, *In re Roberto Ruggeri*, No. 1:13-bk-14718-AA (Bankr. C.D. Cal. July 16, 2013).  This has resulted in an automatic stay as to KC Live's counterclaim against Ruggeri, pursuant to 11 U.S.C. § 362(a).  However, the stay does not preclude the Court from resolving issues of corporate liability.  Moreover, the parties agree that the Court may recount the facts and make findings of fact as to Ruggeri insofar as they relate to corporate issues, but may not make findings of fact and conclusions of law as to Ruggeri's personal liability as guarantor or enter judgment against him.  *See* ECF 114 & 117 (status reports

---

[5] Trial was held on December 3, 4 and 5, 2012, and January 14, 15, 29 and 30, 2013.  In citing to the trial transcript, I refer to the volume associated with each day: Volume I is the transcript for December 3, 2012 (ECF 94); Volume II is the transcript for December 4, 2012 (ECF 95); Volume III is the transcript for December 5, 2012 (ECF 96); Volume IV is the transcript for January 14, 2013 (ECF 97); Volume V is the transcript for January 15, 2013 (ECF 98); Volume VI is the transcript for January 29, 2013 (ECF 99); and Volume VII is the transcript for January 30, 2013   (ECF 100).  In citing to witness testimony, I identify the witness in parentheses.  Closing arguments are contained in Volume VIII (ECF 107).

submitted by Bistro); ECF 115 & 118 (status reports submitted by KC Live). Because of the stay, I will also abstain from addressing any issue as to personal jurisdiction with respect to Ruggeri. *See* ECF 24, 25, 29, 32, 37, 39 and 40.

The Court now issues this Memorandum of Decision, which includes findings of fact and conclusions of law, in compliance with Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons that follow, I find Bistro liable to KC Live, in the amount of $3,473,320.74.[6]

## I. Factual Summary

At trial, Bistro presented the testimony of Ruggeri, an equity owner in Bistro, the personal guarantor on each lease, and the founder and an owner of the Bice Restaurant Group (the "Bice Group" or "Bice"), an international restaurant group; Roberto Ruggeri's son, Raffaele Ruggeri ("Raffaele"), an equity owner in Bistro and Vice President of the Bice Group; Trevor Sacco, an equity owner in Bistro and former Chief Operating Officer of the Bice Group; Kevin Wilkey, the owner of Lush Hospitality Group and a restaurant consultant; and Wilkey's fiancée, Heather Bowman. KC Live presented the testimony of Michael Morris, a former Cordish employee who was the Development Director for the Power & Light District until February 2008; Nicholas Benjamin, Esq., a Cordish employee who succeeded Morris in February 2008 as Development Director and became the Executive Director of the Power & Light District in August 2009; Robert Fowler, Esq., a real estate attorney for Cordish; and Gregory Scovitch, a former Cordish employee who was a project manager at the Power & Light District. The parties also introduced numerous exhibits and stipulated to several facts.[7]

---

[6] The parties have agreed to defer determination of an award of attorneys' fees until after a decision on the merits.

[7] Although I do not expressly mention each item of evidence presented during trial, I have considered all of the stipulations, exhibits, and testimony. In citing to particular pages of

## The Power & Light District

The Power & Light District is a mixed use real estate development located in Kansas City, Missouri, owned by Cordish.[8]  *See* Tr. Vol. II at 172:12-174:21 (Morris); Tr. Vol. IV at 144:18-145:25 (Fowler).  The District is comprised of approximately nine city blocks, with each block constituting a separate limited liability company managed by CTR Management, a Cordish management entity.  *See* Tr. Vol. IV at 145:9-25 (Fowler); Tr. Vol. II at 172:7-173:1 (Morris). The District now includes, *inter alia*, over 525,000 square feet of retail space; the world headquarters of H&R Block; an 18,500 seat arena; a 3,000 seat music and entertainment venue; and a "six screen state-of-the-art movie theater."  *See* Tr. Vol. II at 173:16-174:5 (Morris).

## Lease Negotiations Between Bice Group and Cordish

In approximately 2004, Morris, then Development Director for the District, initiated contact with Ruggeri.  *See* Tr. Vol. II at 175:7-21 (Morris).  As noted, Ruggeri is the founder of the Bice Group, which owns approximately thirty restaurants around the world, including ten in the United States.  Tr. Vol. I at 194:24-195:4 (Ruggeri); *id.* at 47:18-48:20, 50:1-2 (Raffaele). Morris and Ruggeri discussed restaurant opportunities at several projects owned by Cordish, including the Power & Light District, and Ruggeri visited Cordish's main office, located in Baltimore.  Tr. Vol. II at 176:1-179:4, 182:4-185:2 (Morris).  The parties also explored the possibility of converting a smaller, adjoining space to a café and gelateria.  *See id.* at 199:11-200:4, 200:19-201:8 (Morris); *see also* Def. Exh. 18 (Dec. 11, 2006 email from Ruggeri to Morris); Def. Exh. 19 (Dec. 18, 2006 email from Sacco to Morris).  Throughout this period,

---

the trial exhibits, I may refer to the "Bates" number on the exhibit, such as "BKC" followed by a numerical reference.

[8] According to Fowler, "the Cordish Company is widely used by the public and by the company to refer to properties owned by members of the Cordish family."  Tr. Vol. IV at 144:19-21 (Fowler).

Morris was based in Baltimore.  Tr. Vol. II at 189:9-20, 191:11-16 (Morris).  He "constantly" exchanged emails with Ruggeri, and "frequently" exchanged phone calls with him, while he was in Baltimore.  *Id.* at 194:2-21 (Morris).

While Morris handled "the business side" of transactions in the District, Fowler, an attorney with Cordish, handled "the legal side."  Tr. Vol. II at 195:1-3 (Morris); *see* Tr. Vol. V at 153:12-24, 157:3-21 (Fowler).  Generally, Fowler works in Cordish's Baltimore office.  His responsibilities include negotiating and drafting leases and, when necessary, enforcing them.  Tr. Vol. V at 155:23-156:1, 167:9-21 (Fowler).  Fowler drafted and negotiated the Restaurant Lease in Baltimore.  *Id.* at 155:23-156:1, 167:9-21 (Fowler); *see also* Tr. Vol. II at 195:22-24, 196:15-22 (Morris); Def. Exh. 15 (Nov. 9, 2006 cover letter from Fowler to Ruggeri, enclosing draft of Restaurant Lease).

<u>Lease Terms</u>

On March 27, 2007, Bistro, as Tenant,  and KC Live, as Landlord, executed a ten-year lease for a 7,136 square foot space in the District, to be used for "the operation in a first-class manner of an upscale Bice Bistro Italian Restaurant."  Restaurant Lease, Def. Exh. 26, § 201(c).[9] The restaurant had two floors, with a bar and a main dining room on the first floor, and another dining room on the second floor, and could seat approximately 140 people.  Tr. Vol. I at 60:20, 89:9-15 (Raffaele).  Minimum hours were from 11 a.m. to 10 p.m., Sunday through Thursday, and until midnight on Friday and Saturday.  Restaurant Lease § 201(q).  On October 1, 2007, Bistro and KC Live also executed a lease for an adjoining 1,369 square foot space, for "the operation in a first-class manner of an upscale Italian gelateria and espresso bar."  Gelateria

---

[9] Plaintiff's Exhibit 1 is a copy of the Restaurant Lease, but it is missing the exhibits to the lease and the guaranties.  Citations to the Restaurant Lease therefore refer to Defendant's Exhibit 26, which presents a complete document.  *See* Tr. Vol. I at 55:1-6.

Lease, Def. Exh. 32, § 201(c).[10]  The gelateria, which was adjacent to the restaurant, shared the restaurant's kitchen.  Tr. Vol. I at 89:10-11 (Raffaele).  It was required to operate from 6 a.m. to 10 p.m., Sunday through Thursday, and until midnight on Friday and Saturday.  Gelateria Lease § 201(q).

During the relevant time, three equity groups held ownership interests in Bistro: Sacco Restaurant Group, LLC, which held 25% of the equity in Bistro; the Coral Family Corporation, which held 10% of the equity in Bistro; and Bice Restaurant Holding, LLC, which held 65% of the equity in Bistro.  *See* Tr. Vol. I at 175:15-177:5 (Sacco).  Raffaele was president of the Coral Family Corporation.  *Id.* at 176:17-19 (Sacco).  Ruggeri was one of the equity owners of Bice Restaurant Holding, LLC.  *Id.* at 176:24-177:4 (Sacco).  Sacco was the sole equity owner of Sacco Restaurant Group and the "operating partner" for Bistro.  *Id.* at 147:23, 175:20-176:11 (Sacco).  He "supervis[ed] on site day-to-day operations," "manag[ed] [the restaurant] from a distance" when not in Kansas City, and "hir[ed] general managers."  *Id.* at 147:23-25 (Sacco).  About four months after opening, Sacco also "took over the accounting."  *Id.* at 148:5-6 (Sacco).

Both leases were made pursuant to, and were to be governed by and construed in accordance with, the laws of the State of Missouri.  Restaurant Lease § 2702; Gelateria Lease § 2702.  In addition, "Bice Holding, Inc." and Ruggeri guaranteed both leases, jointly and severally.  *See* Restaurant Lease at 000068-73; Gelateria Lease at 000489-94.[11]  Bice enjoyed

---

[10] Plaintiff's Exhibit 2 is also a copy of the Gelateria Lease.  It is missing the exhibits to the lease and the guaranties.  Citations to the Gelateria Lease therefore refer to Defendant's Exhibit 32, which constitutes a complete document.

[11] In view of the Stay, I have not described Ruggieri's posture as a guarantor of both leases.  I note that, in the Restaurant Lease, Ruggeri identified himself as the president of Bice Holding, Inc.  *See* Restaurant Lease at 000073.  However, Ruggeri conceded at trial that no entity exists by the name of Bice Holding, **Inc.**  But, there is an entity known as Bice Holding, **LLC**.  Tr. Vol. II at 15:3-17:8, 21:12-20, 23:10-15 (Ruggeri); *see* Def. Exh. 25 at 13 (Bistro's answers to KC Live interrogatories, stating that "there is no such entity" as Bice Holding, Inc.).

limited liability with regard to the Restaurant Lease, provided that Bistro, *inter alia*, "ha[d] opened for business and ha[d] otherwise complied with its obligations in accordance with the Lease as of and through the Rent Commencement Date"[12] and, at the time of default, Bistro was "the lien-free owner of all equipment, fixtures, trade fixtures, inventory and other assets used or reasonably necessary in the operation" of the restaurant. *See* Restaurant Lease at 000072. The guaranty executed by Bice as to the Gelateria Lease also provided for limited liability as to Bice, subject to substantially similar conditions. *See* Gelateria Lease at 000493.

The lease provisions governing rent and default that are particularly relevant to this case are presented below. Additional lease provisions are included, as necessary, in the Discussion.

### *Rent*

Bistro's obligation to pay rent under each lease commenced on the "Rent Commencement Date." *See* Restaurant Lease §§ 321, 701; Gelateria Lease §§ 321, 701. In the Pretrial Order, the parties stipulated to a Rent Commencement Date of January 14, 2008. SOF ¶ 4.[13] The Rent Commencement Date also triggered the ten-year term of each lease. Restaurant Lease §§ 201(b), 601-602; Gelateria Lease §§ 201(b), 601-602.

Each lease required Bistro to make payments on the first day of each month for "Minimum Rent," "Percentage Rent," and "Additional Rent." *See* Restaurant Lease §§ 320, 701; Gelateria Lease §§ 320, 701. "Minimum Rent" for the restaurant began at $25,750 per month, to increase "at the beginning of each Lease Year thereafter by the greater of (i) two percent (2%) or

---

[12] The Rent Commencement Date is discussed, *infra*.

[13] I will address, *infra*, Bistro's motion to modify this stipulation.

(ii) the increase in the [Consumer Price Index] for the prior Lease Year." *Id.* § 201(c).[14]

"Percentage Rent" was "[a] sum equal to eight percent (8%) of [the restaurant's] Gross Sales . . . for each Lease Year in excess of three million dollars . . . ." *Id.* §§ 201(e), 702-703. "Additional Rent" was defined as "[a]ll payments of money from Tenant to Landlord or to the City of Kansas City, Missouri, and required to be paid under [the Restaurant] Lease other than Minimum Rent and Percentage Rent." *Id.* § 301. For example, Bistro was obligated to pay, as "Additional Rent," a "Grand Opening Promotional Charge" of "$1.00 per square foot" of the restaurant premises. *Id.* §§ 201(u), 1101. The Minimum Rent for the Gelateria began at $5,476 per month. *See* Gelateria Lease § 201(d). An identical rent scheme governed the Gelateria Lease. *See id.*

### Default

Section 26 of each lease pertained to defaults by the Tenant and the Landlord. Section 2601 described occurrences resulting from Bistro's conduct that gave rights to KC Live, as Landlord, including termination rights, as set forth in § 2602. Section 2601 also described defaults by KC Live that gave rise to remedies for Bistro, as Tenant.

Section 2601 of each lease provided that the following actions by Bistro would constitute an "Event of Default":

(i)      Failure of Tenant to pay any Rent when due (provided, however, that Landlord shall provide written notice of default and Tenant shall have five (5) days from notice to cure, except that if Landlord sends two (2) such notices in any twelve (12) month period, Landlord shall not be required to send further notices);

(ii)     Subject to the express terms and conditions of this Lease, failure of Tenant to commence business by the end of the Fixturing Period;

---

[14] "Consumer Price Index" was defined in § 303 of each lease. "Lease Year" was defined in § 312 of each lease as the successive twelve-month periods following the "Rent Commencement Date."

(iii)     Subject to the express terms and conditions of this Lease, discontinuance of the operation of Tenant's business at the Premises;

(iv)     Subject to the express terms and conditions of this Lease, apparent abandonment and/or abandonment of the Premises[.]

Under each lease, "so long as" Bistro was "in compliance with its obligations," it was promised "peaceful and quiet possession of the Premises during the Term" of the lease. Restaurant Lease § 404; Gelateria Lease § 404.  In the event of a default by Bistro, § 2602 of each lease provided:

Upon the occurrence of an Event of Default:

(i)     Landlord may terminate this Lease . . . by giving notice of such termination to Tenant, whereupon this Lease shall automatically cease and terminate, and Tenant shall be obligated to immediately quit the Premises. . . . If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease, without prejudice, however, to the right of Landlord to recover from Tenant all Rent accrued up to the time of termination or recovery of possession by Landlord, whichever is later, any amounts set forth below (including but not limited to Rent through the Expiration Date had there been no such termination) and any other monetary damages or loss of Rent sustained by Landlord.

(ii)     Whether or not this Lease is terminated pursuant to Section 2602(i), Landlord may proceed to recover possession of the Premises under and by virtue of the provisions of the laws of the state where the Premises are located or by such other proceedings, including re-entry and possession, as may be applicable.

(iii)     Should this Lease be terminated pursuant to Section 2602(i) or if Tenant shall abandon or vacate the Premises (whether or not the keys shall have been surrendered or the Rent shall have been paid) before the Expiration Date without having paid the full Rent for the remainder of the Term, Landlord shall have the option to relet the Premises (or any part thereof ...) for such rent and upon such terms as Landlord (in Landlord's sole, subjective discretion) may deem advisable, and if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be received by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, [and] attorneys' fees . . . .

(iv)     . . . .

(v)      Any damage or loss of Rent sustained by Landlord may be recovered by Landlord, at Landlord's option: (i) in one (1) or more separate actions, at any time and from time to time, as and to the extent that said damages and/or loss of Rent shall have accrued; or (ii) in a single action deferred until on or after the Expiration Date . . . ; or (iii) in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant agrees to pay Landlord the present value of the Rent reserved through the Expiration Date (without regard to the earlier termination) under this Lease on the date of breach, discounted at the per annum rate equal to the Federal Reserve Bank discount rate, the latter remedy hereby acknowledged to be a fair estimation of Landlord's damages and not an unenforceable penalty.

(vi)     Nothing contained herein shall prevent the enforcement of any claim Landlord may have against Tenant for anticipatory breach of the unexpired Term. In the event of a breach or anticipatory breach by Tenant of any of the covenants or provisions hereof, Landlord shall have . . . the right to invoke any remedy allowed at law or in equity under this Lease.

Section 2602 also included a provision for liquidated damages. It stated:

(vii)     If tenant fails to conduct its business operations at the Premises during the Minimum Store hours for more than three (3) consecutive business days, it is agreed and understood that Landlord shall have been deprived of an important right under this Lease, and, as a result thereof, shall suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right to collect as liquidated damages (and not as a penalty) two (2) times the Rent due for each month, or portion thereof, that such discontinuance shall persist. . . .

As to defaults by KC Live, as Landlord, § 2601 of each lease provided:

If Landlord defaults under its obligations in this Lease, after twenty days notice and opportunity to cure (unless the failure is of such a character as to require more than twenty (20) days to cure, in which event it shall be a default by the Landlord upon (1) its failure to commence and proceed diligently to cure such default with such twenty (20) day period, and/or (b) its failure to cure such default within sixty (60) days after Tenant's notice to Landlord of such default), Tenant shall have such remedies as are available by law.

## Construction Funding Agreement

In November 2007, Bistro and KC Live executed a Construction Funding Agreement ("CFA") (Def. Exh. 36)[15] as to $1,521,930 in costs associated with the build out of the restaurant and the gelateria. *See* Tr. Vol. II at 218:8-220:21 (Morris). Under the CFA, Bistro agreed to pay $600,147 of the construction costs and KC Live agreed to pay the remaining $921,783. *See* CFA ¶ D. The CFA also provided: "Default by a party under this Funding Agreement shall constitute a default of such party under the Leases. Default by a party under either of the Leases shall constitute a default by such party under this Funding Agreement." *Id.* ¶ 5.

## The Opening of the Restaurant and the Gelateria

The restaurant and the gelateria did not open until on or about July 25, 2008. Tr. Vol. I at 104:12-16 (Raffaele); Tr. Vol. III at 30:16-31:6 (Benjamin). According to Raffaele, "the restaurant struggled financially from the beginning." Tr. Vol. I at 64:19 (Raffaele). He claimed that Bistro's business was adversely affected because "[t]here was no retail open so there was no lunch traffic," and "the theaters that were supposed to happen ended up opening much later." *Id.* at 64:22-65:1 (Raffaele). In February 2008, Benjamin replaced Morris in managing business relationships with tenants in the District. Tr. Vol. III at 17:3-19:11, 21:21-22:10 (Benjamin). He recalled that by March 2008 only "about 50% of the project was open and occupied." *Id.* at 21:12-13 (Benjamin).

According to Benjamin, Bistro failed to pay rent under both leases between the Rent Commencement Date and opening, *see* Tr. Vol. III at 32:21-33:3 (Benjamin), and was delinquent in paying rent after opening. *See id.* at 33:10-12, 41:9-23, 49:2-50:13 (Benjamin). In a Notice of

---

[15] At the outset of trial, Bistro lodged an objection to the CFA based on the Statute of Frauds. Tr. Vol. II at 216:20-25. It subsequently withdrew the objection. Tr. Vol. IV at 2:21-23.

Default dated November 24, 2008, the Landlord claimed $86,170.01 in unpaid rent under the Restaurant Lease. *See* Def. Exh. 46. And, in a Notice of Default dated November 24, 2008, the Landlord claimed $31,087.70 in unpaid rent under the Gelateria Lease. *See* Def. Exh. 47. In fact, during all of 2008, the only payment Bistro made under the Gelateria Lease was on or about October 1, 2008, for $3,250.90. Tr. Vol. VI at 43:1-2 (Fowler); Tr. Vol. III at 73:5-18 (Benjamin). Benjamin also recalled that Bistro fell behind on its payments under the CFA. *See* Tr. Vol. III at 53:16-54:7 (Benjamin). By December 2008, Bistro allegedly owed KC Live approximately $600,000 in construction costs under the CFA and unpaid rent. *See id.* at 52:8-54:7 (Benjamin); *see also* Def. Exh. 48 (email exchange between Benjamin, Sacco, Ruggeri, and Alan Hicks, a Cordish employee, discussing, *inter alia*, unpaid rent and CFA costs allegedly owed by Bistro).

Benjamin testified that in January 2009, Sacco and Ruggeri "communicated" to him that the restaurant and gelateria "were both doing very badly." Tr. Vol. III at 55:17-24 (Benjamin). In February 2009, Bistro discontinued operations at the gelateria. *Id.* at 72:22-73:4 (Benjamin); Tr. Vol. V at 179:10-12 (Fowler). And, the restaurant was in a "state of chaos" by April of that year. Tr. Vol. III at 64:1-7 (Benjamin).

<u>2009 Amendment to Lease</u>

On April 1, 2009, KC Live sued Bistro, claiming approximately $358,000 for Bistro's unpaid share of construction costs under the CFA; approximately $430,000 in past due rent under both leases; and approximately $3.6 million for future rent allegedly due under both leases, discounted to present value. *See* Pl. Exh. 71 (April 1, 2009 complaint filed by KC Live). In connection with the parties' settlement of that suit, they executed an Amendment to Lease in

June 2009. *See* Amendment to Lease, Pl. Exh. 5 ("Amendment" or "Amendment to Lease")[16];

Tr. Vol. III at 67:9-68:17 (Benjamin); *see also* Def. Exh. 52 (April 2009 email chain between

Benjamin and Ruggeri regarding possible settlement terms).

Pursuant to the Amendment to Lease, Bistro agreed to pay KC Live a total of $596,574,

consisting of a payment of $200,000 upon execution of the Amendment and four installment

payments of $99,143.50 each, due on November 30, 2009, January 30, 2010, March 30, 2010,

and May 30, 2010, respectively. *See* Amendment to Lease ¶ 2. Additionally, the Amendment

reduced monthly rent under "the Lease," defined as both the Restaurant Lease and the Gelateria

Lease, for the months of May 2009 through December 2009. *Id.* ¶ 3. Specifically, the total

monthly rent under "the Lease" was reduced from approximately $32,000 to $20,000, "due on

the first day . . . and paid no later than the third day" of each month. *Id.* KC Live did not

terminate the Gelateria Lease, but reserved "a continuing right" to do so upon written notice to

Bistro and without affecting any amounts due under the Amendment. *Id.* ¶ 4.

Paragraph 5 of the Amendment provided:

> If Tenant strictly (including timeliness) complies with the provisions of
> this Agreement, and strictly (including timeliness) complies with the provisions of
> the Lease as to the payment of Rent throughout the Term (except as modified
> hereby), Minimum Rent and recurring monthly charges due for periods prior to
> the Rent Commencement Date shall be waived. If Tenant fails to strictly
> (including timeliness) comply with the provisions of this Agreement, and/or if
> Tenant fails to strictly (including timeliness) comply with the provisions of the
> Lease as to the payment of Rent throughout the Term (except as modified
> hereby), Landlord in addition to all other remedies available under the Lease or
> the law, shall have the right to terminate the Lease or Tenant's right to possession
> of the Premises by notice to Tenant without the requirement of any default notice
> or cure period, all sums due under the Lease that were reduced or conditionally
> waived hereunder shall be immediately due and payable, and Landlord shall not

---

[16] At trial, KC Live initially lodged an objection to admission of the Amendment under
the Statute of Frauds. *See* ECF 80-4 (written submission objecting to admissibility). It
subsequently withdrew the objection. Tr. Vol. IV at 2:15-17. The Amendment was also
introduced as Defendant's Exhibit 53. *See* Tr. Vol. III at 67:17-18.

be bound by any concessions made herein. Landlord acknowledges that Tenant and Guarantors dispute the amount of rent owed for periods prior to the Rent Commencement Date and nothing in this Agreement shall be construed as a waiver by Tenant and Guarantors of any defenses related thereto. Notwithstanding anything to the contrary contained herein, once Tenant is again paying Rent as set forth in the Lease without regard to this Agreement (i.e., January, 2010), as to Minimum Rent and recurring charges due monthly under the Lease, notice and cure periods provided for nonpayment of Rent under the Lease shall apply, but such notice and cure periods have no applicability to sums due under this Agreement (including section 2 regardless of when due) and are waived by Tenant.

Bistro made the initial $200,000 payment pursuant to the Amendment. Tr. Vol. I at 71:3-4 (Raffaele); *id.* at 148:15-17 (Sacco); Def. Exh. 54 ($200,000 check dated Nov. 8, 2009). Bistro also made the payment of $99,143.50 for November 30, 2009. Tr. Vol. I at 71:8-11 (Raffaele); *id.* at 148:18-19 (Sacco). Additionally, Bistro made the reduced rent payments for the months of May 2009 through December 2009. Tr. Vol. I at 149:15-17 (Sacco); Tr. Vol. III at 84:16-19 (Benjamin). However, the November 30, 2009 payment and each of the monthly rent payments made under the Amendment were late by one or more days. Tr. Vol. III at 84:3-11 (Benjamin). And, according to Benjamin, because of Bistro's problematic payment history, timeliness was important to KC Live in making concessions contained in the Amendment to Lease. *See* Tr. Vol. III at 72:8-15, 73:22-74:7 (Benjamin). Nevertheless, KC Live did not notify Bistro, at the time of its payments, that it was in default or in violation of the Amendment because of late payments. Tr. Vol. I at 149:18-150:10 (Sacco); Tr. Vol. II at 3:22-4:1 (Ruggeri).

<u>The Concept Change</u>

According to Benjamin, "[t]he restaurant continued to perform poorly" through the Fall of 2009. Tr. Vol. III at 85:20 (Benjamin). As a result, the parties began to explore "a potential change of concept" to make the restaurant "more successful." *Id.* at 85:21-22, 86:13-14 (Benjamin); *see also* Tr. Vol. I at 78:16-21 (Raffaele) (describing concept change as a way to "help the restaurant" and "actually bring people in"); *id.* at 195:5-17 (Ruggeri) (discussing the

restaurant's "financial hardship" and "need to change something . . . to keep afloat"). In or about December 2009, Bistro raised the possibility of "creating a lounge that was driven more by liquor and little tapas," to cater to the "drinking crowd" that frequented the District. Tr. Vol. I at 78:1-79:16 (Raffaele). Benjamin recommended that Bistro consult with Wilkey, who had worked on other projects in the Power & Light District and owned a restaurant and a café there, to develop the new lounge concept. *See* Tr. Vol. II at 86:6-89:11 (Wilkey); *id.* at 47:24-48:2 (Ruggeri).

As the plan developed, Sacco proposed to buy out all other membership interests in Bistro, to close the restaurant temporarily, and to then reopen it as a lounge, under a new name. *See* Tr. Vol. I at 78:1-79:16 (Raffaele); *id.* at 178:5-14 (Sacco). Benjamin claimed, however, that he was never provided with a "detailed, specific, comprehensive proposal." Tr. Vol. III at 117:4-21 (Benjamin); *see* Def. Exh. 66 (email of Jan. 21, 2010, from Sacco to Benjamin, attaching letter outlining "basic overview of the concept and menu").

Bistro and KC Live also discussed deferral, until February 15, 2010, of the payment of $99,143.50 due under the Amendment by January 30, 2010. Tr. Vol. IV at 29:8-16 (Benjamin). In an email of January 22, 2010, Ruggeri wrote to Benjamin, proposing deferral of payment until February 15, 2010. See Pl. Exh. 18 at 002957-58. On January 25, 2010, by email from Benjamin to Ruggeri, Benjamin responded: "This is fine but it is important that payment be made on February 15 and that [the] other two payments[17] stay on schedule." *Id.* at 002957.

At trial, the parties disagreed as to whether Benjamin had agreed to defer the payment. Ruggeri "understood from [Benjamin's email] that [the deferral] was granted." Tr. Vol. II at 5:8-

---

[17] Although there were also discussions of upcoming rent payments, it appears that the "other two payments" referred to the two remaining installments of $99,143.50. *See* Pl. Exh. 18; Tr. Vol. VI at 119:10-13 (Fowler).

9 (Ruggeri).  However, Benjamin testified: "I had always been clear that the $99,000 payment that was due at the end of January needed to be paid immediately."  Tr. Vol. III at 134:12-14 (Benjamin); *see also* Tr. Vol. IV at 29:4-16 (Benjamin).  Fowler claimed that the deferral was contingent on Sacco "taking over the operation, buying out Roberto, and investing a lot of money to do it."  *See* Tr. Vol. VI at 119:2-120:6 (Fowler).

Ultimately, Sacco decided that he did not want to pursue the buy-out and, on January 31, 2010, he sent an email to Benjamin and Ruggeri withdrawing his proposal.  *See* Def. Exh. 68 (January 31, 2010 email from Sacco to Benjamin and Ruggeri); Tr. Vol. I at 178:15-179:6 (Sacco).  He explained that "without a local partner or added capital investment . . . , the concept is too risky."  Def. Exh. 68.  He also wrote:  "Roberto has stated that he is not interested in putting any more money in to keep the restaurant open so I will do everything I can to keep the lights on for the next few days but cannot promise to do this for very long."  *Id*.  Nevertheless, Sacco advised that he would "continue to keep all options open including continuing to run it [*i.e.*, the restaurant] as Bice Bistro with a cash infusion and to aggressively pursue some other investors that have shown interest but not yet committed to participating."  *Id.*

The following day, Monday, February 1, 2010, a flurry of emails ensued between the parties.  Ruggeri sent an email to Sacco and Benjamin expressing his "great shock" at Sacco's withdrawal and stating: "I am at this point in no position (myself) to keep th[e] Restaurant open. . . .  For me, the operation is finished as [of] Saturday night as discussed many times."  Def. Exh. 69 (Feb. 1, 2010 email from Ruggeri to Sacco and Benjamin).  The email concluded: "The restaurant has to be closed immediately.  You might want to post a sign 'for renovation' and we will all explore together any further possibility for future operations . . . ."  *Id.*

At trial, Ruggeri explained that he wrote the email to "pressure" Sacco to go forward with the deal, and that he "had no intentions of closing th[e] restaurant," but "only wanted to change

the concept." Tr. Vol. II at 53:10-54:19 (Ruggeri); *see also* Tr. Vol. I at 179:19 (testimony of Sacco that "there was posturing going on"). Based on the content of the email, however, Benjamin believed that Ruggeri "was planning to close the restaurant immediately." Tr. Vol. III at 126:18-19 (Benjamin).

In an email response, also on February 1, 2010, Benjamin cautioned Ruggeri and Sacco, as follows:

> Closing the restaurant is not an acceptable solution. If the restaurant closes we will immediately sue for possession and against you personally. Pursuant to the lease, you will owe double rent for every day that the restaurant is closed along with the backrent that is currently owed and other amounts which I can detail if you'd like.

> . . . . From what I understand Trevor is willing to keep the restaurant open for the next few days and could, with a bit of capital support from you, keep the restaurant open through February. It would be ideal for the restaurant to undergo a significant makeover before the Big 12 tournament and March generally but I think that even an interim fix . . . would reap significant rewards in March. . . . It would be a significant mistake and missed opportunity on your part Roberto to not figure out a way to stay open through March. In the meantime we can further explore the opportunities that are available to bring investors in or re-concept.

> The above is the only solution that I see working out positively for both sides. It should not involve an inordinate investment from you. It is of course also necessary that you continue on the agreed-to payment schedule pursuant to the amendment.

> Legal is aware of your intention to close and unless I hear differently from you and am made aware of a plan to keep the restaurant open and continue with required payments they will file suit the next day.

Def. Exh. 70 (Feb. 1, 2010 email from Benjamin to Ruggeri and Sacco).

Shortly afterwards, Sacco sent an email to Benjamin and Ruggeri "to make everyone aware of what it will take to keep the restaurant open" for the week. Def. Exh. 71 (Feb. 1, 2010 email from Sacco to Benjamin and Ruggeri); *see* Tr. Vol. I at 182:24-184:6 (Sacco); Tr. Vol. III at 129:21-130:25 (Benjamin). According to Sacco, there were "several bills very overdue," and approximately $22,898.50 was "needed to continue operations" for that week alone. Def. Exh.

71. In particular, he asserted that Bistro owed its employees "4 weeks of payroll totaling approximately $16,000"; it owed $3,780.79 to two utility companies, which had issued shut off notices; and it owed "over $6,000" to its accountant, Flores Financial Services, which had threatened to "stop issuing checks and freeze all accounting processes unless . . . paid $3,117.71." *Id.* By email that afternoon, Ruggeri responded that he would "keep the restaurant open a few more days." Def. Exh. 72 (Feb. 1, 2010 email from Ruggeri to Sacco and Benjamin). Ruggeri did not provide the $22,898.50 requested by Sacco. Tr. Vol. II at 62:5-7 (Ruggeri). However, the employees were eventually fully compensated. *Id.* at 63:16-21 (Ruggeri).

Ruggeri and Benjamin had "a couple of conversation[s]" about the Ruggeris "taking over the same deal" that Sacco had proposed. Tr. Vol. I at 196:18-20 (Ruggeri); *see also* Tr. Vol. II at 57:12-16 (Ruggeri). Raffaele testified that they "had some potential investors" who were "very interested" in the change in concept. Tr. Vol. I at 83:2-15, 84:4-10 (Raffaele). Therefore, on either the evening of February 2, 2010, or the morning of February 3, 2010, Raffaele flew to Kansas City to iron out a deal with Benjamin. *Id.* at 83:12-20, 126:10-23 (Raffaele); *see also* Tr. Vol. II at 60:1-13 (Ruggeri).

<u>February 3, 2010</u>

There is no dispute that, by the end of February 3, 2010, the doors of the restaurant were locked, the lights were out, and the restaurant was closed. But, the events of February 3 were the subject of extensive and contradictory testimony. Bistro elicited testimony from Ruggeri, Raffaele, Wilkey, Bowman, and Sacco. KC Live disputed the evidence largely through the testimony of Benjamin and Scovitch. Both parties also relied on documentary evidence, including numerous email exchanges and photographs. The relevant testimony follows.

Raffaele testified that he stopped by the restaurant on the morning of February 3, 2010. Tr. Vol. V at 55:18-23 (Raffaele).  He recalled that "all [of the] lights were on," the doors were unlocked, "[t]he restaurant was open to the public," and "[a]nybody could have walked in and been served."  *Id.* at 34:15-21 (Raffaele).  He also claimed that "[t]he restaurant was fully stocked, fully operational, with everything that a restaurant needs," including kitchen equipment, refrigerators "stocked with food and prep items," "China ware," and "small ware."  Tr. Vol. I at 97:20-98:2 (Raffaele).  Moreover, he maintained that his general manager was present, along with a chef, a bartender, and a server for lunch.  *Id.* at 88:9-20 (Raffaele).

Raffaele acknowledged that the restaurant had no customers, which he attributed to "blizzard" conditions in Kansas City.[18]  *Id.* at 87:18-88:4 (Raffaele).  He also indicated that February 3, 2010, was a Monday, and "Monday's the slowest day of the week."  *Id.* at 87:14 (Raffaele).  However, he subsequently conceded that February 3, 2010 was, in fact, a Wednesday.  Tr. Vol. V at 54:9-18 (Raffaele).  Moreover, meteorological records from the National Climatic Data Center of the U.S. Department of Commerce showed no precipitation in Kansas City during the first three days of February 2010.  *See* Def. Exh. 81; Tr. Vol. IV at 93:9-100:24.  Notably, Bistro had no documentary evidence, such as invoices, payroll data, or any other records, to support Raffaele's testimony that the restaurant was, in fact, open and operating on February 3, 2010.[19]

---

[18] Sacco also testified that the restaurant was affected by a blizzard in Kansas City on February 3, 2010.  Tr. Vol. I at 187:10-13 (Sacco).

[19] Ruggeri explained that KC Live refused Bistro access to the computers where its data was stored, which remained on the restaurant premises.  Tr. Vol. V at 77:15-79:13 (Ruggeri).  Although the restaurant's general manager would normally transmit data and invoices from the restaurant to Bistro's New York office every morning, Ruggeri claimed that Bistro had not done

Early on the afternoon of February 3, 2010, Raffaele met with Benjamin at KC Live's offices in Kansas City, to discuss the proposed concept change. *See* Tr. Vol. I at 85:13-19 (Raffaele); Tr. Vol. V at 36:14-15 (Raffaele). According to Raffaele, they "discussed the changes and terms of the change, including the dates we were going to close [the restaurant], the dates we were going to open, rent," and other financial aspects of the deal. Tr. Vol. I at 85:15-18 (Raffaele); *see also* Tr. Vol. V at 37:24-38:1 (Raffaele). Raffaele requested financial concessions from KC Live in order to pursue the change in concept, including deferral of the $99,143.50 payment due on January 30, 2010, pursuant to the Amendment to Lease. Tr. Vol. I at 130:1-8 (Raffaele). He testified that he and Benjamin reached an oral agreement and shook hands, but acknowledged that no written agreement was signed. *Id.* at 85:21-86:1-5 (Raffaele). Raffaele also conceded that neither he nor Benjamin had authority to make any final decisions that were binding on KC Live. Tr. Vol. V at 38:4-13 (Raffaele).

After the meeting, Raffaele returned to the restaurant. Tr. Vol. I at 131:13-15 (Raffaele). He claimed that he met with Kevin Wilkey, Rodman Cruse, the general manager, and various "tradespeople." *Id.* at 131:17-132:22 (Raffaele). He recalled that Benjamin went with him to meet the contractors and tour the restaurant. *Id.* at 93:23-94:2, 132:10-133:6 (Raffaele).[20]

Sometime before 3:38 p.m., Raffaele left for the airport. Tr. Vol. V at 56:10-13 (Raffaele). Before his flight, he sent Benjamin and others an email, attaching a proposed menu and a proposed budget for the new restaurant. Def. Exh. 73 (Feb. 3, 2010 email from Raffaele to Benjamin, Wilkey, Roberto, and Sacco). The proposed budget required a "capital investment of about $220,400." Tr. Vol. I at 135:14-16 (Raffaele); *see* Def. Exh. 73 at 004227 ("KC Lounge

so in early February because business had been slow. *See* Tr. Vol. V at 91:7-94:15 (Ruggeri). Bistro did not claim that it sought access to the computers during discovery.

[20] No contractors who were allegedly present were called to testify.

Budget"). When Raffaele landed that evening, he received the following email from Benjamin, sent at about 7 p.m.:

> Rafael [sic],
>
> Unfortunately we are not going to be able to accept your offer. We cannot accept the non-payment of rent for jaguar [January] and [F]ebruary and we cannot accept the delay in payment of the 99k owed on [J]anuary 30. We are going to pursue the legal avenues available to us to collect what is owed.
>
> Nick

Def. Exh. 73 at 004228 (Feb. 3, 2010 email from Benjamin to Raffaele, Wilkey, Ruggeri, and Sacco).

Raffaele also received several phone messages relating that the restaurant had been shut down, but had no personal knowledge of what occurred. Tr. Vol. I at 97:1-2, 138:24-139:2 (Raffaele). He claimed that he never authorized the closure of the restaurant, *id.* at 97:13-16 (Raffaele), and that he "tried to call" Benjamin that evening, but his call was not returned. *Id.* at 98:24-99:1 (Raffaele).

### *Testimony of Nick Benjamin and Gregory Scovitch*

Benjamin recalled the events of February 3, 2010, quite differently from Raffaele. Benjamin said that he began the meeting with Raffaele "by asking Raffaele if the restaurant was closed," because he had been informed by the facilities manager "that the restaurant hadn't opened for lunch." Tr. Vol. III at 135:4-24 (Benjamin).[21] According to Benjamin, Raffaele responded, "Yes, we closed it." *Id.* at 136:13-14 (Benjamin).

Benjamin also recalled that Raffaele requested several concessions to move forward with the concept change. These included deferral of the $99,143.50 payment that was due January 30,

---

[21] The statement of the facilities manager was admitted to provide context for Benjamin's testimony, and not to establish that the restaurant was, in fact, closed during lunch. *See* Tr. Vol. III at 135:19-136:9.

2010, and conversion of the second floor of the restaurant to a "lounge/night club," which could provide "bottle service." *Id.* at 136:24-139:4 (Benjamin). From Benjamin's perspective, these requests represented significant changes from previous discussions. *Id.* at 137:24-138:5 (Benjamin). However, Raffaele offered only "back of the envelope" calculations on financing, indicating that they would need approximately $200,000 to move forward. *Id.* at 138:15-22 (Benjamin). At the end of the meeting, Benjamin explained that he "couldn't give [Raffaele] an answer as to what [KC Live's] position would be, but that [he] would relay it to the people who would make the decision and get back to him." *Id.* at 138:6-8 (Benjamin).

Benjamin understood that Raffaele was going directly to the airport after their meeting. *Id.* at 144:4-7 (Benjamin). He emailed Fowler about the proposal, and was told it "was unacceptable." *Id.* at 144:14-15; 144:23-24 (Benjamin). Shortly thereafter, at around 4 or 5 p.m., he telephoned Sacco and told him that "the restaurant was closed," and "asked [Sacco] to arrange to have the keys given to [Benjamin] so that [KC Live] could secure the space, as it was closed." *Id.* at 145:4-6, 147:23 (Benjamin). Benjamin called Sacco because he understood that, despite withdrawing his proposal to take over the restaurant, Sacco was "continu[ing] to participate directly" in its operation, as an owner. Tr. Vol. IV at 38:9-13 (Benjamin). According to Benjamin, Sacco "confirmed that he knew that the restaurant was closed," *id.* at 146:12-13 (Benjamin), and said that he "was going to call Rodman Cruse," the general manager of the restaurant, to hand over the keys. *Id.* at 147:5-6 (Benjamin).

Benjamin maintained that he did not contact Ruggeri or Raffaele to ask for the keys to the restaurant. Tr. Vol. IV at 38:14-40:1 (Benjamin). However, early on the evening of February 3, 2010, after Benjamin received the proposed menu and press release via email from Raffaele, Benjamin emailed Raffaele, "telling him that the deal that he had proposed was unacceptable."

Tr. Vol. III at 148:2-4 (Benjamin); *see* Def. Exh. 73 (Feb. 3, 2010 email from Benjamin to Raffaele, Wilkey, and Sacco).

At about 6 p.m. on February 3, 2010, Benjamin went to the restaurant with Scovitch, KC Live's construction project manager, to obtain the keys and secure the restaurant. Tr. Vol. III at 154:2-5 (Benjamin). Benjamin asked Scovitch to accompany him as a witness and to take photos. Tr. Vol. IV at 31:7 (Benjamin); *id.* at 114:5-13 (Scovitch). Benjamin and Scovitch both testified that the front door of the restaurant was locked when they arrived. Tr. Vol. III at 154:5-6 (Benjamin); Tr. Vol. IV at 115:2-6 (Scovitch). Cruse, who was in the bar/lobby area of the restaurant, unlocked the door for them. Tr. Vol. III at 154:7-8 (Benjamin); Tr. Vol. IV at 115:6-7 (Scovitch).

Benjamin recalled: "The space at that time was very much closed." Tr. Vol. III at 154:11 (Benjamin). According to Benjamin, Wilkey and Bowman were at the bar with blueprints spread out in front of them, and they had tested brown paint on one of the first-floor walls. Tr. Vol. III at 154:12-14, 157:7-13 (Benjamin). No customers were in the restaurant, the bar was not fully stocked, and the chef was not there. Tr. Vol. IV at 31:13-32:17 (Benjamin). Similarly, Scovitch said that nobody else was in the restaurant. *Id.* at 115:9-24 (Scovitch). Although Benjamin recalled that "the lights were off in the restaurant portion of the space," Tr. Vol. III at 154:12-14 (Benjamin), Scovitch said that they were on. Tr. Vol. IV at 123:5-11 (Scovitch).

While there, Scovitch "walked the entire space and took pictures of everything." *Id.* at 115:21 (Scovitch). Twenty-two of his photographs were introduced into evidence by plaintiffs. *See id.* at 122:3-123:2, 124:4-127:5 (Scovitch); Pl. Exh. 72 (Scovitch photographs). The photographs depict a vacant dining room, although the tables are set with glassware, plates, and cutlery, and the restaurant lights appear to be on. *See* Pl. Exh. 72 at 004414, 004417, 004431, 004432, 004434, 004435. Wilkey and Bowman appear in one photograph seated at the bar, *see*

*id.* at 004415; in another, Benjamin and Wilkey are at a nearby table, and appear to be interacting with Cruse and Bowman. *See id.* at 004434. No other individuals appear in any photographs. Additionally, the kitchen shelves are mostly bare; there is no indication of food preparation, and no ovens or stoves that appear to be in use. *See id.* at 004418-23, 004426, 004429-30. According to Scovitch, there was a "very, very limited amount" of food in the walk-in freezer and walk-in refrigerator. Tr. Vol. IV at 135:8-9 (Scovitch).

After Benjamin and Scovitch arrived, Benjamin asked Cruse for the keys to "secure the space." Tr. Vol. III at 154:10-11 (Benjamin). Cruse handed them over and then left with Wilkey and Bowman. *Id.* at 154:16-19 (Benjamin); Tr. Vol. IV at 117:2-19 (Scovitch). Benjamin testified that he did not engage Wilkey in conversation, but recalled that, as Wilkey and Bowman were leaving, Wilkey said: "I wish I had known this was going to happen, I wouldn't have wasted my time." Tr. Vol. III at 158:11-17 (Benjamin). Benjamin and Scovitch quickly checked the restaurant, turned off the lights, locked the doors, and left. Tr. Vol. III at 154:18-21 (Benjamin); Tr. Vol. IV at 118:8-9 (Scovitch).

*Testimony of Kevin Wilkey and Heather Bowman*

Wilkey and Bowman differed with Benjamin and Scovitch in their recollection of events on February 3, 2010.

As indicated, Wilkey owns Lush Hospitality Group, and presently works with Ruggeri on projects in North Scottsdale, Arizona, and Miami, Florida. *See* Tr. Vol. II at 152:4-153:17 (Wilkey). Bowman, Wilkey's fiancée, works with him at Lush. *Id.* at 159:13-22 (Bowman).

Wilkey testified that he had been at the restaurant twice on February 3, 2010. Initially, he went to the restaurant at around 9 a.m. to meet with a contractor from "Guiding Light Electric." Tr. Vol. II at 132:6-133:9 (Wilkey). When recalled by Bistro in rebuttal, he claimed that he met with a "painting contractor to look at some scaffolding issues." Tr. Vol. V at 131:7-8 (Wilkey).

According to Wilkey, neither Raffaele nor Benjamin was there, Tr. Vol. II at 132:6-133:9 (Wilkey), but Cruse and the chef were present. Tr. Vol. V at 131:14-15 (Wilkey).

Wilkey did not tour the restaurant with Raffaele, Benjamin, or any tradespeople that afternoon. Tr. Vol. II at 134:8-135:1 (Wilkey). Instead, he was at his own restaurant during lunch. *Id.* at 133:13 (Wilkey). At about 4 p.m., he sent a proposed press release to Benjamin about the change in concept, for publication in the *Kansas City Star*. *See* Pl. Exh. 29 (Feb. 3, 2010 email from Wilkey to Benjamin, providing draft press release); Tr. Vol. II at 95:2-96:16 (Wilkey).

At about 5:30 p.m., Wilkey returned to the restaurant with Bowman to test a paint color on the wall for the new "lounge area" on the second floor. Tr. Vol. II at 97:11-98:2 (Wilkey); Tr. Vol. V at 132:15 (Wilkey). According to Wilkey, the chef and another restaurant employee were present, in addition to Cruse, and the restaurant lights were on. Tr. Vol. II at 98:17-99-21 (Wilkey). He added that the restaurant was open and the doors were unlocked. Tr. Vol. V at 132:16-22 (Wilkey). Wilkey proceeded to the second floor to test the paint and, when he came downstairs, Benjamin was "engaged with Rodman [Cruse] in some kind of discussion." Tr. Vol. II at 100:3-6 (Wilkey). Wilkey "saw the keys change hands," and Cruse "headed straight out the door." *Id.* at 100:18-20 (Wilkey). The "other two staff members had already left." *Id.* at 100:20 (Wilkey). Wilkey asked Benjamin, "What's going on?" *Id.* at 100:23 (Wilkey). Benjamin responded: "We're shutting it down." *Id.* at 100:25 (Wilkey).

On February 6, 2010, Ruggeri emailed Wilkey, apologizing to him for having become "involved in this matter," and stating, *inter alia*, that "if [the] Landlord has no intention of coming to an understanding, I will need to call you for a deposition, on how things have arrived. . . . Let me know if you were in the restaurant when Cordish came and requested the keys." Def. Exh. 80 at A.C. 0033-34 (Feb. 6, 2010 email from Ruggeri to Wilkey). Wilkey responded by

email that day, indicating, *inter alia*, that "Cordish did not ask for the keys when they walked in," and that "Rodman [Cruse] had already prepared a master set of keys on a key ring and handed them over to Cordish and then left." *See id.* at A.C. 0032-33 (Feb. 6, 2010 email from Wilkey to Ruggeri). He added: "This seemed like something that had already been discussed and was not a surprise to Rodman [Cruse] at all so I would not characterize the event as Cordish showing up and demanding the keys." *Id.* Notably, Wilkey did not report in his email that Benjamin had said, "We're shutting it down." Tr. Vol. II at 144:16-18 (Wilkey). At trial, Wilkey testified that he "want[ed] to be clear" that he was "not going to misrepresent the situation for anybody." *Id.* at 150:5-6 (Wilkey).

Wilkey forwarded his email exchange with Ruggeri to Benjamin on February 11, 2010, and reiterated: "You did not ask for the keys nor was the situation uncomfortable or stressful. Rodman [Cruse] handed you the keys he had prepared and we all talked while Greg [Scovitch] took pictures of the location. Never did you ask or demand the keys or pressure anyone into handing them over." Def. Exh. 80 at A.C. 0032 (Feb. 11, 2010 email from Wilkey to Benjamin, forwarding Wilkey's email exchange with Ruggeri).

Bowman accompanied Wilkey to the restaurant both that morning and that evening. Tr. Vol. II at 160:25 (Bowman). According to Bowman, the restaurant was open that evening, and the wait staff, the bartender, and Cruse were present. *Id.* at 161:16-21 (Bowman). She sat at the bar while Wilkey went upstairs. *Id.* at 162:2-3 (Bowman). When Benjamin arrived at the restaurant, Cruse "handed over the keys" and left. *Id.* at 162:9-12 (Bowman). Wilkey then came down the stairs and asked Benjamin, "What's going on?" *Id.* at 163:3-5 (Bowman). According to Bowman, Benjamin replied, "We're shutting it down." *Id.* at 163:5 (Bowman).

Sacco testified that, after talking with Benjamin on February 3, 2010, he informed Cruse that a representative of KC Live would come to collect the restaurant keys, and instructed Cruse to hand them over. Tr. Vol. V at 25:22-25, 26:7-17 (Sacco). That evening, at approximately 9:56 p.m., Sacco emailed Ruggeri, Raffaele, and Benjamin to provide a "recap of what occurred" and "to clear up any confusion." Def. Exh. 76. The email said, *id.*:

> This afternoon I got a phone call from Nick stating that the restaurant was officially closed and that he would like to come by to pick up the keys in order to secure the space. I called Rodman directly and asked him what had transpired after the meeting with Nick and Raffaele and he told me that Raffaele told him "that for all intents and purposes, the restaurant was closed." If it would reopen it would be under a new structure with new partners. Rodman was aware Nick Benjamin would be coming down to collect the keys to the space and I told him to give the keys to the landlord so they could secure the space.

At trial, Sacco explained that Raffaele's statement to Cruse meant "that they [we]re closing the restaurant to remodel and renovate the restaurant as per what they were negotiating with the landlord." Tr. Vol. V at 24:3-5 (Sacco). Sacco conceded, however, that his understanding of Raffaele's statement was not explained in the email. *Id.* at 24:6-8 (Sacco).

## Subsequent Events

On February 4, 2010, KC Live sent Bistro a "Notice of Default" with respect to the Restaurant Lease. See Defendant's Exhibit 74. It said, in part, *id.*:

> You have failed to pay rent when due under the [Restaurant] Lease. You have also recently vacated and abandoned the Premises in violation of your Lease. Landlord hereby demands that you pay all rent outstanding and reopen and operate the premises in accordance with the Lease. Please note the liquidated damages provisions in the Lease for failing to keep the Premises open and operation . . . . For security purposes, we have changed the locks to the Premises, but you can have access any time by contacting Nick Benjamin . . . .

Pursuant to § 2705 of the Restaurant Lease, the Notice was sent to the Bistro address listed in § 201(s), and copies were sent to the California address of an attorney for Bistro, Tim

Pickwell.  *See* Def. Exh. 74; Restaurant Lease § 201(s).  Additionally, copies were mailed to Ruggeri and Bice at Ruggeri's address in Miami Beach, Florida, in accordance with the guaranty with respect to the Restaurant Lease.  *See* Def. Exh. 74; Restaurant Lease at 000070.

Also on February 4, 2010, James Myers, Esq., counsel for Bistro and Ruggeri in Kansas City, sent an email to Benjamin and Fowler, presenting his clients' view of the events of February 3, 2010.  *See* Def. Exh. 78.  He complained, *inter alia*, that "Cordish officials went to Bice Bistro and demanded the local manager hand over the keys to the restaurant," even though "the restaurant was open for business."  *Id.* at BKC 000772.  Further, he asserted that "Cordish's actions ha[d] significantly damaged" Bistro, and prevented Bistro from "access[ing] the property to get its business documents and records."  *Id.* at BKC 000773.

Bistro took no steps to reopen the restaurant or the gelateria.  Effective March 1, 2011, KC Live relet the restaurant premises to a sushi restaurant, Drunken Fish, for a term of six years, but at a monthly rent that was less than Bistro was to pay.  Tr. Vol. V at 202:21-203:15 (Fowler); *see* Def. Exh. 83 §§ 201(b), 201(m) (Drunken Fish lease).[22]  And, KC Live relet the gelateria premises to Balsano's Gelato Café ("Balsano"s"), for a term of five years beginning July 1, 2011.  Tr. Vol. VI at 42:13-15 (Fowler); *see* Def. Exh. 84 § 201(b) (Balsano's lease).[23] However, Balsano's has no option to renew its lease.  Moreover, its monthly rent is less than was due under the Gelateria Lease.  Tr. Vol. VI at 22:8, 37:2-13 (Fowler).

---

[22] The replacement tenant is actually So. Power, Inc., t/a Drunken Fish.  *See* Def. Exh. 83 §§ 101, 201(o).

[23] The actual tenant is T&T, Inc., t/a Balsano's Gelato Café.  *See* Def. Exh. 84 §§ 101, 201(o).

Bistro's kitchen equipment,[24] furniture, dishes, and the like, remained on the premises, and KC Live made all of it available for use by Drunken Fish. Tr. Vol. IV at 59:2-60:5 (Benjamin); *see* Tr. Vol. VI at 102:11-17 (Fowler). The kitchen equipment was financed by Wasco Capital Services, LLC, for approximately $210,000. Tr. Vol. V at 62:15-65:2 (Ruggeri); Def. Exh. 38 (Master Finance Agreement); Def. Exh. 39 (Wasco Capital letter authorizing $210,000 disbursement). Bistro contends that it owes approximately $170,000 to $175,000 to the current creditor, Sterling National Bank, for the equipment. Tr. Vol V at 73:5-74:20 (Ruggeri); *see* Def. Exh. 37 (assignment of equipment finance agreement). Bistro has made no payment on that debt since February 3, 2010, and Ruggeri did not know the exact amount of principal owed on the debt. Tr. Vol. V. 83:3-20, 85:11 (Ruggeri).

Sterling has not sued Bistro or Ruggeri to collect on the debt. *Id.* at 85:16-87:20 (Ruggeri). However, on or about February 18, 2011, Sterling wrote to David Cordish, President of Cordish, requesting delivery of the equipment to Sterling. *See* Pl. Exh. 73 (letter dated Feb. 18, 2011, from Sterling to David Cordish). Fowler was copied on the correspondence. *See id.* Although the Restaurant Lease provided that KC Live would subordinate its position to the equipment lien, *see* Restaurant Lease § 1602, Fowler testified that Sterling "had no authority to remove it until [Bistro's] rent was paid." Tr. Vol. IV at 194:25-195:1 (Fowler); *see id.* at 189:19-21 (Fowler) ("If the tenant's in default, nothing can go, whether it's got a lien on it or nothing."). According to Fowler, he had discussions with Sterling about the security interest, and although Sterling "threatened to take legal action" to recover the equipment, it never did so. Tr. Vol. VI at 100:13-101:2 (Fowler).

---

[24] The kitchen equipment at issue consists of eleven pages of items, such as a "reach-in" refrigerator, a gas fryer, a pizza deck oven, a walk-in freezer, and a convection oven. *See* Def. Exh. 41 (equipment list).

In addition, Sacco testified that approximately $32,130.42 of audiovisual equipment, which Sacco paid for as "a loan to the restaurant," has not been returned to Bistro and remains at the restaurant. *See* Tr. Vol. I at 159:5-8, 162:14-163:8, 175:4-7 (Sacco); Pl. Exh. 52 (copy of check made out by Sacco for audiovisual equipment). The audiovisual equipment includes items such as speakers, television monitors, AV equipment, and wall mounts. *See* Pl. Exh. 52 (audiovisual equipment sales order); Tr. Vol. I at 162:14-16 (Sacco).

Additional facts are included in the discussion of the issues.

## II.     Motion of Bistro and Ruggeri to Amend the Pretrial Order

Pursuant to § 402 of each Lease, KC Live claimed damages at trial that included the monthly rent and liquidated damages allegedly owed because Bistro did not open the restaurant and the gelateria by the Rent Commencement Date. *See* Tr. Vol. VI at 25:6-13 (Fowler); Def. Exh. 85 (calculation of damages by KC Live). Specifically, § 402 of the Restaurant Lease stated:

> If Tenant does not open the Premises for the conduct of its business by the expiration of the Fixturing Period then in order to compensate Landlord for its loss, Landlord . . . shall have the option of collecting from Tenant an amount equal to all Minimum Rent plus Additional Rent due under this Lease, <u>plus</u> an additional amount (which shall constitute Additional Rent under the Lease) [of] $500[25] per day for each and every day from the Rent Commencement Date until the date Tenant opens for business from the Premises in accordance with the terms of this Lease. Such additional amount shall be deemed to be in lieu of any Percentage Rent that might have been earned during the period of Tenant's failure to open.

The financial penalty provided in § 402 of each lease is calculated by reference to the Rent Commencement Date. As noted, the Rent Commencement Date triggered the ten-year term of each lease, per § 201(b) of each lease, and established the opening date for operation of the

---

[25] Under the Gelateria Lease, the daily penalty is $100.

premises, per § 402 of each lease. Notably, in the Pretrial Order (ECF 66),[26] the parties stipulated to a Rent Commencement Date of January 14, 2008, for both leases. SOF ¶ 4 ("Rent Commencement under both Leases occurred on January 14, 2008.").

Under each lease, the Rent Commencement Date hinged on construction of the premises by KC Live, referred to as "Landlord's Work." *See* Tr. Vol. III at 34:6-35:20 (Benjamin); Tr. Vol. IV at 111:23-113:2 (Fowler). Specifically, § 321 of each lease defined the Rent Commencement Date, in relevant part, as "the next calendar day after the last day of the Fixturing Period." The "Fixturing Period," in turn, referred to a ninety-day period, beginning with "Notice of Possession," during which Bistro was "obligated to build, fixture and equip the Premises." Restaurant Lease §§ 201(m), 307; Gelateria Lease §§ 201(m), 307. The leases defined "Notice of Possession," in pertinent part, as "the date . . . of Landlord's notice to Tenant that Landlord has substantially completed the work expressly listed on Exhibit C as being performed by Landlord . . . (the 'Landlord's Work') . . . ." Restaurant Lease § 316; Gelateria Lease § 316.

Benjamin and Fowler testified briefly that Notice of Possession was provided to Bistro on October 16, 2007, after completion of the Landlord's Work, and therefore, the Rent Commencement Date was January 14, 2008. *See, e.g.*, Tr. Vol. III at 34:1-35:20, 36:25-37:12 (Benjamin); Tr. Vol. IV at 183:15-20 186:2-11 (Fowler); *see also* Def. Exh. 33 (Oct. 16, 2007 letter from KC Live to Bistro, providing notice of possession). This evidence was fully consistent with the parties' stipulation as to the Rent Commencement Date. *See* SOF ¶ 4.

_____

[26] The Pretrial Order included a brief statement of facts and legal theories for each party; any amendment of the pleadings or abandonment of issues sought by either party; a joint stipulation of facts requested by Bistro with KC Live's responses and admissions; damages claimed and relief sought by both parties; a list of trial exhibits; a witness list; and citations to deposition transcripts that each party anticipated using at trial. *See* ECF 66.

Nonetheless, Bistro called Sacco as part of its rebuttal case to dispute the Rent Commencement Date.[27]  Sacco claimed that KC Live had not finished its construction of the premises when the Notice of Possession was delivered in October 2007.  The matter was raised with Morris, who told Sacco to disregard the Notice of Possession.  *See generally* Tr. Vol. V at 3:17-9:12 (Sacco).  According to Sacco, KC Live did not complete its work on the premises until June 2008.  *Id.* at 9:10-12 (Sacco).  Sacco also testified that Bistro did not receive keys to the premises until the summer of 2008, and the restaurant opened within forty-five days of that date. *Id.* at 9:12-24, 18:17 (Sacco).  Sacco maintained that there were "hundreds of pages of documentation" to show that KC Live had not completed its work at the time the Notice of Possession was sent.  *Id.* at 11:2-10 (Sacco).  However, no such documentation was offered into evidence at that time.

When Fowler resumed his testimony, I asked about KC Live's construction obligations, as they related to the Notice of Possession and the Rent Commencement Date.  *See generally* Tr. Vol. V at 107:12-115:11.  Fowler explained that he was not prepared to testify as to the details on the issue, because he understood that it was the subject of a pretrial stipulation.  But, on the fifth day of the eight-day trial, Bistro and Ruggeri objected when KC Live moved to enter into evidence the parties' stipulation as to the Rent Commencement Date.  They claimed, *inter alia*, that they had not intended to concede that the restaurant opened late, or to waive any claims or defenses as a result of the late opening.  *See generally id.* at 118:3-124:13.  In overruling the objection, I said: "The stipulation in the rent commencement date was January 14 of '08."  *Id.* at 129:10-12.

---

[27] Due to scheduling issues, Bistro presented its rebuttal case prior to the conclusion of KC Live's case.

On January 23, 2013, a week after all the evidence had been presented, Bistro and Ruggeri filed a Motion to Modify Pretrial Order ("Motion," ECF 88), pursuant to Fed. R. Civ. P. 16(d) and (e) or Fed. R. Civ. P. 15(b), asking me to disregard the stipulation and treat the Rent Commencement Date as a disputed fact, subject to proof at trial.[28]  Bistro conceded that it had "originally proposed this stipulation" to KC Live.  Motion at 3.  Additionally, the stipulation was submitted as part of the proposed Pretrial Order on October 24, 2012, almost a year after discovery concluded in December 2011, and about two and a half years after the case was filed in June 2010.[29]  Nonetheless, Bistro and Ruggeri asserted that "Rent Commencement was not a hotly debated issue during discovery and was considered relatively insubstantial." *Id.* at 2.  They claimed that they "did not anticipate Nick Benjamin and Robert Fowler testifying that in essence the landlord completed its construction timely," such that Bistro's failure to open for business by the Rent Commencement Date "triggered additional substantial damages." *Id.*  Accordingly, Bistro and Ruggeri maintained that "a manifest injustice would occur if the Court does not disregard the stipulation . . . , as the evidence presented by both sides at trial contrary to the stipulation is substantial." *Id.*  Bistro's arguments lack merit.

Fed. R. Civ. P. 16(d) states that a pretrial order "controls the course of the action unless the court modifies it."  Further, as a general rule, a stipulation of fact in a pretrial order "stands as fully determined as if it had been adjudicated after the taking of testimony at trial."  6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE §

---

[28] KC Live filed its response in opposition on February 11, 2013 ("Opposition" or "Opp.," ECF 101).

[29] Bistro and Ruggeri's trial attorneys were not retained until after discovery had concluded.  They filed their notices of appearance on March 28, 2012.  *See* ECF 58, 59.  Bistro and Ruggeri had previously been represented by other counsel.

1527, at 386 (3d ed. 2010, 2012 Supp.); *see Richardson v. Dir., Office of Workers' Compensation Programs*, 94 F.3d 164, 167 (4th Cir. 1996) (collecting cases).

"[F]actual stipulations are 'formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'" *Christian Legal Soc'y v. Martinez*, ___ U.S. ____, 130 S. Ct. 2971, 2983 (2010) (quoting 2 McCormick on Evidence § 254, at 181 (6th ed. 2006)); *see McLean Contracting Co. v. Waterman Steamship Corp.*, 277 F.3d 477, 480 (4th Cir. 2002) ("Failure to identify a legal issue worthy of trial in the pretrial conference or pretrial order waives the party's right to have that issue tried."); Fed. R. Civ. P. 16 advisory committee's note (1983) ("Counsel bear a substantial responsibility for assisting the court in identifying the factual issues worthy of trial.  If counsel fail to identify an issue to the court, the right to have the issue tried is waived.").  Indeed, the Supreme Court has long recognized that litigants "'[a]re entitled to have [their] case tried upon the assumption that . . . facts, stipulated into the record, were established.'" *Christian Legal Soc'y*, 130 S. Ct. at 2983 (quoting *H. Hackfeld & Co. v. United States*, 197 U.S. 442, 447 (1905)).

To be sure, "total inflexibility is undesirable."  Fed. R. Civ. P. 16 Advisory Committee's note (1983).  Therefore, Fed. R. Civ. P. 16(e) provides that a "court may modify the order issued after a final pretrial conference," but "only to prevent manifest injustice."  For example, a district court may disregard a stipulation if to accept it would be "manifestly unjust or if the evidence contrary to the stipulation [is] substantial."  *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984).  But, a court should also consider: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; and (4) bad faith by the party

seeking to modify the order." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir. 2000). As to Bistro, the manifest injustice required under Rule 16(e) was not met here.[30]

Throughout this litigation, until the fifth day of an eight-day trial, Bistro took the position that the Rent Commencement Date was January 14, 2008. In answers to KC Live's counterclaim, Bistro *admitted* that the Rent Commencement Date on both leases was January 14, 2008. *See* Bistro's Answer to Counterclaim ¶¶ 10, 14 (ECF 23); *see also* Ruggeri's Answer to Counterclaim ¶¶ 10, 14 (ECF 24). A defendant's admissions in response to a complaint are intended to "apprise" the plaintiff "of those allegations in the complaint that stand admitted and will not be at issue at trial and those that are contested and will require proof to be established to enable the plaintiff to prevail." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1261, at 526 (3d ed. 2004, 2013 Supp.). Indeed, a party is ordinarily bound by admissions made in its pleadings. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, ___ U.S. ___, 133 S. Ct. 1184, 1197 n.6 (2013); *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989). Understandably, then, the Rent Commencement Date was not "hotly debated," as Bistro asserts, because Bistro admitted to the date almost from the outset of the litigation.

Bistro unconvincingly claims that there is substantial evidence to contradict the stipulation. It relies on the "detailed" testimony of Benjamin and Fowler, complaining: "If [the Rent Commencement Date] had been treated as entirely stipulated, then such detailed testimony should not have been elicited by the Defendant . . . ." Motion at 6. But, the "detailed testimony" offered by Benjamin and Fowler was entirely consistent with the Rent Commencement Date of January 14, 2008, and was offered merely to provide context for KC Live's damage claim.

---

[30] Because of the stay, discussed earlier, my ruling on this issue is limited to Bistro.

Further, Bistro asserts that Benjamin's trial testimony differed from his deposition testimony as KC Live's 30(b)(6) corporate designee. *See id.* at 6. Bistro quotes the following portion of Benjamin's deposition testimony, Pl. Exh. 49 at 13:1-8:

> **Question**: What was the position of the Cordish Company on whether or not the space had been—whether there was a delay in construction?

> **Answer**: The position was that if there was any delay, it was insubstantial, and that most of the delay had been caused by Bice. And, again, you know, we essentially worked that out and put that issue to bed in that amendment.

Bistro insists that, in reliance on Benjamin's deposition, it "proposed the stipulation . . . viewing the construction delay as insubstantial and that, in any event, the Amendment resolved most of this issue." Motion at 7. In its view, "once the trial began, it was clear that Defendant did not believe the delay in opening to be 'insubstantial,' and Robert Fowler made clear that the Defendant's position was that the Amendment did not resolve anything." *Id.* But, Bistro overlooks that, *before* Benjamin's deposition, it had admitted to the particular Rent Commencement Date that it now disputes. Bistro also misreads Benjamin's deposition testimony, which did not contradict the stipulation: Benjamin said that any delay in *construction* was insubstantial; he did not testify that any delay in *opening* was insubstantial. He also claimed the delay was caused by Bistro. The cause of the delay would be irrelevant in light of the stipulation, but hardly so in the absence of the stipulation.

Bistro adds that Sacco's testimony was "in direct conflict with the stipulation," such that modifying the Pretrial Order under Fed. R. Civ. P. 16(e) is appropriate. *Id.* at 9. Bistro's position turns Rule 16 on its head. Bistro purposefully offered Sacco's testimony to dispute the stipulation. It may not manufacture an excuse to avoid its strategic misstep; allowing it to do so would undermine the value in litigation of pretrial stipulations and admissions.

Bistro's reliance on Fed. R. Civ. P. 15(b), which addresses amendments of the pleadings during and after trial, is also unavailing. Fed. R. Civ. P. 15(b)(1) allows for amendment of the pleadings "[i]f, at trial, a party objects that evidence is not within the issues raised by the pleadings." It states: "The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." *Id.* Fed. R. Civ. P. 15(b)(2) provides: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after the judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."

Rule 15, standing alone, does not control amendment of a pretrial order. Modifying a pretrial order in accordance with the standard of Rule 15 would read Rule 16's "manifest injustice" requirement out of the Federal Rules of Civil Procedure. *Cf. Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."); *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003) (applying Rule 16 "good cause" standard to Rule 15 motion to amend pleading after scheduling deadline passed).

It is also noteworthy that neither Bistro nor Ruggeri ever sought to amend their pleadings before trial, even though, over a year before trial, KC Live twice provided spreadsheets itemizing liquidated damages for late opening. *See* Opp. Exh. 1A (calculation of damages as of April 1, 2011, produced on Oct. 14, 2011); Opp. Exh. 2 (calculation of damages as of Nov. 1, 2011, produced on Nov. 17, 2011). Each spreadsheet presented a month-by-month calculation of liquidated damages for late opening that corresponded to the time between the Rent

Commencement Date in January 2008 and the opening in July 2008. Yet, Bistro never questioned Benjamin, KC Live's 30(b)(6) corporate designee, about these calculations at his deposition on November 29, 2011, months after it had received the April 2011 spreadsheet. *See generally* Deposition of Benjamin, Pl. Exh. 49. Nor did Bistro attempt to do so in the ensuing year preceding the trial.

KC Live also points out that "[n]either side sought, and neither side obtained, in trial preparation, the facts or documents that litigating the fixturing-period construction events would have entailed." Opp. at 4. For example, neither party produced the "hundreds" of documents identified by Sacco as material to this issue. Therefore, KC Live argues that disregarding the stipulation would require reopening discovery and delaying trial to accommodate new evidence. It insists that modification of the Pretrial Order, based on a change of position five days into the trial, would unquestionably prejudice KC Live and disrupt the "orderly and efficient trial of the case." *Koch*, 203 F.3d at 1222.

In sum, KC Live would plainly be prejudiced by such a belated "amendment" of the Pretrial Order. Because I see no basis to grant the requested relief, the Motion is denied as to Bistro.

### III. Discussion: Factual Findings and Conclusions of Law

The parties' positions in this case require me to resolve competing allegations of breach of lease under Missouri law[31] and, in doing so, to make credibility determinations.

_____

[31] As a federal court with diversity jurisdiction, I apply the choice of law rules of the forum state. *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). Notwithstanding transfer of the case to this Court, Missouri is regarded as the forum state, as suit was initiated there. *See Ferens v. John Deer Co.*, 494 U.S. 516, 519 (1990) ("[F]ollowing a transfer under § 1404(a) initiated by a defendant, the transferee court must follow the choice-of-law rules that prevailed in the transferor court"). Under Missouri's choice-of-law rules, I apply Missouri law, pursuant to the choice of law provision in § 2702 of each

"A lease in Missouri acts as both a conveyance and a contract, and a damaged party has available the usual contract remedies in the event a provision of a lease is breached 'including damages . . . .'" *Campus Lodge of Columbia, Ltd. v. Jacobson*, 319 S.W.3d 549, 552 (Mo. Ct. App. 2010) (citation omitted). Under Missouri law, the elements of an action for breach of lease are "'the existence of a valid lease, mutual obligations arising under the lease, that defendant did not perform, and that plaintiff was thereby damaged by the breach.'" *Id.* (quoting *TA Realty Assocs. Fund V, L.P. v. NCNB 1500, Inc.*, 144 S.W.3d 343, 347 (Mo. Ct. App. 2004)); *cf. Keveney v. Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo. 2010) (listing elements for claim of breach of contract). The party claiming breach bears the burden of proof to establish a prima facie case. *Campus Lodge*, 319 S.W.3d at 552; *TA Realty*, 144 S.W.3d at 347.

Neither party disputes the existence of a valid lease or the mutual obligations arising thereunder. Rather, they dispute performance under each lease and the resulting damages.

Bistro claims that KC Live "improperly and unlawfully retook possession of the [restaurant] premises without requisite notice, breaching the [restaurant] lease agreement between the parties." Bistro Memo at 2. Further, Bistro claims that because KC Live "was the party first in breach of the lease agreement," KC Live should be "unable to enforce the lease against Bistro"—*i.e.*, seek damages—under Missouri law. *Id.* at 3. As a result of the alleged breach, Bistro claims damages of $676,744.98, including the value of the "furniture, fixtures and equipment" that Bistro was not allowed to reclaim; "construction costs paid by Bistro . . . for improvements made to the lease premises"; and lost profits from the business. *Id.* at 2.

---

lease. *State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 600 (Mo. 2012) ("A valid choice of law provision in a contract binds the parties."). Even if Maryland were the forum state, the same result would follow. *See Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 336 Md. 606, 610, 650 A.2d 246, 248 (Md. 1994) ("[I]t is 'generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract.'") (Citation omitted).

KC Live insists that it did not evict Bistro from the restaurant premises, *see* KC Live Memo at 12, but that even if it did, Missouri law does not excuse Bistro from its obligation to pay rent. *Id.* at 5-7. Instead, it asserts that Bistro breached its obligations under both the Restaurant Lease and the Gelateria Lease by: (1) failing to pay rent; (2) discontinuing operations; and (3) abandoning or apparently abandoning the premises, in violation of § 2601 of both leases. *See id.* at 15. Further, KC Live contends that no notice or opportunity to cure was required before it was entitled to take possession of the premises. *See* KC Live Response at 18-19. As a result, KC Live contends that it is entitled to damages of $4,984,948.27 from Bistro, in accordance with § 2602 of both leases. KC Live Memo at 15.

In evaluating the parties' positions, I construe each lease according to the rules of contract interpretation. *See Campus Lodge*, 319 S.W.3d at 552. "The guiding principle of contract interpretation under Missouri law is that a court will seek to ascertain the intent of the parties and to give effect to that intent." *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. 2005) (en banc). "'The intent of the parties is presumed to be expressed by the natural and ordinary meaning of the language in the contract.'" *Campus Lodge*, 319 S.W.3d at 552 (quoting *Parker v. Pulitzer Pub. Co.*, 882 S.W.2d 245, 249 (Mo. Ct. App. 1994)). Although "[t]he surrounding circumstances at the time of contracting and the positions and actions of the parties are relevant to the judicial interpretation of the contract," such evidence "may not be used to vary, contradict, enlarge, modify, or curtail the written terms of the agreement." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 67 (8th Cir. 1994).

If a contract is unambiguous, neither parol nor extrinsic evidence may be considered. *Id.* Rather, extrinsic evidence may be used to aid interpretation only if a contract is ambiguous. *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784 (8th Cir. 1984). "'An ambiguity exists when there is more than one reasonable interpretation which can be gleaned

from the contract language.'" *McIntire v. Glad Heart Props.*, ___ S.W.3d ____, 2013 WL 2300993, at *3 (Mo. Ct. App. May 28, 2013) (citation omitted).

**A. Breach**

For the reasons discussed below, I find that Bistro did not abandon or apparently abandon the restaurant premises on February 3, 2010.[32]  Nevertheless, I find that Bistro breached the Restaurant Lease, the Gelateria Lease, and the Amendment to Lease by discontinuing operations and by failing to pay rent.  Moreover, I conclude that KC Live did not breach the Restaurant Lease or the Amendment in taking possession of the restaurant on February 3, 2010, even though it did not provide Bistro with prior written notice or an opportunity to cure.[33]  Nor did it constructively evict Bistro on that date.  Pursuant to the Restaurant Lease and the Amendment, Bistro was not obligated to provide prior written notice and an opportunity to cure, although it did so after the fact, on February 4, 2010.  In view of my findings, I need not address whether, under Missouri law, Bistro was relieved of its obligation to pay rent as a result of KC Live's action in taking possession of the restaurant premises.

My analysis follows.

1.  Gelateria Lease

The undisputed evidence showed that Bistro discontinued operations at the gelateria in February 2009.  *See* Tr. Vol. III at 72:22-73:4 (Benjamin); Tr. Vol. V at 179:10-12 (Fowler).  Moreover, it made only a single rent payment of $3,250.90, on or about October 1, 2008.  Tr. Vol. VI at 43:1-2 (Fowler); Tr. Vol. III at 73:5-18 (Benjamin).  Therefore, Bistro breached that

---

[32] The parties did not focus on the issue of abandonment of the gelateria.

[33] KC Live did provide written notice of default in its letter dated February 4, 2010, in which it demanded that Bistro return and reopen the restaurant.  *See* Def. Exh. 74.  However, because this notice was provided after KC Live took possession of the premises on February 3, 2010, it is not relevant to whether KC Live was entitled to take possession on that date.

lease, and KC Live is entitled to pursue damages in accordance with § 2602 of the Gelateria Lease, discussed *infra*.

    2.  <u>Restaurant Lease</u>

As noted, Bistro claims that KC Live breached the Restaurant Lease on February 3, 2010, by taking possession of the premises even though Bistro was not in default. Alternatively, Bistro argues that, even if it was in default, KC Live was obligated to provide notice and an opportunity to cure before taking possession. *See* Bistro Memo at 22-23, 37-41. As a result, Bistro asserts that KC Live breached the covenant of quiet enjoyment, as provided in § 404 of the Restaurant Lease. *Id.* at 34.

"To establish a breach of a covenant of quiet enjoyment, evidence must be presented that shows that lessee has been actually or constructively evicted from the leased premises." *City of St. Joseph, Mo. v. St. Joseph Riverboat Partners*, 141 S.W.3d 513, 517 (Mo. Ct. App. 2004). "A constructive eviction occurs, 'when the lessor, by wrongful conduct or by the omission of a duty placed upon him in the lease, substantially interferes with the lessee's beneficial enjoyment of the demised premises.'" *Id.* (quoting *Ridley v. Newsome*, 754 S.W.2d 912, 915 (Mo. Ct. App. 1988)).

However, "the doctrine of constructive eviction is applicable only when a lessee's beneficial enjoyment of the premises is interrupted by a lessor's 'wrongful conduct.'" *Hurwitz v. Kohm*, 594 S.W.2d 643, 647 (Mo. Ct. App. 1980). Accordingly, a tenant in default has no claim for constructive eviction if the lease permits the landlord take possession of and relet the premises upon the tenant's default. *Id.* (holding that tenant could not claim constructive eviction based on landlord's removal of equipment from premises, demanding return of keys, and denying access to the building, because lease and common law allowed landlord to resume possession and relet premises upon tenant's default).

43

KC Live insists that on February 3, 2010, Bistro discontinued operations, in violation of § 2601(iii) of the Restaurant Lease; abandoned or apparently abandoned the premises, in violation of § 2601(iv) of the Restaurant Lease; and was in default of its payment obligations under the Amendment to Lease. KC Live Memo at 14-15; KC Live Response at 3. Upon an "Event of Default" by Bistro, § 2602(ii) of the Restaurant Lease entitled KC Live to "recover possession of the Premises under and by virtue of the provisions of the laws of the state where the Premises are located or by such other proceedings, including re-entry and possession, as may be applicable." Therefore, upon an "Event of Default," KC Live could take possession of the restaurant premises without constructively evicting Bistro. *See WEA Crestwood Plaza, LLC v. Flamers Charburgers, Inc.*, 24 S.W.3d 1, 7-8 (Mo. Ct. App. 2000) (discussing landlord's options, including repossession, upon a tenant's default); *see also Superior Outdoor Adv. Co. v. Snadon*, 965 S.W.2d 421, 423-24 (Mo. Ct. App. 1998) ("'An alleged breach of a covenant [of quiet enjoyment] on the part of the lessor is not a defense to an action for rent where the acts relied on as a breach occurred subsequent to the termination of the lease by the lessor pursuant to its terms.'") (citation omitted).

    *a. Abandonment or Apparent Abandonment*

KC Live first claims that, as of February 3, 2010, Bistro had abandoned or apparently abandoned the premises of the restaurant, in violation of § 2601(iv) of the Restaurant Lease. Section 2601(iv) provided that "apparent abandonment and/or abandonment of the Premises" constituted an "Event of Default."

"Abandonment" is not defined in the Restaurant Lease. Ordinarily, however, "[a]bandonment requires proof of nonuse of the premises with the intention of relinquishing all property rights." *Phillips v. Ockel*, 609 S.W.2d 228, 233 (Mo. Ct. App. 1980); *accord tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 n.5 (4th Cir. 1976) ("As a general rule, an

'abandonment' of a lease occurs when the lessee leaves the premises vacant with the avowed intention not to pay rent."); *see also* Black's Law Dictionary (9th ed. 2009) (defining "abandonment" of real property as "[t]he relinquishing of or departing from a homestead, etc., with the present, definite, and permanent intention of never returning or regaining possession").

Thus, "[a]bandonment is largely considered a matter of intention." *City of Festus v. Festus Flying Serv., Inc.*, 750 S.W.2d 532, 536 (Mo. Ct. App. 1988); *see Cole Cnty. v. Bd. of Trs. of Jefferson City Free Library Dist.*, 545 S.W.2d 422, 425 (Mo. Ct. App. 1976) ("It is well established that in order to show abandonment, an intention to abandon must be proved."). For example, a tenant abandons a commercial premises when it discontinues any "exercise [of] dominion or control" over the premises. *Jaron Corp. v. Pellet*, 866 S.W.2d 897, 901 (Mo. Ct. App. 1993) (finding that tenant had abandoned premises of liquor bar because "there was no evidence [tenant] continued to exercise dominion or control over the building," even though "some personal property remained"); *see also Festus*, 750 S.W.2d at 536 (finding abandonment when tenant informed landlord of intent to cease operations, and subsequently vacated premises and ceased operations).

The evidence showed that Bistro continued to exercise dominion and control over the premises on February 3, 2010, or intended to do so. At least one Bistro employee was in the restaurant on February 3, 2010, when Benjamin arrived to collect the keys. Wilkey, Bistro's consultant for the new concept, was in the restaurant to apply paint samples to the walls and review blueprints. To be sure, food supplies appear to have been limited, some of the lights may have been off, and the doors may have been locked. But, it is undisputed that Raffaele met that day with Benjamin, in an effort to restructure the restaurant and Bistro's financial obligations. Bistro's proposal to renovate the restaurant demonstrates that Bistro did not intend to abandon its

property rights. These same facts—which were known to Benjamin—demonstrate that Bistro did not "apparently abandon" the restaurant.[34]

      *b.  Discontinuance of the Operation of Tenant's Business*

KC Live also argues that Bistro discontinued the operation of the restaurant, in violation of § 2601(iii) of the Restaurant Lease. Section 2601(iii) provided that "discontinuance of the operation of Tenant's business at the Premises" constituted an "Event of Default."

"Discontinuance of the operation of Tenant's business" is not defined in the lease. However, Missouri courts consider dictionaries to be "a good source for finding the plain and ordinary meaning of contract language." *Bailey v. Federated Mut. Ins. Co.*, 152 S.W.2d 355, 357 (Mo. Ct. App. 2004) (citing *Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo. 1999) (en banc)). The Oxford English Dictionary defines "to discontinue" as, *inter alia*, "[t]o cause to cease; to cease from (an action or habit); to break off, put a stop to, give up." Oxford English Dictionary (2d ed. 1989). Thus, under the plain language of the lease, ceasing to operate the restaurant would constitute "discontinuance of the operations of [Bistro's] business." *See Brittany Sobery Family Ltd. P'ship v. Coinmach Corp.*, 392 S.W.3d 46, 30 (Mo. Ct. App. 2013) (interpreting meaning of lease terms according to dictionary definition).

In my view, Bistro clearly discontinued operations of its business as of Wednesday, February 3, 2010, in violation of § 2601(iii) of the Restaurant Lease. Under the lease, Bistro was obligated to operate an "upscale Bice Bistro Italian restaurant," in "a first class manner." Restaurant Lease § 201(c). Minimum hours of operation for Wednesdays were from 11 a.m. to 10 p.m. *Id.* § 201(q). But, the evidence showed that at approximately 6 p.m. on Wednesday, February 3, 2010, the restaurant was not in operation. According to the testimony of Benjamin

---

[34] I do not address abandonment with respect to the gelateria premises, discussed *supra*, for which there is no dispute as to Bistro's default.

and Scovitch, which I find to be credible, the restaurant doors were locked and there were no servers, chefs, or customers in the restaurant. The application of paint samples to the restaurant's walls does not constitute operation of the restaurant.

Although Bistro claims that the restaurant was "open for business" at lunch, the evidence showed, in the words of Bistro's own lawyer, that it was "running on fumes." Tr. Vol. VIII at 9:20-21 (Bistro closing argument). For example, photographs taken by Scovitch showed that at the dinner hour the kitchen was largely devoid of food, no food preparations were underway, and no customers were present. Benjamin testified that the bar was not fully stocked. Tr. Vol. IV at 31:13-17 (Benjamin). And, noticeably absent from the record are any invoices, payroll data, or other documents of Bistro to show that the restaurant was open and operating, and that a customer could have walked in and ordered a meal. In fact, Bistro offered no documentary evidence that the restaurant purchased any items for its operations, made any sales, or had any wait staff working on February 3, 2010.

That the restaurant had ceased operations is all the more apparent based on communications leading up to February 3, 2010, in which Ruggeri disclaimed any intention to continue operating the restaurant. Indeed, it was these communications that fueled KC Live's decision to obtain the keys. For example, in Sacco's email of January 31, 2010, in which he withdrew his proposal to take over the restaurant, Sacco wrote: "Roberto [Ruggeri} has stated that he is not interested in putting any more money in to keep the restaurant open so I will do everything I can to keep the lights on for the next few days but cannot promise to do this for very long." Def. Exh. 68. The next day, February 1, 2010, Ruggeri responded: "I am at this point in no position (myself) to keep that Restaurant open. . . . For me, the operation is finished as [of] Saturday night as discussed many times. . . . The restaurant has to be closed immediately." Def. Exh. 69. Although Ruggeri subsequently promised to "keep the restaurant open a few more

days," Def. Exh. 72 (Feb. 1, 2010 email from Ruggeri to Sacco and Benjamin), Sacco reported, in his email of February 1, 2010, that $22,898.50 was required to "continue operations" for that week alone, to pay utilities, a month of wages owed to staff, and Bistro's accountant. *See* Def. Exh. 71 (Feb. 1, 2010 email from Sacco to Benjamin and Ruggeri). The funds requested by Sacco to "continue operations" were never provided. *See* Tr. Vol. II at 62:5-7 (Ruggeri).

Raffaele was not present at the restaurant during the early evening hours of February 3, 2010. To rebut the testimony of Benjamin and Scovitch, Bistro relied on the testimony of Wilkey and Bowman. Although Wilkey testified that the doors were unlocked when he arrived at around 5:30 p.m., he also said he was upstairs when Benjamin arrived. So, he could not have known if the doors were locked at that time. Both Wilkey and Bowman also testified that the chef and at least one other restaurant employee were present in the restaurant that evening. Yet, they do not appear in any of Scovitch's photographs. Nor was any explanation offered by Wilkey, Bowman, or others as to how, when, or why the restaurant staff were not evident in the photos. And, Bistro did not call any restaurant staff to testify that they were, in fact, present and that the restaurant was open for business.[35] Moreover, Wilkey's testimony at trial was inconsistent with the emails he sent to Ruggeri on February 6, 2010, and to Benjamin on February 11, 2010, both of which were temporally closer to the events in issue than Wilkey's testimony at trial. In particular, Wilkey did not state in either email that the restaurant was open and operating or that Benjamin announced, "We're shutting it down."

Although Raffaele's recollection of the events of February 3, 2010, was earnest, it was not convincing. For example, he recalled that Benjamin went with him to the restaurant after their meeting to tour the space. Yet, during the time that Raffaele was supposedly at the

---

[35] Bistro had the burden of proof with respect to the claims it lodged as plaintiff.

restaurant, Benjamin was sending emails to Fowler to discuss the proposal and calling Sacco to arrange to pick up the keys. He also claimed that Wilkey was there in the afternoon, yet Wilkey said he did not arrive until 6 p.m., after Raffaele had already left the restaurant. Further, in explaining the absence of customers at the restaurant, he testified that February 3, 2010, was a Monday, and that Mondays were extremely slow. He also claimed that there was a blizzard in Kansas City. As noted, February 3, 2010, fell on a Wednesday, and certified climatological data showed that Kansas City had no precipitation during the first three days of February 2010.

Based on the evidence, I find that the restaurant had discontinued operations as of February 3, 2010, in violation of § 2601(iii) of the Restaurant Lease. With respect to a breach under § 2601(iii), the lease did not provide any requirement for notice or opportunity to cure. Therefore, KC Live was entitled to take possession of the premises, pursuant to § 2602(ii), without providing prior notice or an opportunity to cure.[36]

c. *Failure to Pay Rent*

Even if Bistro did not discontinue operations, it breached the Restaurant Lease and the Amendment by failing to pay rent.

As discussed, under the Amendment to Lease, Bistro enjoyed a period of reduced rent from May through December 2009. Bistro also agreed to pay a total of $596,574 to KC Live by way of an initial payment of $200,000 upon execution of the Amendment, and four equal installments of $99,143.50 each, due on November 30, 2009, January 30, 2010, March 30, 2010, and May 30, 2010, respectively. *See* Amendment ¶¶ 2-3.

The evidence showed that Bistro made each monthly rent payment owed under the Amendment. However, because Bistro failed to make those payments in strict compliance with

---

[36] As noted, KC Live provided notice and an opportunity to cure, by letter of February 4, 2010, but Bistro did not cure.

the timeliness requirements of the Amendment, KC Live maintains that Bistro breached its obligation to pay rent. KC Live asserts that this, in turn, triggered its right to terminate Bistro's possession of the premises under Paragraph 5 of the Amendment. *See* Bistro Memo at 14. As noted, that paragraph provided:

> If Tenant strictly (including timeliness) complies with the provisions of this Agreement, and strictly (including timeliness) complies with the provisions of the Lease as to the payment of Rent throughout the Term (except as modified hereby), Minimum Rent and recurring monthly charges due for periods prior to the Rent Commencement Date shall be waived. If Tenant fails to strictly (including timeliness) comply with the provisions of this Agreement, and/or if Tenant fails to strictly (including timeliness) comply with the provisions of the Lease as to the payment of Rent throughout the Term (except as modified hereby), Landlord in addition to all other remedies available under the Lease or the law, shall have the right to terminate the Lease or Tenant's right to possession of the Premises by notice to Tenant without the requirement of any default notice or cure period, all sums due under the Lease that were reduced or conditionally waived hereunder shall be immediately due and payable, and Landlord shall not be bound by any concessions made herein. Landlord acknowledges that Tenant and Guarantors dispute the amount of rent owed for periods prior to the Rent Commencement Date and nothing in this Agreement shall be construed as a waiver by Tenant and Guarantors of any defenses related thereto. Notwithstanding anything to the contrary contained herein, once Tenant is again paying Rent as set forth in the Lease without regard to this Agreement (i.e., January, 2010), as to Minimum Rent and recurring charges due monthly under the Lease, notice and cure periods provided for nonpayment of Rent under the Lease shall apply, but such notice and cure periods have no applicability to sums due under this Agreement (including section 2 regardless of when due) and are waived by Tenant.

Bistro counters that KC Live waived any claim of breach on the basis of late payments by accepting Bistro's rent payments. *See* Bistro Memo at 24-26. KC Live responds that, under § 2603 of the Restaurant Lease, any waiver was required to be in writing and signed by KC Live. *See* KC Live Response at 21.

The Missouri Court of Appeals has said: "Performance of certain lease terms may be waived when a landlord, by expression or conduct, leads the tenant to believe strict compliance is not required." *Langdon v. United Restaurants, Inc.*, 105 S.W.3d 882, 890 (Mo. Ct. App.

2003).  For example, in *Fritts v. Cloud Oak Flooring, Co.*, 478 S.W.2d 8, 9-10 (Mo. Ct. App. 1972), the parties to a commercial lease executed an "addendum" that, like the Amendment in this case, provided for monthly rent to be paid "when due, time being of the essence with respect to such payments." *Id.* at 10.  The addendum also suspended the notice and cure provisions set forth in the original lease, and entitled the landlord to take possession of the premises immediately upon the tenant's breach of its payment obligations. *Id.* at 10-11.  Additionally, the lease included a waiver provision that stated: "[N]o failure of the landlord to insist upon strict compliance by the tenant and no custom or practice of the parties at variance with the terms of the lease should constitute a waiver of the landlord's right to demand exact compliance with the terms thereof." *Id.* at 13-14.

The appellate court upheld the trial court's finding that the landlord had waived the requirement of strict compliance in the timely payment of monthly rent. *See id.* at 12-14.  It stated: "By the mere act of including an essence provision in the addendum . . . , the landlord did not immunize or insulate himself from the legal effect and consequence" of accepting rent "without protest or complaint." *Id.* at 13.  And, it found that the waiver provision did not preclude the landlord from waiving the timeliness requirement by accepting late rent without complaint. *Id.* at 14.  In accordance with *Fritts*, I agree with Bistro that, because KC Live accepted the untimely payments without complaint, KC Live waived any claim of breach based on Bistro's failure to make timely payments under the Amendment.

Nevertheless, any waiver of default as to timeliness of payments did not waive KC Live's right to pursue other defaults by Bistro. *See, e.g.*, *Spencer's River Roads Bowling Lanes, Inc. v. Unico Mgmt. Co.*, 615 S.W.2d 121, 125 (Mo. Ct. App. 1981) (finding that landlord's acceptance of late rental payments over several years did not waive landlord's right to pursue subsequent default in rent).  And, there is no dispute that Bistro failed to pay rent for January 2010 and

February 2010.  Nor did it pay the installment of $99,143.50 that was due on January 30, 2010.  According to KC Live, Bistro's failure to make these three payments entitled KC Live "to terminate the Lease or Tenant's right to possession of the Premises by notice to Tenant without the requirement of any default notice or cure period," as provided under Paragraph 5 of the Amendment to Lease.  *See* KC Live Memo at 14-15; KC Live Response at 18-19.  It relies on the following portion of  Paragraph 5 of the Amendment:  "[O]nce Tenant is again paying Rent as set forth in the Lease without regard to this Agreement (i.e., January, 2010) . . . notice and cure provisions . . . shall apply . . . ."  Because Bistro did not pay its rent for January 2010, KC Live maintains that the notice and cure provisions under the Lease were not reactivated.  KC Live Memo at 14.

Bistro claims, however, that the notice and cure provisions of the Restaurant Lease were reinstated automatically as of January 2010.  *See* Bistro Memo at 26-33.  Accordingly, it argues that KC Live could not take possession of the restaurant without first providing the required notice and cure period, as set forth in § 2601(i) of the lease.  *See id.*  Like KC Live, Bistro also relies on Paragraph 5 of the Amendment, claiming that, as of January 2010, it was "once . . . again paying rent as set forth in the Lease without regard to [the Amendment]."  Amendment to Lease ¶ 5; *see* Bistro Memo at 26.  Additionally, Bistro asserts that KC Live agreed to defer until February 15, 2010, the payment that was due on January 30, 2010, and therefore it had not defaulted on that payment as of February 3, 2010.  *See* Bistro Memo at 23-24.

The parties' dispute regarding reinstatement of notice and cure presents an issue of contract interpretation.  As noted, "[t]he guiding principle of contract interpretation under Missouri law is that a court will seek to ascertain the intent of the parties and to give effect to that intent."  *Triarch Indus.*, 158 S.W.3d at 776.  "The intent of the parties to a contract is presumed to be expressed by the ordinary meaning of the contract's terms."  *Id.*

The plain language of the Amendment to Lease unambiguously required Bistro to be "paying" rent in accordance with the original Restaurant Lease, and the insertion of "(i.e., January, 2010)" merely noted the time when that was to occur. Reinstatement of the notice and cure provisions would not occur prior to January 2010, and then only if the Tenant resumed "paying." The word "paying" is defined as "[t]he *action* of recompensing a person with money." Oxford English Dictionary (3d ed. 2005) (emphasis added). Thus, "paying" connotes the act of tendering payment, not just the imposition of the obligation to pay, as Bistro seems to contend. Significantly, the Amendment did not state that the notice and cure provisions were automatically restored "on January 1, 2010," upon expiration of the rent reduction period.

Nor am I persuaded by Bistro's claim that Benjamin's trial testimony introduced ambiguity as to the question of reinstatement of the original notice and cure provisions under the Amendment. *See* Bistro Memo at 29-30. Bistro seizes on the following testimony, which was elicited on cross-examination of Benjamin:

> **Bistro's Counsel**: So as we go back into the January 2010 timeframe, and there were discussions that were going on between the landlord and the tenant, Cordish treated that language as continuing to require written notice and cure in 2010 should there be any kind of a default issue, correct?
>
> **Benjamin**: Are you saying we complied with the terms of this amendment?
>
> **Bistro's Counsel**: I'm not asking whether or not you believe you complied. I'm just saying that *Cordish treated the notice and cure provisions as of January 2010 as having been restored, correct?*
>
> **Benjamin**: Yes.

Tr. Vol. IV at 16:2-11 (Benjamin) (emphasis added).

Bistro overlooks that Benjamin immediately clarified his testimony, stating: "As I read the amendment now, I read it that *assuming tenant starts paying rent* as set forth in the lease in January of 2010, the notice and cure provisions of the lease would be restored." Tr. Vol. IV at

16:24-17:1 (Benjamin) (emphasis added). He also said: "What it means is once tenant gets through the payments schedule pursuant to this amendment and *is back paying full rent under the lease* after the reduced rent period is over, at that point the notice and cure provisions in the lease would be restored." Tr. Vol. III at 74:13-21 (Benjamin) (emphasis added). In addition, Benjamin explained that notice and cure would apply "[a]t the point in time when the reduced monthly rent payment schedule has ended and tenant *has gone back to paying* full rent owed under the lease." *Id.* at 77:16-18 (Benjamin) (emphasis added).

The clause is not ambiguous. If the parties intended to restore the notice and cure provisions automatically as of January 1, 2010, they easily could have written the contract to provide for such a provision. A court may not rewrite the terms of an unambiguous contract merely because a party is unhappy with its terms. *See Freeman v. Barrs*, 237 S.W.3d 285, 288 (Mo. Ct. App. 2007); *Williams v. Metro. Life Ins. Co.*, 448 S.W.2d 295, 297-98 (Mo. Ct. App. 1969) ("It is not the function of the court to re-write the contract, nor 'to change its meaning by a perversion of language or by conjuring up an ambiguity.'") (citations omitted).

Moreover, extrinsic or parol evidence cannot be used to modify the terms of an unambiguous contract. *Mercantile Bank of St. Louis v. Benny*, 978 S.W.2d 840, 844 (Mo. Ct. App. 1998). Benjamin's trial testimony as to the meaning of the Amendment constitutes parol evidence, which may not be used to alter the Amendment's unambiguous language. *See, e.g.*, *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo. 1979) (en banc) (holding that witness testimony as to meaning of contract terms "may not be used to create ambiguity in an otherwise unambiguous contract").

Accordingly, I conclude that, as a predicate to the reinstatement of the original notice and cure provisions, Bistro was obligated to begin *paying* the January 2010 rent. It did not do so. Therefore, KC Live was entitled to take possession of the premises without regard to the notice

and cure requirements of § 2601(i) of the Restaurant Lease. Because Bistro breached its monthly rent obligation, any alleged agreement by KC Live to defer the payment due on January 30, 2010, is of no moment.

## B. Damages

KC Live claims total damages of $4,984,948.27. *See* KC Live Memo at 15-16; Def. Exh. 85. The calculations in support of these damages are set forth in Defendant's Exhibit 85, which Fowler addressed at trial.[37] Specifically, KC Live claims damages for unpaid rent, liquidated damages for late opening, and liquidated damages for "premature closing," on which KC Live has assessed interest through January 31, 2013, in the total amount of $3,331,858.54. Def. Exh. 85 at 1-5; *see* Tr. Vol. VI at 9:14-23 (Fowler). KC Live also seeks to recover construction costs of $104,756.89 under the Construction Funding Agreement between Bistro and KC Live, entered in November 2007, on which no interest has been assessed. Def. Exh. 85 at 1, 8; *see* Tr. Vol. VI at 11:18-24 (Fowler). Additionally, KC Live claims "future" rent for the period of February 1, 2013 to January 14, 2018, offset by rent payable by the replacement tenants, along with liquidated damages, reduced to present value according to the Federal Reserve discount rate, for a total of $1,548,332,84. Def. Exh. 85 at 1, 6-7; *see* Tr. Vol. VI at 11:1-15 (Fowler).[38]

For the reasons that follow, I find that KC Live is entitled to damages of $3,473,320.74.

---

[37] Fowler testified that he prepared the exhibit with the assistance of the Accounting Department at Cordish. *See* Tr. Vol. VI at 33:2-34:2 (Fowler). It was submitted as an exhibit, and Bistro did not offer alternative calculations. My discussion of KC Live's claim for damages is grouped in accordance with the categories and amounts that were presented by KC Live in its submission.

[38] Defendant's Exhibit 75 presented KC Live's calculation of damages as of the Pretrial Order, in the sum of $5,614,771.53. Thereafter, KC Live made several adjustments. Specifically, after the Court pointed out that KC Live's interest rate exceeded that permitted under Missouri law, KC Live revised the interest calculation. It also credited payments at the time they were made, added monthly charges for trash services, and reallocated certain payments by Bistro from rent to construction. *See* Tr. Vol. VI at 79:23-81:16. These adjustments resulted in a *reduction* of $629,823.26 in the amount of damages claimed by KC Live.

1.     Unpaid Rent and Construction Costs

KC Live claims that it is owed unpaid rent under both the Restaurant Lease and the Gelateria Lease, for the period between the Rent Commencement Date of January 14, 2008, and January 31, 2013.  To calculate the amount owed, KC Live first added the minimum monthly rent between these dates, accounting for the annual 2% increase in rent, as provided in each lease.  It also added the unpaid Grand Opening charge for the gelateria and the restaurant.  KC Live then credited the rent payments made by Bistro during the term of its tenancy, as well as the monthly rent payments made by Drunken Fish (the replacement tenant for the restaurant), and Balsano's (the replacement tenant for the gelateria), by applying those payments to the minimum rent owed by Bistro.[39]  In addition, KC Live included the monthly charges provided by each lease, such as for trash services for both the restaurant and the gelateria for the periods they were operating, *see* Restaurant Lease § 1704; Gelateria Lease § 1704, Tr. Vol. VI at 23:13-25:23, 39:5-12 (Fowler), as well as taxes and insurance for the gelateria.  *See* Gelateria Lease § 319; Tr. Vol. VI at 37:25-39:5 (Fowler).  KC Live's claim for damages based on unpaid rent totals $1,270,281.25 for both leases, exclusive of interest.

KC Live also claims damages in the amount of $104,756.89 for unpaid construction costs under the CFA, excluding interest.  According to KC Live, Bistro owed a total of $959,047.39 pursuant to the CFA, but paid only $899,290.50.  Tr. Vol. VI at 65:23-66:3 (Fowler).  And, KC Live paid $45,000 to settle a mechanic's lien on Bistro's behalf, denominated as the "Ball Kelly

---

[39] As noted, the monthly rent for each replacement tenant is less than the monthly rent under the Restaurant Lease and the Gelateria Lease, which, according to Fowler, was "not unusual" for "leases signed in 2007 versus leases signed in 2010 and 2011."  Tr. Vol. VI at 36:21-37:19 (Fowler).  Bistro does not dispute Fowler's testimony that KC Live satisfied its duty to mitigate damages in reletting the premises.  *See id.* at 37:17-22 (Fowler).

Settlement," for "work performed for [Bistro] on the premises."  Tr. Vol. VII at 49:2-11 (Fowler).

Notably, KC Live calculated damages for unpaid rent and construction costs "without regard to any concessions" made in the Amendment to Lease.  Tr. Vol. VI at 8:24-9:3 (Fowler). In other words, KC Live has treated the Amendment as though it never existed, although it credited the reduced rent payments made by Bistro under the Amendment against the minimum rent set forth in the Restaurant Lease, *see id.* at 32:10-20 (Fowler), and the construction costs paid by Bistro under the Amendment against the construction costs allegedly owed.  *See id.* at 65:2-13 (Fowler).

Bistro insists that KC Live is not entitled to damages for amounts owed prior to the Amendment, because Bistro made the agreed upon reduced rental payments in accordance with the Amendment.  *See* Bistro Response at 7-10.  As previously noted, Paragraph 5 of the Amendment provided (emphasis added):

> If Tenant fails to strictly (including timeliness) comply with the provisions of this Agreement, and/or if Tenant fails to strictly (including timeliness) comply with the provisions of the Lease as to the payment of Rent throughout the Term (except as modified hereby), . . . *Landlord shall not be bound by any concessions made herein.*

To be sure, Bistro made each payment required under the Amendment through December 2009, including the initial $200,000 payment, each payment of rent during the reduced rent period, and the installment payment of $99,143.50 due on November 30, 2009.  And, as discussed, by its conduct KC Live waived the requirement of strict compliance with the timeliness of payments under the Amendment.  Nonetheless, it is undisputed that Bistro failed to pay any rent for January 2010 or February 2010, and failed to make the three remaining payments of $99,143.50, due under the terms of the Amendment.  KC Live never waived its right

to receive each payment owed under the Amendment and the Restaurant Lease. *See Spencer's River Roads*, 615 S.W.2d at 125.

Clearly, Bistro "failed to strictly . . . comply with the provisions of" the Amendment and "the provisions of the Lease as to the payment of Rent throughout the Term." Amendment to Lease ¶ 5. Therefore, as I previously determined, KC Live was no longer "bound by any concessions" in the Amendment regarding rent or construction costs. *Id.* To the contrary, the parties reverted to their pre-Amendment positions. As a result, KC Live is entitled to damages for unpaid rent and construction costs that were otherwise subject to the Amendment to Lease. These damages total $1,375,038.16, excluding interest. [40]

2.     Liquidated Damages and "Future" Rent

For both the restaurant and the gelateria, KC Live seeks to recover liquidated damages for late opening, per § 402 of each lease, and for failure to operate, per § 2602(vii) of each lease.

Under § 402, each lease provided for a daily financial penalty to be paid by Bistro for each day that the premises were not open for business, beginning on the Rent Commencement Date of January 14, 2008, through July 25, 2008, when both the restaurant and the gelateria opened for business. *See* Tr. Vol. VI at 25:3-20, 39:22-25 (Fowler). Under § 402 of the Restaurant Lease, the daily penalty is $500; under § 402 of the Gelateria Lease, the daily penalty is $100. In sum, KC Live claims liquidated damages for late opening, excluding interest, of $96,000 for the restaurant and $19,200 for the gelateria, for a total of $115,200. *See* Def. Exh. 85 at 3, 5.

Section 2602(vii) of each lease provided for liquidated damages based on Bistro's failure to operate the restaurant or gelateria for more than three consecutive days. According to KC

_____

[40] Bistro also lodged this argument with respect to liquidated damages for late opening, discussed *infra*. That argument fails for the same reason.

Live, it is entitled to liquidated damages under § 2602(vii) of each lease for any portion of the tenancy when the premises were unoccupied or, in effect, unoccupied. *See* Def. Exh. 85 at 2-7. Section 2602(vii) stated:

> If Tenant fails to conduct its business operation at the Premises during the Minimum Store hours for more than three (3) consecutive business days, it is agreed and understood that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, shall suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right to collect as liquidated damages (and not as a penalty) two (2) times the Rent due for each month or portion thereof that such discontinuance shall persist. . . .

As to the restaurant, KC Live claims liquidated damages for Bistro's failure to operate after February 3, 2010, despite KC Live's demand that it reopen and operate the restaurant. *See* Tr. Vol. VI at 52:1-53:9 (Fowler); Def. Exh. 74 (Feb. 4, 2010 "Notice of Default" and demand to reopen). The Landlord does not seek liquidated damages for the period of Drunken Fish's occupancy, which began on March 1, 2011. *See* Tr. Vol. VI at 25:21-26:9 (Fowler); Def. Exh. 85 at 2. However, it seeks liquidated damages for the period following the expiration of the Drunken Fish lease, *i.e.*, March 1, 2017, through the termination date of the restaurant lease, *i.e.*, January 14, 2018. *See* Def. Exh. 85 at 6-7.

As to the gelateria, KC Live claims liquidated damages based on Bistro's failure to operate as of February 1, 2009. Tr. Vol. VI at 42:3-14 (Fowler). The Landlord does not seek liquidated damages for the period of Balsano's occupancy of the premises, which began on July 1, 2011. *See* Tr. Vol. VI at 42:6-15 (Fowler); Def. Exh. 85 at 4. However, it seeks liquidated damages for the period following the expiration of Balsano's lease, *i.e.*, July 1, 2016, through the termination date of the gelateria lease, *i.e.*, January 14, 2018. *See* Def. Exh. 85 at 6-7.

Additionally, KC Live seeks to recover the difference between the "future" rent owed under the restaurant and gelateria leases and the "future" rent to be paid by Drunken Fish and Balsano's, for the period between February 1, 2013 and January 14, 2018. *See id.*

Excluding interest, KC Live claims liquidated damages under § 2602(vii) through the beginning of the replacement tenancies, in the amount of $680,167.45 for the restaurant and $402,848.73 for the gelateria, for a total of $1,083,016.18. *See* Def. Exh. 85 at 3, 5. As to all "future" rent not obtained in mitigation from the Drunken Fish and Balsano's tenancies, coupled with liquidated damages under § 2602(vii) for the period following the expiration of the Drunken Fish and Balsano's leases, KC Live seeks $1,548,332.84, a sum discounted to present value according to the Federal Reserve discount rate of 0.75%, under § 2602(v) of each lease. *See* Def. Exh. 85 at 7.

Thus, the total amount claimed by KC Live in liquidated damages and "future" rent is $2,746,549.02, excluding interest on past due amounts. Bistro opposes KC Live's entitlement to these damages on three grounds.

### a. *Impossibility of Performance*

Invoking the doctrine of impossibility of performance, Bistro asserts that KC Live is not entitled to liquidated damages under § 2602(vii) for Bistro's failure to operate the restaurant. Bistro Response at 10-12. In particular, Bistro claims that it was excused from performing its obligations under the lease because KC Live wrongfully took possession of the premises on February 3, 2010. *See id.* I reject Bistro's argument.

"The doctrine of impossibility of performance excuses a party to a contract from performance when an Act of God, the law, or the other party renders performance impossible." *Werner v. Ashcraft Bloomquist, Inc.*, 10 S.W.3d 575, 577 (Mo. Ct. App. 2000). However, "[o]ne cannot by his own act place himself in a position to be unable to perform a contract, then plead

that inability to perform as an excuse for nonperformance." *Arnett v. USX Corp.*, 763 S.W.2d 169, 171 (Mo. Ct. App. 1988). "A party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract." *Farmers' Elec. Co-op., Inc. v. Mo. Dep't of Corrs.*, 977 S.W.2d 266, 271 (Mo. 1998). Notably, economic hardship does not excuse performance under the impossibility doctrine. *See Ellis Gray Mill Co. v. Sheppard*, 222 S.W.2d 742, 747-49 (Mo. 1949) (en banc) (holding that substantial increase in price ceiling placed on corn during World War II did not render performance impossible for sale of corn contracted for at lower price); *United States v. Conservation Chem. Co.*, 661 F. Supp. 1416, 1422 (W.D. Mo. 1987) ("[F]inancial difficulties which make it difficult for a defendant to meet its obligations do not in themselves suspend or release contractual duties."); *see also In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 846 (Del. Ch. 2012) ("[A] party cannot 'abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts.'") (citation omitted); *cf. W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 769 n.12 (1984) ("Economic necessity is not recognized as a commercial impracticability defense to a breach of contract claim.").

Bistro's operation of the restaurant was not rendered impossible by KC Live's action in taking possession of the premises. As indicated, I found that Bistro had already ceased operations at the time it claims its performance was rendered impossible. Indeed, it was Bistro's discontinuance of operations that led KC Live to take possession of the restaurant on February 3, 2010.

Further, in KC Live's letter to Bistro of February 4, 2010, KC Live demanded that Bistro reopen and operate the restaurant, but Bistro declined to do so. *See* Def. Exh. 74. Bistro takes pains to point out that it did not formally receive that letter until several days after the events of

February 3, 2010.  But, it knew that the restaurant had been closed.  And, even when Bistro learned of the Landlord's position, Bistro never attempted to resume operations.

To be sure, Raffaele testified that, in his experience, shutting down a restaurant with no indication of reopening will "destroy[] [its] reputation" in a matter of days.  Tr. Vol. I at 99:13-22.  Yet, Bistro had already been planning to close the restaurant as part of its plan for a change in the concept.  Thus, it had fully anticipated shutting down for several weeks to renovate the premises. Given that Bistro had supposedly planned to close the restaurant during renovations, it is disingenuous for Bistro to insist that any closure by KC Live irrevocably damaged Bistro's ability to reopen and operate.

### b. *Unenforceable Penalty Clauses*

Additionally, Bistro asserts that liquidated damages provided by the leases are not enforceable under Missouri law.  In Missouri, "liquidated damages clauses are valid and enforceable; penalty clauses are not."  *Grand Bissell Towers, Inc. v. Joan Gagnon Enters., Inc.*, 657 S.W.2d 378, 379 (Mo. Ct. App. 1983).  "A liquidated damages clause is valid in Missouri if (1) the amount fixed as damages is a reasonable forecast for the harm caused by the breach, and (2) the harm that is caused is of a kind that is difficult to accurately estimate."  *DynaSteel Corp. v. Black & Veatch Corp.*, 698 F. Supp. 2d 1170, 1179 (W.D. Mo. 2010) (citing *Information Sys. & Networks Corp. v. City of Kansas City, Mo.*, 147 F.3d 711, 714 (8th Cir. 1998)).  Additionally, to claim liquidated damages, a party must make "a showing of some actual harm or damage."  *Taos Constr. Co. v. Penzel Constr. Co.*, 750 S.W.2d 522, 536 (Mo. Ct. App. 1988).

As an initial matter, KC Live argues that because Bistro failed to assert, as an affirmative defense, that liquidated damages are unenforceable, the argument is waived.  *See* KC Live Supp. Memo at 6-10.  Fed. R. Civ. P. 8(c) provides that a "party must affirmatively state any avoidance or affirmative defense."  Failure to do so may result in waiver, particularly when it results in

"unfair surprise or prejudice" to the opposing party. *S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367, 373-74 (4th Cir. 2003) (holding insurer waived affirmative defense of insurance policy's two-year limitations period by failing to raise issue until summary judgment stage, and noting that the delayed assertion of the defense prejudiced the opposing party); *see also Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (deeming affirmative defense of qualified immunity waived in part because defendants failed to pursue immunity in motions and at trial). KC Live also suggests that the Court's consideration of this issue, under the circumstances, would constitute reversible error, because it was raised *sua sponte* by the Court during closing arguments, and not previously advanced by Bistro. KC Live Supp. Memo at 8-9; *see Eriline Co. v. Johnson*, 440 F.3d 648, 653-57 (4th Cir. 2006) (holding that district court erred in raising statute of limitations defense *sua sponte* and dismissing case where defendants had failed to assert it in their answer).

Federal courts have found that a defendant's failure to assert the "unreasonableness or unenforceability" of a contract's liquidated damages provision as an affirmative defense constitutes waiver. *Tidewater Fin. Co., Inc. v. Fiserv Solutions, Inc.*, 192 F.R.D. 516, 524 (E.D. Va. 2000), *aff'd* 4 F. App'x 201 (4th Cir. 2001); *see also Ace Hardware Corp. v. Marn, Inc.*, No. 06-CV-5335, 2008 WL 4286975, at *12 (N.D. Ill. Sept. 16, 2008). However, the parties agree that Missouri law governs whether such an argument is, in fact, an affirmative defense for Rule 8(c) purposes, and they have not identified any Missouri case that has addressed the issue.

Under Missouri law, an affirmative defense "is a defense which avers that even if the petition is true, the plaintiff cannot prevail because there are *additional facts* which permit the defendant to avoid legal responsibility." *World Enters., Inc. v. MidCoast Aviation Servs., Inc.*, 713 S.W.2d 606, 608 (Mo. Ct. App. 1986) (emphasis in *World Enters.*). Thus, Bistro asserts that

contesting liquidated damages as unenforceable would not raise any "'additional facts,' because it contemplates a matter that forms part of the original contract." Bistro Supp. Response at 4.

I need not resolve the waiver claim or the question of whether a challenge to the enforceability of liquidated damages is an affirmative defense under Missouri law. Regardless, I am satisfied that the liquidated damages clauses in the leases do not constitute an unenforceable penalty.

Bistro argues that the liquidated damages were not a "reasonable forecast for the harm." I disagree. In Missouri, "[c]ourts look with candor on provisions deliberately entered into between parties, and do not look with disfavor upon liquidated damage stipulations." *Germany v. Nelson*, 677 S.W.2d 386, 388 (Mo. Ct. App. 1984). Here, the amount of damages was agreed to by sophisticated business entities, all represented by counsel. *See DynaSteel*, 698 F. Supp. 2d at 1179 ("Most significantly . . . , DynaSteel is a sophisticated business that freely negotiated its contract with B & V and agreed" to the liquidated damages); *see also Information Sys.*, 147 F.3d at 715 (finding liquidated damages enforceable under Missouri law, in part because "the parties agreed in the contract that these amounts were a 'reasonable portion' of the damages"); *XCO Int'l Inc. v. Pac. Scientific Co.*, 369 F.3d 998, 1002 (7th Cir. 2004) (noting that it is "hard to give convincing reasons why in the absence of fraud or unconscionability consenting adults that are, moreover, substantial organizations rather than mere consumers should be prohibited from agreeing to [liquidated damages] provisions").

Specifically, the parties agreed in § 2602 of each lease that Bistro's discontinuance of operations would "deprive[]" KC Live "of an important right under this Lease," and therefore, KC Live "shall have the right to collect as liquidated damages (and not as a penalty) two (2) times the Rent due." Additionally, § 402 of each lease provided that the daily penalty for late opening was "in lieu of any Percentage Rent that might have been earned during the period of

[Bistro's] failure to open." I see no reason to second guess these determinations five years after the fact, and Bistro has not demonstrated any justification for doing so.

Notably, Bistro concedes that the second factor—whether the harm is difficult to estimate—is satisfied. *See* Bistro Supp. Response at 5. Indeed, Missouri courts have recognized that "it is difficult to measure damages upon breach of a lease by the tenant." *Paragon Grp., Inc. v. Ampleman*, 878 S.W.2d 878, 881 (Mo. Ct. App. 1994). For example, *id.*:

> [I]t is hard to say how long the [premises] will be vacant or how much time, expense and energy will be expended to re-let the premises. It is also difficult to estimate whether or how many prospective long-term tenants were turned away while the leasing tenant occupied the premises or how this damaged the landlord.

Although Bistro contends that KC Live failed to show any "actual harm," it overlooks that the leases stipulated to harm that KC Live would suffer should Bistro fail to operate the restaurant or gelateria. Moreover, Raffaele's testimony showed that each tenant's business was influenced by its neighbors' businesses. *See* Tr. Vol. I at 64:20-65:2 (explaining that lack of retail and delay in opening of theaters negatively impacted the restaurant's business). Additionally, the evidence showed that KC Live relet the premises to Drunken Fish and Balsano's for less rent than Bistro had agreed to pay. Such evidence is sufficient to show that ceasing operations at the restaurant and the gelateria caused KC Live "actual harm." Therefore, I find the liquidated damages clauses set forth in §§ 402 and 2602 are not unenforceable penalty clauses.

### c. *Speculative Future Damages*

Bistro challenges KC Live's claim for "future" rent and liquidated damages as of the end of the replacement leases with Drunken Fish and Balsano's. In its view, such claims are speculative, because they are based on KC Live's mere assumption that it will not relet the

restaurant or gelateria premises at the expiration of the tenancies of Drunken Fish and Balsano's, a time well into the future. *Id.* at 12-13. I agree.

As a general rule, "damages 'may not be determined by mere speculation or guess," although "they may be subject to 'just and reasonable inference.'" *Comcast of Ill. v. Multi-vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)); *see Bailey v. Hawthorn Bank*, 382 S.W.3d 84, 97 (Mo. Ct. App. 2012). Put more colorfully, "a damage award must be based on more than 'a gossamer web of shimmering speculation and finely-spun theory.'" *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo. Ct. App. 2001) (quoting *Carmel Energy, Inc. v. Fritter*, 827 S.W.2d 780, 783 (Mo. Ct. App. 1992)). Thus, "[a] party should be fully compensated for its loss, but not recover a windfall." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. 2005) (en banc).

KC Live's attempt to recover damages for the period following the conclusion of the leases for Drunken Fish and Balsano's is wholly speculative, if not rapacious. There is no indication that the premises will not be relet, either to the existing tenants or to substitute tenants. In fact, Drunken Fish has an option to renew its lease. And, there may be a strong market for commercial property in the Power & Light District when KC Live needs new tenants. Although it is possible that the premises will not be relet immediately, there is no factual basis to justify such a finding, particularly with a Landlord as experienced as Cordish. Conversely, allowing KC Live to claim such damages would amount to a windfall if it successfully relets the premises.

Accordingly, KC Live is not entitled to recover unpaid rent or liquidated damages for the period following the expiration of the two replacement leases. Therefore, there is no basis for KC Live's claim of $929,012.77 in future liquidated damages and "future" rent for the

restaurant, and $380,482.34 in future liquidated damages and "future" rent for the gelateria, or, in the aggregate, $1,309,495.11 (a sum that is discounted to present value).

3. <u>Interest</u>

Under § 311 of each lease, the interest rate for unpaid amounts was set at "the lesser of (i) the maximum rate of interest permitted in Missouri, or (ii) twelve percent (12%)." Pursuant to Mo. Ann. Stat. § 408.030, Missouri's maximum rate of interest is ten percent. In assessing interest on the accumulating amount owed under each lease, KC Live applied interest to the net amount owed through January 31, 2013, accounting for payments actually made by Bistro. *See* Tr. Vol. VI at 29:16-32:20 (Fowler). It claims total interest under the Restaurant Lease of $603,199.62, and total interest under the Gelateria Lease of $260,161.51. *See* Def. Exh. 85 at 3, 5. Bistro does not dispute the award of interest. Therefore, I find that Bistro is entitled to the full amount of interest it has claimed, *i.e.*, $863,361.12.

4. <u>Set Off for Equipment</u>

In closing, Bistro's counsel claimed that the value of Bistro's kitchen and audiovisual equipment, left at the restaurant, should "be an offset" against damages because it was the Tenant's equipment, which "the landlord has . . . enjoyed the benefit of." Tr. Vol. VIII at 53:18-20 (Bistro closing argument).[41] In particular, the Landlord has made the equipment available for use by Drunken Fish, without any credit to Bistro.

Bistro financed the purchase of the kitchen equipment, for which it paid $210,000 in March 2008. *See* Def. Exh. 39 (pay proceeds letter); Def. Exh. 40 (delivery and acceptance receipt). The evidence showed that it owes a debt of approximately $170,000 to Sterling National Bank, secured by the kitchen equipment. Additionally, it owes $32,130.42 to Sacco for

---

[41] In Bistro's claim for damages, it affirmatively sought to recover for the Landlord's failure to return the equipment. *See* Bistro Memo at 44-45.

the audiovisual equipment, which he purchased on Bistro's behalf in July 2008. *See* Pl. Exh. 52 (check and sales order).

I am persuaded that Bistro is entitled to a set off equal to the value of this equipment. "'The general rule [in Missouri] is that a party may not recover from all sources an amount in excess of the damages sustained, or be put in a better condition than he would have been had the wrong not been committed.'" *Moore Auto. Grp., Inc. v. Lewis*, 362 S.W.3d 462, 468 (Mo. Ct. App. 2012) (citation omitted); *see, e.g.*, *Gen. Elec. Capital Corp. v Rauch*, 970 S.W.2d 348, 359 (Mo. Ct. App. 1998) (finding that trial court erred in awarding damages to plaintiff that would constitute double recovery for a portion of plaintiff's loss). Allowing KC Live to retain the benefit of the equipment would plainly violate this rule.

Pursuant to § 1602 of the Restaurant Lease, KC Live agreed to subordinate its position to any equipment liens. *See* Restaurant Lease § 1602 ("Tenant shall have the right to finance equipment . . . , and Landlord agrees to subordinate its liens to such third-party purchase lenders."). Although the lease allowed KC Live to retain possession of equipment and personal property left by Bistro, it could do so only as security against loss suffered by a default. *See* Restaurant Lease § 1602 ("[I]f in default, Landlord shall have a lien on such trade fixtures as security against loss or damage resulting from any such default by Tenant, and said fixtures shall not be removed by Tenant until such default is cured . . . ."); *id.* § 2606 (upon default by tenant, "Landlord shall have a lien upon all the personal property and fixtures of Tenant in the Premises, as and for security for the Rent and other obligations of Tenant" and "shall have the right . . . to sell such personal property" and "apply the proceeds thereof to the payment of any balance due to Landlord on account of Rent or other obligations of Tenant"). Consequently, the Restaurant Lease does not permit KC Live to retain the equipment *in addition to* recovering damages for breach. Further, although the value of using the equipment may have been a factor in retaining a

68

substitute tenant at the restaurant, *see* Tr. Vol. VII at 50:25-51:13 (Fowler), which ultimately was a benefit to Bistro, there is insufficient credible evidence to support that conclusion.

To be sure, as KC Live argues, "[t]here is no evidence in the record of what the fair market value of this equipment was, as of February 3, 2010, had it been sold at auction under the UCC." *See* KC Live Response at 11-12. Additionally, KC Live asserts: "No evidentiary basis was laid to give Bistro a basis to assert that it suffered economic injury regarding Sacco's 'loan' to it to acquire audio visual equipment . . . ." *Id.* at 12. However, I believe it is reasonable to infer that the value of the kitchen and audio-visual equipment is at least equal to the outstanding portion of Bistro's debt. Accordingly, I will reduce KC Live's recovery by $170,000 in regard to the kitchen equipment, and $32,132.42 for the audio-visual equipment, for a total of $202,132.42.

## Conclusion

For the foregoing reasons, I find that Bistro of Kansas City, MO., LLC is liable to Kansas City Live Block 125 Retail, LLC for damages in the principal amount of $2,609,959.62, together with prejudgment interest accrued through January 31, 2013, in the amount of $863,361.12, for a total of $3,473,320.74. Simple prejudgment interest shall accrue at the rate of 10% per annum, *i.e.*, at the rate of $715.06 per day, from January 31, 2013, until reduced to judgment. However, in the Court's view, final judgment cannot be entered until any dispute as to contract-based attorneys' fees is resolved.

Under Fed. R. Civ. P. 54(d)(2) and 58(e), judgment should not be entered in advance of a determination as to a prevailing party's entitlement to attorneys' fees if "the substantive law requires those fees to be proved . . . as an element of damages." Fed. R. Civ. P. 54(d)(2)(A); *see, e.g.*, *Carolina Power & Light Co. v. Dynergy Marketing & Trade*, 415 F.3d 354, 360 (4th Cir. 2005). In a diversity case, a party's right to recover attorneys' fees is ordinarily governed by

state law. *See Ranger Const. Co. v. Prince William County Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979). In Missouri, it appears that a claim for attorneys' fees must be resolved before an appeal is taken. *See Gunter v. City of St. James*, 91 S.W.2d 724, 727 (Mo. App. 2002); *see also Jones v. Housing Auth. of Kansas City, Mo.*, 118 S.W.3d 669, 676 n.4 (Mo. Ct. App. 2003). Thus, this case may fall within the provision of Fed. R. Civ. P. 54(d)(2)(A) for actions in which the substantive law governing the action provides for the recovery of such fees as an element of damages.

In the alternative, if attorneys' fees in this case are not an element of damages, the Court will exercise its discretion under Fed. R. Civ. P. 58(e) to treat any timely motion for attorneys' fees, upon filing, as a post-judgment motion under Fed. R. Civ. P. 59, which will achieve the same result: the time to note an appeal, if any, will run from entry of an order resolving the issue of attorneys' fees. *See Carolina Power*, 415 F.3d at 359.

A separate Order follows.


Date:   August 16, 2013                    _____/s/_____
                                           Ellen Lipton Hollander
                                           United States District Judge