IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BISTRO OF KANSAS CITY, MO., LLC, <br>    *Plaintiff,* <br><br> v. <br><br> KANSAS CITY LIVE BLOCK 125 RETAIL, LLC, <br>    *Defendant & Counter-Plaintiff,* <br> v. <br><br> BISTRO OF KANSAS CITY, MO., LLC & ROBERTO RUGGERI, JR., <br>    *Counter-Defendants.* | Civil Action No.: ELH-10-2726 |

**MEMORANDUM**

Bistro of Kansas City, Mo., LLC ("Bistro" or "Tenant") initiated suit against Kansas City Live Block 125 Retail, LLC ("Kansas City Live," "KC Live," or "Landlord") in Missouri. After suit was transferred to this Court, Kansas City Live filed a counterclaim against Bistro and its principal owner, Roberto Ruggeri, Jr. ("Ruggeri"). The suit involved two commercial leases and a personal guaranty.

In particular, Kansas City Live and Bistro executed a commercial lease on March 27, 2007, for a 7,000 square foot space in Kansas City, to be used by Bistro as a restaurant (the "Restaurant Lease"). On October 1, 2007, KC Live and Bistro executed a lease for a smaller, adjoining space, to be used as a gelateria (the "Gelateria Lease"). The premises were located in the Kansas City Power & Light District ("District" or "Power & Light District"), a mixed use real estate development owned by the Cordish Company ("Cordish"). Ruggeri, an experienced restaurateur, executed a personal guaranty for each lease.

At a bench trial in December 2012 and continuing in January 2013, the parties presented competing allegations as to breach of the leases. Post-trial briefing followed, and closing arguments were heard on April 26, 2013.

On August 16, 2013, I issued a 70-page Memorandum Of Decision (ECF 119), setting forth my findings of fact and conclusions of law in regard to the parties' disputes, along with an Order (ECF 120). Issues as to Ruggeri were not resolved, however. This is because in July 2013, Ruggeri filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. *See* ECF 112 ("Notice Of Suggestion Of Bankruptcy"), Voluntary Petition, In Re: Roberto Ruggeri, Number 1:13-bk-14718-AA (Bankr. C.D. Cal., July 16, 2013). Ruggeri's filing resulted in an automatic stay as to KC Live's claims against Ruggeri, pursuant to 11 U.S.C. § 362(a). Although counsel agreed that the Court could recount the facts and make findings of fact as to Ruggeri with respect to corporate issues, they were of the view that I could not make findings of fact and conclusions of law as to Ruggeri's personal liability as guarantor of the two leases. *See* ECF 114, 117 (status report submitted by Bistro); ECF 115, and 118 (status report submitted by KC Live); *see also* ECF 119 at 3–4. As a result, I also abstained from resolving any issue as to personal jurisdiction with respect to Ruggeri. *See* ECF 24, 25, 29, 32, 37, 39, and 40; *see also* ECF 119 at 4. Nor could I enter judgment against him.

On September 12, 2013, the United States Bankruptcy Court, Central District of California, terminated the automatic stay as to Ruggeri and his estate, under 11 U.S.C. § 362(a), insofar as this case is concerned. *See* ECF 123, Exhibit A. Thereafter, I directed the parties to submit proposed findings of fact and conclusions of law as to Ruggeri, addressing the remaining matters that counsel believed necessary to conclude the litigation. *See* ECF 124.

Kansas City Live submitted its proposed findings of fact on October 28, 2013. *See* ECF 127. No response was filed by Bistro or Ruggeri, however.

In this Memorandum, I shall address the matters as to Ruggeri that I was unable to resolve in ECF 119 because of the bankruptcy stay pending at that time. I need not restate here the factual summary, the findings of fact, and/or the conclusions of law set forth in ECF 119. Instead, I shall incorporate them here by reference.

**Personal Jurisdiction**

Early in the litigation, Ruggeri moved to dismiss the counterclaim against him, pursuant to Fed. R. Civ. P. 12(b)(2). He argued that, as to KC Live's counterclaim against him, this Court lacked personal jurisdiction. In March 2011, I made a prima facie finding of personal jurisdiction and, on that basis, I denied Ruggeri's motion. *See* ECF 39, 40. However, I noted that at trial the burden remained on KC Live to prove, by a preponderance of the evidence, the existence of this Court's personal jurisdiction as to Ruggeri. ECF 40 at 3. *See E. Wellington Fin. Corp. v. Flagship Resort Development Corp.*, 416 F.3rd 290, 294 n.5 (4th Cir. 2005); *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

In post-trial briefing, Ruggeri did not dispute or even address the personal jurisdiction issue. *See* ECF 102. At closing argument on April 26, 2013, I inquired of Ruggeri's counsel whether Ruggeri continued to contest the Court's personal jurisdiction over him. Ruggeri's attorney essentially conceded that Kansas City Live established personal jurisdiction as to Mr. Ruggeri. *See* Transcript, Vol. VIII (April 26, 2013) (ECF 107) at 56.

The evidence adduced at trial supported my previous findings as to personal jurisdiction, as set forth in ECF 40, which I incorporate here. In view of the evidence presented at trial, I am

satisfied that Ruggeri had sufficient minimum contacts with Maryland so as to subject him to personal jurisdiction in this forum in regard to the claims lodged against him.

**The Personal Guaranties**

Ruggeri personally guaranteed all obligations under both leases. I find that Ruggeri is personally liable to Kansas City Live with respect to his personal guaranty of the Restaurant Lease as well as his personal guaranty of the Gelateria Lease.

The guaranties were admitted in evidence at trial. *See* Defendant's Exhibit 26 (Restaurant Lease); Defendant's Exhibit 32 (Gelateria Lease). At trial, Ruggeri admitted that he signed each one. *See* Trial Transcript Vol. II (December 4, 2012) (ECF 95) at 12, 21. Each guaranty provided, in part, as follows: "The liability of Guarantor is coextensive with that of Tenant and also joint and several. . . ." *See* Defendant's Exhibit 26 at 00068; Defendant's Exhibit 32 at 000489.

To be sure, each guaranty contained language that potentially limited Ruggeri's financial exposure for breach of the respective lease. As to the Restaurant guaranty, Ruggeri's liability was limited to an amount not greater than $600,000, provided that Bistro, *inter alia*, "opened for business and has otherwise complied with its obligations in accordance with the Lease as of and through the Rent Commencement Date," and so long as Bistro was "the lien-free owner of all equipment, fixtures, trade fixtures, inventory, and other assets used in or reasonably necessary to the operation" of the restaurant. *See* Restaurant Lease at 00069, 00072. With respect to the Gelataria guaranty, Ruggeri was relieved of liability for damages if, at the time KC Live sought to enforce the guaranty, Bistro was "the lien-free owner of all equipment, fixtures, trade fixtures, inventory, and other assets used in or reasonably necessary for the operation" of the Gelateria. Gelateria Lease at 000490. In my Memorandum Of Decision, ECF 119 at 12, I found that Bistro

had not timely opened for business and had not complied with its obligations as of the Rent Commencement Date. *Id.* at 12. Moreover, Ruggeri testified at trial that Bistro had not been released from the liens on its equipment and trade fixtures. *See* Trial Transcript, Volume V (January 15, 2013) (ECF 98) at 81, 82. Indeed, Bistro sought an award of damages from the Landlord because the Landlord retained the Tenant's kitchen equipment, the purchase of which had been financed, and for which the debt was outstanding. Pursuant to Bistro's request, I awarded Bistro an offset against the damages awarded to KC Live, in the amount of $170,000, because of the debt owed by Bistro on liened equipment. *See* ECF 119 at 67–69. Accordingly, the limitations with respect to Ruggeri's potential exposure under the guaranties are not applicable.

Therefore, for these reasons, and for the reasons set forth in my Memorandum Of Decision (ECF 119), I conclude that Roberto Ruggeri, Jr. is jointly and severally liable to Kansas City Live for actual damages in the principal amount of $2,609,959.62. Additionally, as I explained in my Memorandum of Decision (ECF 119 at 67), the parties contractually agreed that the interest rate for unpaid amounts due would be set at "the lesser of (i) the maximum rate of interest permitted in Missouri, or (ii) twelve percent (12%)." Pursuant to Mo. Ann. Stat. § 408.030, Missouri's maximum rate of interest is ten percent. I am determined that, at that rate, and without compounding, prejudgment interest of $863,361.12 had accrued through January 31, 2013. *See* ECF 120 ¶ 3. Since then, additional prejudgment interest on the actual damages (without compounding) has accrued in the amount of $213,802.94, calculated at the rate of 10% per annum, *i.e.*, $715.06 per day, from February 1, 2013, until reduced to judgment on November 26, 2013. Thus, I will award a total of $1,077,164.06 in prejudgment interest.

To be sure, the amount of interest is substantial. However, the parties contractually agreed to the ten percent rate that I applied, and neither Bistro nor Ruggeri disputed KC Live's entitlement to interest at the contractual rate, *if* KC Live prevailed. Moreover, I have been unable to find any legal authority that would allow me to deviate from the interest rate upon which the parties agreed. It is also noteworthy that judgment was entered against Bistro on August 16, 2013, but, because of the automatic stay occasioned by Ruggeri's bankruptcy proceedings, entry of final judgment was delayed for more than three months. As a result, in the interim, prejudgment interest continued to accrue against Ruggeri and Bistro at the rate of $715.06 per day, resulting in an increase in prejudgment interest of more than $70,000. Ruggeri and Bistro have not cited any authority under Missouri law or bankruptcy law that would permit me to suspend the accumulation of interest during the bankruptcy stay, and I am aware of none.

Accordingly, I will award prejudgment interest in the amount of $1,077,164.06. Together with damages of $2,609,959.62, the combined total of damages and prejudgment interest amounts to $3,687,123.68.

## Attorneys' Fees and Costs

By agreement, the parties had deferred claims as to attorneys' fees until after the resolution of the merits. On September 6, 2013, KC Live filed a Motion For An Award Of Attorneys' Fees And Litigation Costs, along with its supporting points and authorities. *See* ECF 122. The exhibits to the motion include the Declaration of Charles Kerr, Esquire, trial counsel for Kansas City Live; detailed billing records as to the time expended in connection with this matter; and records as to the litigation costs.

Mr. Kerr was the primary attorney on the case, but two other attorneys in his office also worked on this matter, along with a legal assistant and the Firm Administrator. They are

Kathleen McDonald, Esquire; Cristina Flores, Esquire; paralegal Peggy Putman; and Theresa Otto, Firm Administrator.

In particular, in ECF 122, Kansas City Live sought attorneys' fees for three lawyers and one legal assistant, in the amount of $295,942.50, through August 31, 2013, as well as litigation expenses in the amount of $27,864.10, for a total of $323,806.60. Neither Bistro nor Ruggeri filed for attorneys' fees, nor did they respond to KC Live's motion for attorneys' fees and costs.

In ECF 127, Kansas City Live sought additional legal fees and costs for the period after August 31, 2013, through October 26, 2013. KC Live also included a request for payment for the time expended by the Firm Administrator, who compiled the billing records. According to KC Live, in that period additional legal fees of $17,591.50 were incurred, and additional expenses accrued, in the sum of $3,129.61, for a combined total of $344,527.71. No response was filed by Bistro or Ruggeri to ECF 127.

Mr. Kerr graduated from law school in 1974. His bills reflect an hourly billing rate of $315 per hour, which is in the middle of the hourly rate range of $275 to $400, as set forth in this Court's guidelines for persons admitted to the Bar for 15 years or more. *See* Appendix B: Rules And Guidelines For Determining Attorneys' Fees In Certain Cases, § 3.d. Ms. McDonald has been a member of the Maryland Bar for more than 30 years, and her time was billed at the same rate as for Mr. Kerr. Ms. Flores has been a member of the Maryland Bar for over 20 years, and her time was billed at $200 per hour, which is below the range set forth in this Court's guidelines for an attorney with her level of experience. *See id.* The time of Ms. Putman and Ms. Otto was valued at $90 per hour. Mr. Kerr was the only attorney who appeared at trial for Kansas City Live.

Without question, the amount in dispute was quite substantial. The Court is also aware that this matter was initiated in state court in Missouri, removed to the United States District Court for the Western District of Missouri, and then transferred to the District of Maryland under a forum selection clause in the leases. Thereafter, the parties vigorously litigated Ruggeri's motion to dismiss for lack of personal jurisdiction. That was, however, the only substantive pretrial motion that the parties litigated. Trial consumed approximately eight days and involved pretrial and post-trial briefings. Although the issues were largely fact intensive and not unduly complicated, counsel were required to undertake research of Missouri law.

Section 2602(iii) of each lease provides that, if the Tenant "vacate[s] the Premises" before the Expiration Date, without having paid the full Rent for the remainder of the Term," then the Tenant "shall be liable" for damages, including the Landlord's attorneys' fees. In addition, § 2701 of both leases provides: "Should Landlord file suit against Tenant for any reason, including, but not limited to, a suit for possession of the Premises, payment of Rent, damages, or to enforce or interpret the provisions of this Lease, Tenant shall reimburse Landlord for its reasonable attorneys' fees and cost of litigation."

In a diversity action, such as this one, a parties' right to recover attorneys' fees is "ordinarily governed by state law." *See Ranger Const. Co. v. Prince William County School Board*, 605 F.2d 1298, 1301 (4th Cir. 1979); *Roahn Prods. Int'l, LC v. Sofietel A Corp.*, Civil No. WDQ-06-504, 2010 WL3943747, at *4 n.13 (D. Md. October 7, 2010) ("'In a diversity case, absent a conflicting applicable federal rule of procedure, state law governs not only the actual award of attorneys' fees but also the method of determining those fees.'" (citation omitted)); *Glassman Const. Co. v. Maryland City Plaza, Inc.*, 371 F. Supp. 1154, 1162 (D. Md. 1974). The

leases in dispute in this case were made pursuant to, and were to be governed by and construed in accordance with the laws of Missouri.[1]

Under Missouri law, when a contract provides for payment of attorneys' fees "the trial court must award them to the prevailing party." *Howell v. ARD Services, Inc.*, 941 S.W. 2d 645, 652 (Mo. Ct. App. 1997). The prevailing party is a party who obtains a judgment, regardless of the amount. *See Brooke Drywall of Columbia, Inc. v. Building Construction Enterprises, Inc.*, 361 S.W. 3d 22, 27 (Mo. Ct. App. 2011). However, the amount of such an award is committed to the trial court's discretion. *Mansfield v. Auditorium Bar & Grill, Inc.*, 965 S.W. 2d 262, 268 (Mo. Ct. App. 1998). In exercising its discretion to calculate the reasonable value of legal services, the trial court

> should consider the time spent, nature and character of services rendered, nature and importance of the subject matter, degree of responsibility imposed on the attorney, value of property or money involved, degree of professional ability required and the result.

*Id.* (quotation marks and citation omitted).

---

[1] In a diversity case, a court applies the choice-of-law rules of the forum state. As to contract actions, Maryland courts ordinarily apply the law of the jurisdiction where the contract was made, under the principal of *lex loci contractus*. *Erie Insurance Exchange v. Haffernan,* 399 Md. 598, 618, 925 A.2d 636, 648 (2007). However, it is not necessarily clear whether the state law that governs an award of attorneys' fees is the law of the forum state or, instead, the law of another state that is applicable to the substantive issues being litigated, under the forum state's choice-of-law rules. *See generally Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786, 796-97 (8th Cir. 2005) ("[O]ur conclusion that the matter of attorney's fees is 'substantive' for purposes of [the *Erie* Doctrine]—such that state rather than federal law governs—does not necessarily establish that the issue of attorney's fees is 'substantive' rather than 'procedural' for purposes of conflict of laws. The two inquiries are distinct.") (citing *Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988)). Here, Maryland is the forum state but, under the choice-of-law provisions, Missouri contract law applies.

The Landlord has analyzed the matter of attorneys' fees under Missouri law, and Bistro and Ruggeri have not challenged that analysis. In any event, Missouri law regarding attorneys' fees does not appear to be materially different from Maryland law. Therefore, I will address both.

Similarly, in Maryland, "[c]ontract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable . . . ." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006). "Even in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Id*. at 207, 892 A.2d at 532; *see Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460, 478 (2004); *SunTrust Bank v. Goldman*, 201 Md. App. 390, 398, 29 A.3d 724, 730 (2011) ("Current law allows a court to grant only those attorneys' fees it finds reasonable."). Thus, "courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010). The "reasonableness of attorney's fees is a factual determination within the sound discretion of the court." *Myers*, 391 Md. at 207, 892 A.2d at 532.

In Maryland, "'[t]he burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Ulico*, 380 Md. at 316, 844 A.2d at 478 (citation omitted). Therefore, the party seeking a fee award must provide "'detailed records'" that specify "'the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged.'" *Rauch v. McCall*, 134 Md. App. 624, 639, 761 A.2d 76, 84 (2000) (citation omitted), *cert. denied*, 362 Md. 625, 766 A.2d 148 (2001). "'[W]ithout such records, the reasonableness, vel non, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.'" *Id.* at 639, 761 A.2d at 85 (citation omitted). To the extent this requirement applies here, KC Live has certainly satisfied its obligation.

10

In Maryland, under a contractual fee-shifting provision in a dispute between private parties over breaches of contract, a court "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8.

MRPC 1.5(a) enumerates eight non-exclusive "factors to be considered in determining the reasonableness of a fee," which are similar to those articulated in *Mansfield*, 965 S.W. 2d 262.[2] They are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

"In order to apply Rule 1.5 to a fee award, a court does not need to evaluate each factor separately" *SunTrust*, 201 Md. App. 401, 29 A.3d at 730; *see Monmouth Meadows*, 416 Md. at 337 n.11, 7 A.3d at 8 n.11.[3] Moreover, when conducting an MRPC 1.5 analysis, a court "should consider the amount of the fee award in relation to the principal amount in litigation. . . .

---

[2] MRPC 1.5(a) is a standard of professional ethics, generally applicable to all attorney-client relationships, which mandates that an attorney "shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."

[3] Indeed, a court need not "make explicit findings with respect to Rule 1.5" at all, or even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Monmouth Meadows*, 416 Md. at 340 n.13, 7 A.3d at 10 n.13.

Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8. And, a "trial court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id.* at 337–38, 7 A.3d at 8.[4]

With respect to the hourly rate, the Fourth Circuit follows the "locality rule," by which "'[t]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.'" *Montcalm Pub. Corp. v. Commonwealth of Virginia*, 199 F.3d 168, 173 (4th Cir. 1999) (citation omitted). Ordinarily, "[e]vidence of the prevailing market rate . . . takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate." *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000).

"In the District of Maryland, this market knowledge is embedded in the Guidelines." *Gonzalez v. Caron*, Civil No. CVD-10-2188, 2011 WL3886979 at *2 (D. Md. September 2, 2011). The Guidelines set forth advisory fee ranges for attorneys based on years of experience. The rates "are intended solely to provide practical guidance to lawyers and judges when requesting, challenging and awarding fees," and "may serve to make the fee petition less onerous by narrowing the debate over the range of a reasonable hourly rate in many cases." Guidelines

---

[4] Cases decided under the lodestar approach, applicable to fee-shifting statutes, can "provide helpful guidance" in contractual fee-shifting cases, *Congressional Hotel*, 200 Md. App. at 505, 28 A.3d at 85, because "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8. A list of factors similar to the list in MRPC 1.5 was enunciated, for use in a lodestar analysis, in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and the so-called "*Johnson* factors" have been adopted for use in lodestar cases by the Fourth Circuit, *see Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978), and in Maryland. *See Friolo v. Frankel*, 373 Md. 501, 522 n.2, 819 A.2d 354, 366 n.2 (2003).

§ 3 n.6. Although the fee ranges are not binding on the Court, the Court generally "presumes that a rate is reasonable if it falls within these ranges." *Gonzales*, 211 WL3886979 at *2.

Kansas City Live's submission carefully addressed the ten litigation-phase categories set forth in Rule 1.b of Appendix B. As noted, the amount at stake in this case was considerable, although the legal issues were not unduly complex. According to Mr. Kerr, the case was "ably and aggressively litigated by Bistro's counsel." ECF 122 at 13. That is equally true with respect to Kansas City Live's counsel.

In my view, Mr. Kerr's expenditure of time generally appears reasonable, and consistent with the substantial amount at stake. The time expended by his legal assistant and his associate was also generally reasonable. However, in my discretion, I will not award fees sought for time expended by Ms. McDonald or Ms. Otto. Moreover, in regard to two instances, discussed below, I will reduce the request sought by Kansas City Live.

The invoice of December 31, 2011 (Bates No. F000143-50) reflects a charge of two hours of work by Mr. Kerr, valued at $630.00, in regard to an email to opposing counsel and a status letter to the court. A status letter was filed by Mr. Kerr on December 9, 2011 (ECF 48), which is quite simple. In my view, two hours seems excessive. Therefore, I will allow compensation for one hour.

With respect to the invoice of March 31, 2012 (Bates No. F000126-32), the invoice reflects an expenditure of 3.9 hours by Mr. Kerr, valued at $1,228.50, and 7 hours of work by Ms. Flores, valued at $1,848.50. The work was in connection with a draft motion for default and to dismiss, as well as a draft status letter to the court. Presumably, this work was prompted by a motion filed by Bistro's former counsel to withdraw, filed on January 10, 2012 (ECF 51). I granted that motion on February 13, 2012 (ECF 53). Kansas City Live submitted a status report

on February 28, 2012 (ECF 55), which consisted of one paragraph. The motion for default was never filed and, in my view, it would be unreasonable to charge Bistro and Ruggeri for it. Therefore, I will award fees of two hours for Mr. Kerr, valued at $630.00, and will not award any of the fees for Ms. Flores.

Accordingly, Kansas City Live is entitled to attorneys' fees in the amount of $306,003.52 and litigation expenses in the amount of $30,993.70.

For the foregoing reasons, I will enter Judgment in favor of Kansas City Live and against Bistro and Ruggeri, in the amount of $2,609,959.62; I will award prejudgment interest in the amount of $1,077,164.06; I will award attorneys' fees to Kansas City Live in the amount of $306,003.52; and I will award litigation expenses to Kansas City Live in the amount of $30,993.70.

A separate JUDGMENT, consistent with this Memorandum, follows.


November 26, 2013                              /s/
Dated                                   Ellen Lipton Hollander
                                        United States District Judge